1  HOWARD E. COLE
   California Bar No. 91707
2  hcole@lrlaw.com
   SUZANNE L. MARTIN
3  California Bar No. 210613
   smartin@lrlaw.com
4  LEWIS AND ROCA LLP
   3993 Howard Hughes Pkwy., Ste. 600
5  Las Vegas, Nevada 89169
   (702) 949-8200
6  (702) 949-8398 (fax)

7  Attorneys for the Defendant

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11

12  LOU RAMONDETTA,                    Case No. C08-01002 EDL

13                    Plaintiff,       **Declaration of Suzanne L. Martin** *in*
                                       *support of* **Motion to Strike Plaintiff's**
14  vs.                                **Opposition to Konami's Motion to**
                                       **Compel Arbitration**
15  KONAMI, et al., Konami,
                                       Hearing Date: August 19, 2008
16                    Defendant.       Hearing Time: 9:30 a.m.
                                       [pending approval]
17
                                       [*filed contemporaneously herewith*: Motion
18                                     to Strike; Motion for an Order Shortening
                                       Time; Proposed Order re: OST; and Master
19                                     Certificate of Service]

20

21     I, Suzanne L. Martin, declare as follows:

22     1.     The following facts are within my personal knowledge and, if called to testify, I

23  could testify competently to them.

24     2.     I am counsel for Defendant Konami Gaming, Inc. ("Konami") in this matter and

25  am filing this declaration in support of a Motion to Strike Plaintiff's Opposition to Konami's

26  Motion to Compel Arbitration ("Motion").

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

27

28            DECLARATION OF SUZANNE L. MARTIN
                            1

3.      On July 8, 2008, this Court entered an Order requiring that Plaintiff Lou Ramondetta ("Ramondetta") serve and file his Opposition to Konami's Motion to Compel Arbitration ("Opposition") no later than July 29, 2008.

4.      On July 30, 31, and August 1, 2008, I had my secretary, Laura Sliwinski, call the Court and Magistrate Judge Laporte's judicial assistant to determine whether Ramondetta had filed an Opposition to Konami's Motion to Compel Arbitration.  On each of these days, it was reported to her that no Opposition had yet been received by the Court or filed by Ramondetta.

5.      I received a copy of Ramondetta's Opposition via U.S. mail on August 1, 2008. The Opposition arrived in a manila envelope postmarked July 30, 2008.

6.      Our offices checked the Court's docket on PACER online on August 5, 2008. The Court's docket did not reflect that Ramondetta's Opposition had been filed with the Court. Our offices also called the Court on August 5, 2008, to determine if it had received Ramondetta's Opposition.  The Court has still not received the Opposition.

7.      Konami filed its Motion to Strike Ramondetta's Opposition on August 5, 2008. Some of the cases cited in Konami's Motion are not officially published.

8.      Therefore, in compliance with Cir. Rule 36-3(d), true and correct copies of the unpublished decisions cited in Konami's Motion are attached hereto.  The cases, as they appear in order in the motion are:

    a.  *Jefferson v. County of Napa*, No. C 03-5031, 2007 U.S. Dist. LEXIS 92009 (N.D. Cal. Dec. 14, 2007), Exhibit 1;

    b.  *Woodfin Suite Hotels, LLC v. City of Emeryville*, No. C 07-1719, 2007 U.S. Dist. LEXIS 44079 (N.D. Cal. June 7, 2007), Exhibit 2;

    c.  *Miller v. Best Lock Corp.*, No. 89-35790, 1990 U.S. App. LEXIS 20567 (9th Cir. Oct. 1, 1990), Exhibit 3;

    d.  *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C-95-3577, 1996 U.S. Dist. LEXIS 11696 (N.D. Cal. July 24, 2006), Exhibit 4;

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

DECLARATION OF SUZANNE L. MARTIN
2

C08-01002 EDL
430758.1

1        e.  *Espinoza v. Astrue*, No. C 07-3115, 2008 U.S. Dist. LEXIS 31654 (N.D. Cal.

2            March 26, 2008), Exhibit 5.

3        I declare under penalty of perjury under the laws of the United States of America,

4   including 28 U.S.C. § 1746, that the foregoing is true and correct based upon my personal

5   knowledge.

6        Executed on this 5th day of August, 2008.

7

8   _____
                        Suzanne L. Martin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Lewis and Roca LLP
993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada  89169

27

28

DECLARATION OF SUZANNE L. MARTIN
3

C08-01002 EDL
430758.1

# EXHIBIT 1

LEXSEE 2007 U.S. DIST. LEXIS 92009

**PETER JEFFERSON, as guardian ad litem for VLADIMIR JEFFERSON, Plaintiff, v. COUNTY OF NAPA, and COUNTY OF NAPA CHILD PROTECTIVE SERVICES, Defendants.**

No. C 03-5031 SI

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 92009*

**December 14, 2007, Decided**
**December 14, 2007, Filed**

**PRIOR HISTORY:** *Jefferson v. County of Napa, 2007 U.S. Dist. LEXIS 84690 (N.D. Cal., Nov. 5, 2007)*

**COUNSEL:** [*1] For Peter Jefferson, as Guardian ad Litem for Vladimir Jefferson, Plaintiff: Russell Alan Robinson, LEAD ATTORNEY, Law Office of Russell A. Robinson, APC, San Francisco, CA.

For County of Napa, County of Napa Chiled Protective Services, Defendants: Gary M. Lepper, Lepper & Harrington, Walnut Creek, CA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER GRANTING DEFENDANTS' MOTION FOR ISSUE PRECLUSION SANCTIONS; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On November 30, 2007, the Court heard argument on defendants' motion for summary judgment and defendants' motion for issue preclusion. For the reasons set forth below, the Court GRANTS defendants' motion for issue preclusion sanctions and GRANTS defendants' motion for summary judgment.

**BACKGROUND**

**I. Factual background**

On September 16, 2002, at about 11:30 a.m., an unnamed woman called the Napa Emergency Women's Services ("NEWS") domestic violence hotline to report the suspected domestic abuse of her neighbor, Goldie Jefferson. Faruqui Decl., Ex. A at 1. The caller said that she had become close with Mrs. Jefferson because their children played together, and that Mrs. Jefferson had told her about abuse by her husband, Peter. [*2] *Id.* at 2. The caller also reported that she felt the domestic violence was severe and believed that the couple's then eight-year-old son, Vladimir, had witnessed it. *Id.* She had heard Vladimir whisper to his mother, "Please smile, I don't want them to know you were kicked." *Id.*

The hotline worker made a written "Suspected Child Abuse Report" to Napa County Child Protective Services ("CPS") that day. *Id.* A CPS intake worker completed an Intake Screening Form, noting on the "Screener Alerts" line: "Domestic Violence/Bulgarian family, limited English." Seely Decl., Ex. D at 1. CPS caseworker Denise Seely ("Seely") reviewed the Intake Screening Form. Seely Decl. P 2. Seely's supervisor also reviewed the form, classified the abuse as "potentially substantial," and directed Seely to conduct an in-person investigation. *Id.* Seely prepared an "Emergency Response Referral Information" form, and classified the "abuse category" as "substantial risk," and checked the "10-day" referral box. *Id.* P 3, Ex. E.

On September 24, 2002, at 2:30 p.m., Seely went to St. John's Lutheran School to talk to Vladimir. Seely

Case 3:08-cv-01002-EDL    Document 74-2    Filed 08/05/2008    Page 3 of 34

Page 2
2007 U.S. Dist. LEXIS 92009, *2

Decl. P 4. Seely spoke with St. John's Office Manager, Cynthia Zeller, and asked for permission [*3] to speak to Vladimir. Zeller Decl. P 5. Zeller has submitted a declaration which states,

> As the office manager, I am familiar with the school's practice concerning requests for interview by representatives of the Napa County Child Protective Services Department ("CPS"); I was so familiar on September 24, 2002.

> The practice was that CPS was regarded as a quasi-law enforcement agency with which the school would cooperate. Specifically, if a CPS representative were to ask to speak with a student, then permission would be granted unless some peculiar difficulty or impediment existed. Thereafter, if a student were to ask for me to be present during the interview, I would attend. Once I was satisfied that the child was comfortable enough for the interview to proceed, then a private room would be located so that the conversation could be confidential.

> In the approximate half-dozen instances of CPS representatives' requests for student interviews during the 18 months prior to September of 2002, no student declined to be interviewed or requested the presence of an adult in addition to the CPS representative.

> On September 24, 2002, CPS representative Denise Seely came to the school and asked for permission [*4] to speak with Vladimir Jefferson. She told me that she needed to speak with Vladimir but did not tell me why.

> I called by intercom to the third grade classroom and asked for Vladimir to come to the office. St. John's Lutheran School (preschool-8) is small and students regularly come to the office, without adult accompaniment, for diverse reasons.

> I was acquainted with Vladimir and

he with me. When he arrived, he did not seem upset or uncomfortable.

> I recall introducing Ms. Seely and telling Vladimir that she would like to speak with him. I asked if he was willing to speak with her and, if so, whether he wanted me to be present. Vladimir was very relaxed -- generally, he is a very self-confident boy -- and said that he did not.

> I was satisfied that Vladimir was neither intimidated nor nervous. If he had seemed so, I would have asked again if he wanted me to be with him.

> I led Ms. Seely and Vladimir to a private office, where they spoke for a short time.

> When the interview was over, Vladimir returned to the school office. In my opinion, he was unchanged (i.e. he was not upset, agitated or the like) and seemed very blasé about the experience.

> I told Vladimir to return to his third grade classroom. [*5] Ms. Seely then left.

Zeller Decl. PP 2-12.

The parties agree that Seely's interview of Vladimir lasted approximately one half-hour. Seely Decl. P 6; Jefferson Decl. P 5. [1] During the interview, Vladimir stated: that he lives with his mother, father, and two chickens; that he is in the third grade; that he is good at math and social studies; that he has friends at school; and that after school he does homework, watches TV or plays in the park. Seely Decl., Ex. F at 1 (9/24/02 entry). He stated that "he hardly ever gets caught doing something wrong," so he rarely gets in trouble. *Id.* When he does get in trouble he gets a time out, is not allowed to watch TV, or has his toys taken away. *Id.* He said that he is not hit by his parents, and that there is no hitting in his family. *Id.*

> 1    As discussed *infra,* plaintiff resubmitted the July 21, 2004 declaration of Peter Jefferson in opposition to the current motion for summary judgment.

Vladimir asked Seely why she had chosen to question him. *Id.* She replied that the purpose of CPS is to make sure kids are safe. *Id.* She told him that CPS "had received information that someone heard hitting going on in his home, so she wanted to check with him to find [*6] out what was happening and if he was safe." *Id.* Vladimir said again that there is no hitting in his family, and stated: "My home is the safest place for me." *Id.* Seely asked if he had numbers he could call if something happened that scared him, and he said that he could go to a neighbor, but he did not need to because he is safe at home. *Id.* He did not ask any other questions. *Id.* Seely gave him her business card and thanked him. *Id.* He went back to class. *Id.*

According to Seely's Investigation Narrative, Seely called the Jefferson home on September 25, 2002 and left a message on the answering machine. *Id.* Ex. F at 1 (9/25/02 entry). On September 30, 2002, Seely again called the Jefferson home and spoke to Peter Jefferson. *Id.* at P 7. Seely reported that Mr. Jefferson "was extremely agitated and upset that Vladimir had been interviewed without his permission. I explained the purpose of my visit, that direct conversation was necessary and that CPS was obliged to investigate such reports." *Id.* On October 1 and 9, 2002, Seely left messages on the Jefferson's machine asking to meet with Mr. and Mrs. Jefferson. *Id.* P 8. She never met with the Jeffersons. *Id.* 9. Seely closed the file on October [*7] 14, 2002, concluding that the allegation of abuse was "inconclusive" and "that no further CPS intervention was practical." *Id.*, Ex. F at 3 (10/14/02 entry).

According to Mr. Jefferson's July 2004 declaration, Vladimir's academic performance dropped after the CPS interview, and he appeared unusually nervous and secretive. Jefferson Decl. P 4, 6. Mr. Jefferson states that Vladimir was "unusually reluctant" to discuss the CPS interview with him. *Id.* P 5. According to Mr. Jefferson,

> Vladimir "told me that a woman took him out of class and asked him 'Are you punished sometimes when you misbehave?' Vladimir indicated that the meeting had been very brief. I later learned that he had been out of the classroom and in this meeting for approximately one half-hour. He has not told me what else was said during this meeting.

*Id.* As discussed in greater detail below, Vladimir has never been deposed in this case and has never submitted a declaration. Accordingly, the record does not contain Vladimir's account of the CPS interview.

## II. Procedural background

On November 12, 2003, Peter Jefferson filed this action on behalf of his son, Vladimir, alleging claims for violation of Vladimir's civil rights, false [*8] imprisonment and negligence. By order filed August 13, 2004, the Court granted summary judgment in favor of defendants. The Court held, *inter alia,* that assuming Seely's interview of Vladimir was a seizure under the *Fourth Amendment,* that the seizure was reasonable based upon the evidence presented. [2] The Court also granted summary judgment in favor of defendants on Vladimir's claims for false imprisonment and negligence. Plaintiff appealed this Court's decision, and by memorandum decision filed March 13, 2007, a divided Ninth Circuit panel reversed.

> [2] In connection with the first motion for summary judgment, defendants filed a declaration from Ms. Seely, as well as the Suspected Child Abuse Report, Emergency Response Referral Information form, Intake Screening Form, and Seely's Investigation Narrative. *See* Docket No. 10. Plaintiff filed a declaration from Peter Jefferson. In support of the instant motion for summary judgment, defendants filed a new declaration from Ms. Seely, all of the same forms and reports mentioned above, a declaration from St. John's Office Manager Cynthia Zeller, and a declaration from Alvina Tipton, who was the interim principal at St. John's at the time of [*9] the CPS interview.

The majority held,

> The evidence shows that Vladimir was removed for questioning from his classroom in a private school without a warrant. The removal was at the behest of and pursuant to an assertion of authority by a Napa County Child Protective Services worker. The evidence leaves no doubt that Vladimir was detained for questioning, at least temporarily, and the County has not come forward with any

Case 3:08-cv-01002-EDL    Document 74-2    Filed 08/05/2008    Page 5 of 34

Page 4
2007 U.S. Dist. LEXIS 92009, *9

evidence that the questioning was pursuant to a valid consent by Vladimir, or to any consent by his parents or the school authorities. The County had the burden of coming forward with evidence of that. Moreover, absent consent, the County had the burden of coming forward with evidence to show the reasonableness of its actions under the circumstances. It did not do so.

We hasten to add that we are not deciding that the detention of Vladimir was without consent; nor are we deciding that it was not reasonable. Our determinations are based on the undeveloped record at summary judgment, and are not meant to establish any facts as the law of the case.

Memorandum Decision at 2-3 (internal citations and footnotes omitted). The dissent disagreed and found that the County had produced [*10] sufficient evidence of reasonableness.

On remand, defendants sought to take Vladimir's deposition in order to develop a fuller record. Plaintiff objected to the deposition, asserting that Vladimir's testimony was irrelevant for a number of reasons. By order filed June 22, 2007, the Court granted defendants' request to take Vladimir's deposition. The Court found that defendants were entitled to take Vladimir's deposition in light of the "Ninth Circuit's explicit direction that the factual record be developed on remand as to the issues of consent and the reasonableness of defendants' actions under the circumstances." June 22, 2007 Order at 1-2. [3]

> 3 There is no dispute that the only witnesses to the events surrounding the CPS interview of Vladimir are Vladimir, the CPS social worker, Denise Seely, and St. John's Lutheran School Office Manager Cynthia Zeller.

The County noticed Vladimir's deposition for July 19, 2007. [4] Two days prior to the deposition, plaintiff's attorney cancelled the deposition due to a "prior commitment." The County attempted to contact plaintiff's counsel regarding rescheduling the deposition; after plaintiff's counsel failed to respond either to telephone messages [*11] or a letter, defendants re-noticed the

deposition for August 15, 2007. On August 3, 2007, the Court held a case management conference and ordered that Vladimir's deposition take place by August 15, 2007. See August 3, 2007 Minute Order. The County re-noticed Vladimir's deposition for August 15, 2007. On August 14, plaintiff's counsel cancelled the deposition, informing defense counsel by email that "Mr. Jefferson informed me that neither he nor his son will be able to make the deposition tomorrow. I will call you to discuss when I am by phone. The deposition cannot proceed tomorrow as scheduled." The next day, plaintiff's attorney called defense counsel and stated that he would ask his client for alternate dates. Plaintiff's counsel then failed to communicate with defendants for two weeks, prompting defendants to seek relief from the Court.

> 4 The facts surrounding Vladimir's deposition are contained in the parties' letter briefs. See Docket Nos. 47, 48, 50-55, and 57.

By order filed September 4, 2007, the Court issued a further order regarding Vladimir's deposition. The Court found that plaintiff had provided no explanation for the last minute cancellations, or for counsel's failure [*12] to communicate with defendants regarding rescheduling the deposition. Instead, plaintiff had simply repeated many of the arguments that the Court previously rejected regarding why Vladimir should not be deposed. The Court also noted that plaintiff stated that Peter Jefferson was "receiving treatment for cancer," and thus unable to attend a deposition of his son. In the September 4, 2007 order, the Court directed plaintiff to file a declaration from Mr. Jefferson's treating physician regarding the nature of Mr. Jefferson's treatment, including the type of treatment, its duration, and when Mr. Jefferson could be expected to attend a deposition. The Court also directed plaintiff to file a supplemental letter brief regarding whether there were any individuals (such as other relatives) who could attend Vladimir's deposition in lieu of Mr. Jefferson. Finally, the Court cautioned plaintiff that the failure to comply with the September 4, 2007 order, or any further orders of the Court, would result ink sanctions which could include issue preclusion.

After receipt of plaintiff's filings in response to the September 4, 2007 order, the Court issued a further order regarding Vladimir's deposition [*13] on September 25, 2007. The Court found plaintiff's response deficient because none of the information provided established that Mr. Jefferson was unable to attend a deposition of his

son. The Court also noted that plaintiff's counsel had asserted, without any explanation, that there were no other adults who could attend Vladimir's deposition in Mr. Jefferson's stead. The Court ordered that Vladimir's deposition take place no later than October 12, 2007, with or without the presence of Mr. Jefferson. 5 The order also stated that the Court would not countenance any further delays of Vladimir's deposition, and the Court informed plaintiff that "the failure to comply with this order will result in issue preclusion sanctions." September 25, 2007 Order at 2. The Court modified the pretrial schedule in order to accommodate the delay in taking Vladimir's deposition. *Id.*

> 5 In its June 22, 2007 order, the Court rejected plaintiff's assertion that the deposition should not proceed because it would traumatize Vladimir because he is a minor. The Court noted that Vladimir is now 13 years old, represented by counsel, and that while a deposition is stressful, it is not an inherently traumatic experience. [*14] The Court also informed plaintiff that he could contact the Court during the deposition if any issues arose.

Immediately after the issuance of the September 25, 2007 order, defendants contacted plaintiff's counsel by telephone and email to schedule Vladimir's deposition. Defendants' Motion for Issue Preclusion, Ex. A. After receipt of plaintiff's counsel's schedule, defendants noticed the deposition for October 11, 2007, the only date on which plaintiff's counsel was available prior to the October 12, 2007 deadline. *Id.* Ex. B, C. On October 8, 2007, plaintiff's counsel informed defendants that Mr. Jefferson "will not be able to produce his son" for deposition. *Id.* Ex. D. Plaintiff's counsel did not provide any explanation for the cancellation.

On October 12, 2007, defendants filed a motion for summary judgment, and a motion for issue preclusion based on plaintiff's failure to appear for his deposition. Both motions were scheduled for a hearing on November 30, 2007. Plaintiff did not file oppositions to the motions, which were due no later than November 9, 2007. At 11:44 p.m. on November 29, 2007, plaintiff filed a "Declaration in Opposition to Motion for Issue Preclusion and Summary [*15] Judgment," signed by plaintiff's counsel. Plaintiff's counsel attached to his declaration a declaration from Peter Jefferson dated July 21, 2004, which was filed in opposition to defendants' first motion

for summary judgment. At the November 30, 2007 hearing, plaintiff's counsel provided no explanation for his failure to timely file opposition papers, instead asserting -- without any authority -- that he was not required to file an opposition because plaintiff's position was clear based upon all previous filings in this case. 6

> 6 Plaintiff's counsel also asserted that he was not required to follow *Civil Local Rule 7-3*, which requires that oppositions be filed no less than 21 days before the hearing date, because *Federal Rule of Civil Procedure 56* permits oppositions to be filed at any time. This assertion lacks merit. *Rule 56* states that a party opposing summary judgment "may serve opposing affidavits before the hearing." *Federal Rule of Civil Procedure 83* authorizes district courts to adopt local rules governing practice so long as those rules are consistent with federal statutes and rules. *Civil Local Rule 7-3* is consistent with *Rule 56*, and accordingly all parties and counsel are [*16] required to comply with the briefing schedule set forth in the local rules.

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in *Rule 56*, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*.

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. [*17] *See T.W. Electric, 809 F.2d at 630-31* (citing *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); Ting v. United States, 927 F.2d 1504, 1509 (9th Cir. 1991).* The evidence presented by the parties must be admissible. *Fed. R. Civ. P. 56(e).* Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).* Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc., 626 F.2d 759, 762-63 (9th Cir. 1980).*

## DISCUSSION

### I. Defendants' motion for issue preclusion

As a result of plaintiff's repeated failure to appear for his deposition in violation of numerous court orders, defendants seek issue preclusion on the following: (1) any contention that either Ms. Zeller or Vladimir did not consent to the interview, (2) any contention that Vladimir's participation in the interview was a result of fraud, deceit or duress, (3) any contention concerning Vladimir's physical or emotional condition during or after the interview, and (4) plaintiff's claim for negligent infliction [*18] of emotional distress since the lack of Vladimir's deposition precludes any exploration of Vladimir's subjective reaction to the interview or his emotional distress as a result. As noted above, plaintiff did not' timely file an opposition to defendants' motion. Instead, plaintiff's counsel filed a declaration approximately 9 hours before the hearing, without seeking leave of Court to do so. Counsel did not provide any explanation regarding why he did not file the declaration by the deadline, and accordingly the Court STRIKES the untimely filing. (Docket No. 75). [7]

> 7    The Court notes, however, that even if the Court considered Mr. Robinson's declaration, plaintiff's counsel does not provide any explanation for the failure to produce Vladimir for deposition on October 11, 2007. Mr. Robinson also asserts that defendants unilaterally cancelled depositions of defense witnesses. The Court notes that plaintiff never sought relief from this Court regarding any alleged discovery misconduct by defendants.

The Court will consider the July 21, 2004 declaration of Peter Jefferson, which was attached to the November 29, 2007 Robinson Declaration,

because that declaration was originally filed in 2004 [*19] and is already part of the record.

*Federal Rule of Civil Procedure 37* authorizes the Court to impose issue preclusion sanctions for a party's failure to comply with discovery orders and failure to appear for a noticed deposition. *See Fed. R. Civ. Proc. 37(b)(2)(A)-(B), (d).* As discussed in detail above and in the Court's several orders regarding Vladimir's deposition, plaintiff [8] has repeatedly cancelled his deposition at the last minute, without providing reasons for doing so. The Court has warned plaintiff several times that the failure to appear for his deposition would result in issue preclusion sanctions. Plaintiff has not provided any explanation for the most recent cancellation; the Court ordered Vladimir to appear for his deposition with or without his father, and thus Mr. Jefferson's health cannot provide a justification. Accordingly, the Court GRANTS defendants' motion for issue preclusion, which is fatal to plaintiffs' claims. As discussed below, however, even if the Court did not impose issue preclusion sanctions and evaluated the record as a whole, the Court finds that plaintiff's claims fail and defendants are entitled to summary judgment.

> 8    The Court recognizes that the [*20] cancellations appear to have been requested by plaintiff's father, Mr. Jefferson.

### II. Defendants' motion for summary judgment

#### A. § 1983 claim

The Ninth Circuit reversed and remanded for an assessment, on a fuller evidentiary record, of whether the "questioning was pursuant to a valid consent by Vladimir, or to any consent by his parents or the school authorities" or, absent consent, whether the County's actions were reasonable under the circumstances. Defendants contend that the record, now supplemented by declarations from Ms. Zeller and Ms. Tipton, establishes that the interview of Vladimir was pursuant to consent, and also that the County's actions were reasonable.

The Court finds that the evidence shows that school authorities consented to the interview of Vladimir. The Zeller and Tipton declarations state that it was St. John's practice to cooperate with CPS, and that if a CPS representative were to ask to speak with a student, "permission would be granted unless some peculiar difficulty or impediment existed." Zeller Decl. P 3;

Tipton Decl. P 4. Ms. Zeller states that she asked Vladimir if he was willing to speak to Ms. Seely, and, if so, whether he wanted Ms. Zeller to be present. [*21] Zeller Decl. P 8. Zeller states, "Vladimir was very relaxed -- generally, he is a very self-confident boy -- and said that he did not." *Id.* Ms. Zeller states that she "was satisfied that Vladimir was neither intimidated nor nervous," and that "[i]f he had seemed so, I would have asked again if he wanted me to be with him." *Id.* P 9. Similarly, Ms. Seely states, "[g]iven the choice of being interviewed in private or in the company of school employee Cynthia Zeller, Vladimir said that he was comfortable talking alone with him." Seely Decl. P 5. The only evidence submitted by plaintiff--Peter Jefferson's July 21, 2004 declaration -- does not contradict defendants' evidence regarding consent.

The Court further finds that the County's actions were reasonable. The CPS interview was in response to information about potentially severe domestic violence in the Jefferson home. The decision to interview was made by a CPS representative statutorily vested with the discretion to make such a determination, and the interview itself was authorized by statute. The interview was conducted by a CPS worker, and took place at Vladimir's school during school hours. The CPS worker gave Vladimir the choice of [*22] being interviewed in private or with another adult present, and he said that he was comfortable talking to her alone. The interview lasted one half-hour, addressed typical topics for a third-grader, like his favorite subjects and after-school activities, and broached the issue of violence at home in terms of "hitting." The Court finds nothing in the record to suggest that CPS worker Seely conducted the interview in an aggressive or invasive manner. Summary judgment is proper if "it is clear that no reasonable jury could conclude that the plaintiff's constitutional rights were violated." *Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 200)*. Based on all these circumstances, the Court finds that no reasonable jury could conclude that plaintiff's constitutional rights were violated and GRANTS summary judgment in favor of defendants.

**B. State claims**

Plaintiff also alleges that defendants committed the torts of false imprisonment and negligent infliction of emotional distress during the CPS interview of Vladimir. State law immunities may shield defendants from liability for state tort claims. Defendants assert that *Cal. Govt.*

*Code § 815* shields them from claims of negligence. However, defendants [*23] are not entitled to immunity for "non-discretionary actions or [] at least some intentional torts committed in the course of making the investigation, such as battery and false imprisonment." *Wallis, 202 F.3d at 1145, citing Newton v. County of Napa, 217 Cal.App.3d. 1551, 1561, 266 Cal. Rptr. 682 (1990)* ("[T]he immunity surrounding the decision to make an in-person response . . . does not exclude the possibility of tortious conduct in making the investigation."). Thus, defendants are protected from state tort liability for their decision to undertake an in-person response to the allegation, but they are not statutorily immune for the alleged torts of false imprisonment or negligent infliction of emotional distress.

Defendants contend that they are entitled to summary judgment on plaintiff's false imprisonment claim because Vladimir's interview was specifically authorized by *California Penal Code § 11174.3*, and thus any restraint on his liberty was lawful. The Court agrees. False imprisonment is "the unlawful violation of the personal liberty of another." *Cal. Penal Code § 236*. "Unlawful" means "without authority." *Barrier v. Alexander, 100 Cal.App.2d 497, 224 P.2d 436 (1950)*. Here, defendants had statutory authority [*24] to conduct the interview. [9] Further, the record shows that Vladimir agreed to speak with CPS worker Seely. The interview lasted half an hour, and at no time was Vladimir's personal liberty constrained in any unlawful way. Thus, this claim fails, and summary judgment is appropriate.

> [9] The Court defers to CPS's assessment that the allegation of Vladimir's exposure to severe domestic violence constituted child abuse or neglect worthy of investigation.

Defendants also argue that because CPS's conduct comported with the law, it cannot have been negligent. The tort of negligent infliction of emotional distress is actually the tort of negligence; "the traditional elements of duty, breach, causation, and damages apply." 6 Witkin Summary of Cal. Law (9th ed. 1988) Torts § 838. When Seely undertook the interview of Vladimir, she assumed a duty -- to act with reasonable care. The evidence shows that Seely never breached that duty. There are simply no facts to support plaintiff's theory of negligence. Accordingly, the Court also GRANTS defendants' motion as to this claim.

**CONCLUSION**

2007 U.S. Dist. LEXIS 92009, *24

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion for issue preclusion [*25] and GRANTS defendants' motion for summary judgment. (Docket Nos. 63 and 64).

**IT IS SO ORDERED.**

    Dated: December 14, 2007

    /s/ Susan Illston

    SUSAN ILLSTON

    United States District Judge

**JUDGMENT**

Defendants' motions for issue preclusion sanctions and for summary judgment have been granted. Judgment is entered accordingly.

**IT IS SO ORDERED AND ADJUDGED.**

    Dated: December 14, 2007

    /s/ Susan Illston

    SUSAN ILLSTON

    United States District Judge

**EXHIBIT 2**

FOCUS - 3 of 8 DOCUMENTS

**WOODFIN SUITE HOTELS, LLC, Plaintiff, v. CITY OF EMERYVILLE, Defendant.**

**No. C 07-1719 SBA, Related Case No. C 06-1254 SBA**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

*2007 U.S. Dist. LEXIS 44079*

**June 7, 2007, Decided
June 7, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Woodfin Suite Hotels, LLC v. City of Emeryville, 2008 U.S. Dist. LEXIS 5394 (N.D. Cal., Jan. 14, 2008)*
Amended by, Motion to vacate denied by, in part, Motion granted by, in part *Woodfin Suite Hotels, LLC v. City of Emeryville, 2008 U.S. Dist. LEXIS 20306 (N.D. Cal., Mar. 13, 2008)*

**PRIOR HISTORY:** *Woodfin Suite Hotels, LLC v. City of Emeryville, 2007 U.S. Dist. LEXIS 35125 (N.D. Cal., May 2, 2007)*

**COUNSEL:** [*1] For Woodfin Suite Hotels, LLC, Plaintiff: Bruno William Katz, Ronald R. Giusso, LEAD ATTORNEYS, Shea Stokes, ALC, San Diego, CA.

For City of Emeryville, Defendant: Benjamin Louis Stock, LEAD ATTORNEY, Benjamin Daniel Winig, McDonough Holland & Allen PC, Oakland, CA.

**JUDGES:** Saundra Brown Armstrong, United States District Judge.

**OPINION BY:** Saundra Brown Armstrong

**OPINION**

**ORDER**

[Docket No. 13, 34]

Before the Court is defendant City of Emeryville's (Emeryville) motion to dismiss [Docket No. 13].

Emeryville also requests the Court strike plaintiff Woodfin Suite Hotels LLC's (Woodfin) opposition to its motion to dismiss as untimely [Docket No. 34]. After reading and considering the arguments presented by the parties, the Court finds these matters appropriate for resolution without a hearing. *See FED. R. CIV. P. 78*. For the reasons that follow, the motion to dismiss is GRANTED. The Court also **STRIKES** Woodfin's **opposition** [Docket No. 31] as **untimely**.

**BACKGROUND**

On May 2, 2007, the Court ordered Woodfin to show cause why defendant City of Emeryville's motion to dismiss should not be granted based on *Younger* abstention principles. [*2] *See* Docket No. 26. The Court stated that absent some demonstration by Woodfin to the contrary, the Court was persuaded that the *Younger* abstention doctrine applies to this matter, and that Woodfin's amended complaint would have to be dismissed on that basis. Woodfin has complied with this order and filed additional briefing, but it is apparent that the *Younger* abstention doctrine is applicable and that Woodfin's complaint must therefore be dismissed.

**LEGAL STANDARDS**

As the Court explained in the prior order, the *Younger* doctrine espouses a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982); see also Hawaii Housing Auth. v. Midkiff,*

*467 U.S. 229, 237-38, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984)* ("Under Younger-abstention doctrine, interests of comity and federalism counsel federal courts to abstain from jurisdiction whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests"); *Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971).* [*3] "[T]he driving principle behind *Younger* was that in matters of special concern to the states, federal courts should avoid depriving the state courts of the opportunity to adjudicate constitutional issues." *M&A Gabaee v. Community Redevelopment Agency of the City of Los Angeles, 419 F.3d 1036, 1040 (9th Cir. 2005); see also Gilbertson v. Albright, 381 F.3d 965, 975 (9th Cir. 2004)* (federal courts should "avoid unwarranted determinations of federal constitutional law").

"Absent 'extraordinary circumstances', abstention in favor of state judicial proceedings is required if the state proceedings (1) are ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims." *Hirsh v. Justices of Supreme Court of Cal., 67 F.3d 708, 712 (9th Cir. 1995)* (per curiam); *see also Canatella v. California, 404 F.3d 1106, 1109-10 (9th Cir. 2005); San Remo Hotel v. City and County of San Francisco, 145 F.3d 1095, 1103 (9th Cir. 1998).*

If the state court proceedings were undertaken in bad faith or for purposes of harassment, or if some other "extraordinary [*4] circumstances" exist, a district court need not abstain under *Younger*. *Younger, 401 U.S. at 54; Dubinka v. Judges of Superior Court, 23 F.3d 218, 225 (9th Cir. 1994).* An example of "extraordinary circumstances" is when the statute involved is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Younger, 401 U.S. at 53-54.*

## ANALYSIS

### 1. Ongoing State Proceedings

The dispositive issue as to whether there are ongoing state proceedings is whether the state proceedings were underway prior to initiation of the federal proceedings. *See Wiener v. County of San Diego, 23 F.3d 263, 266 (9th Cir. 1994).* The Court noted previously that the state court proceedings have been ongoing since late September 2006, and that this federal action was not

initiated until March 27, 2007.

Woodfin, however, argues that the state court proceedings were not ongoing when its first federal lawsuit was filed. On February 21, 2006, Woodfin filed suit in federal court challenging the constitutionality [*5] of Measure C (C 06-1254 SBA). It was not until September 28, 2006, that several Woodfin employees brought a wage and hour action in state court against Woodfin based on purported violations of Measure C. On November 8, 2006, Woodfin answered the complaint filed in state court. As part of its answer, Woodfin seeks a declaration that Measure C is unconstitutional. To defend the constitutionality of the ordinance, Emeryville intervened in the state action.

In response to a pending summary judgment motion against it in federal court, Woodfin requested that it be allowed to voluntarily dismiss its complaint without prejudice. On January 8, 2007, the Court dismissed the complaint without prejudice.

On March 27, 2007, plaintiff Woodfin initiated a new action against defendant City of Emeryville (C 07-1719 SBA) in federal court. Thus, when the federal proceedings were initiated in this case (C 07-1719 SBA), the state court proceedings were clearly already on-going. Woodfin offers nothing to support its position that a prior dismissed case is the relevant starting point for determining on-going proceedings under the *Younger* doctrine.

Even if the Court were to overlook that this is a [*6] second, distinct action, and find the original case is the proper measure of the initiating of federal proceedings, *Younger* abstention would still be required. *Younger* abstention is required if the state court proceedings were initiated "'before any proceedings of substance on the merits have taken place in federal court.'" *Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 238, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984)* (citing *Hicks v. Miranda, 422 U.S. 332, 349, 95 S. Ct. 2281, 45 L. Ed. 2d 223 (1975)).* "*Hicks* and *Hawaii Housing Authority* establish that *Younger* abstention applies even when the state action is not filed until after the federal action, as long as it is filed before proceedings of substance on the merits occur in federal court." *M&A Gabaee v. Community Redevelopment Agency of the City of Los Angeles, 419 F.3d 1036, 1041 (9th Cir. 2005); see also Polykoff v. Collins, 816 F.2d 1326, 1332 (9th Cir. 1987)* (citations omitted) ("Whether the state proceedings are 'pending' is

Case 3:08-cv-01002-EDL    Document 74-2    Filed 08/05/2008    Page 13 of 34

Page 3
2007 U.S. Dist. LEXIS 44079, *6

not determined by comparing the commencement dates of the federal and state proceedings. Rather, abstention under *Younger* may be required if the state proceedings have been initiated [*7] 'before any proceedings of substance on the merits have taken place in the federal court'"); *Adultworld Bookstore v. City of Fresno, 758 F.2d 1348, 1350 (9th Cir. 1985)* ("The *Younger* doctrine has not been limited, however, to instances where state proceedings have been filed before a federal action").

The first case initiated by Woodfin proceeded to the denial of Woodfin's application for a temporary restraining order. "[A] denial of a temporary restraining order is not considered a proceeding of substance on the merits." *Polykoff, 816 F.2d at 1332*. Emeryville filed a motion for summary judgment, but this was not considered on the merits because Woodfin requested allowance to dismiss its complaint, which was granted.

Thus, even if Woodfin's position that the initiation of the proceedings started with the filing of its previously dismissed case is accepted, it does not change the analysis. Because that case did not proceed beyond the "embryonic stage," the state court proceedings were already on-going for *Younger* purposes.

2. Important State Interests

Woodfin apparently does not dispute that there is an important state interest, [*8] as it has not challenged this prong of the *Younger* test. It also does not contest the important state interests identified by the Court in its May 2, 2007 order.

3. Adequate Opportunity to Raise Federal Claims

Woodfin also makes no argument in its reply that it is procedurally barred from raising the constitutional issues it wishes to press against the validity of Measure C and its associated regulations in state court. It has in fact done so. In its answer in state court, Woodfin asserts a number of affirmative defenses to the City of Emeryville's intervention in that action, including violation of the *due process clauses of the Fifth* and *Fourteenth Amendment* (Tenth Affirmative Defense); that the ordinance is unconstitutional (Thirteenth Affirmative Defense); and that the ordinance is entirely preempted by federal and state law (Fourteenth Affirmative Defense).

Thus, the three elements of determining the applicability of *Younger* abstention are satisfied in this case. Absent a showing of bad faith or extraordinary circumstances, the Court is required to abstain from interfering with the ongoing state proceedings.

4. Bad Faith Exception to *Younger* [*9]

Woodfin contends that the Court should find that the "bad faith" exception to the *Younger* doctrine applies in this case. Woodfin protests that the "Court must not abstain from hearing this matter as the state action and the City's complaint in intervention were brought in bad faith and solely for the purpose of harassing Woodfin." Docket No. 27, at 7-8. Woodfin asserts that Emeryville is biased against it, demonstrated by the City's close alignment with "extremist labor front organizations" and the participation of a City Councilmember in protests at the Woodfin Hotel. *Id.* at 8.

The plaintiff bears the burden to establish that an exception to *Younger* exists. *See Kern v. Clark, 331 F.3d 9, 11 (2d Cir. 2003)* (per curiam); *Phelps v. Hamilton, 122 F.3d 885, 889-90 (10th Cir. 1997)*. For a plaintiff to invoke the bad faith exception, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome. *See Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 199 (2d Cir. 2002)*; *see also Perez v. Ledesma, 401 U.S. 82, 85, 91 S. Ct. 674, 27 L. Ed. 2d 701 (1971)*.

There is nothing persuasive in Woodfin's briefing [*10] to support its assertion that Emeryville intervened in the state action in bad faith and for the sole purpose of harassing Woodfin. Emeryville asserts that it intervened in the state court proceedings because Woodfin was seeking to have one of its ordinances declared unconstitutional. Woodfin points to nothing concrete to cast suspicion on this or to otherwise raise questions about the City's defense of Measure C. Thus, Woodfin has not met its burden to show that the "bad faith" exception to *Younger* applies.

5. Request to Strike the Opposition

Emeryville objects to Woodfin's opposition to its motion to dismiss, arguing that it is untimely and therefore should be stricken. The hearing date for the motion to dismiss is set for June 12, 2007. Local Rule 7-3(a) provides that "[a]ny opposition to a motion must be served and filed not less than 21 days before the hearing date." Emeryville points out that this means Woodfin's opposition was due on May 23, 2007, but was

not filed until May 29th. Emeryville also notes that Woodfin did not request or receive an extension of time to file its opposition.

Woodfin did not request leave to file after the date required by the local [*11] rules. Woodfin has also offered no explanation for its untimely filing. Therefore, the Court will strike Woodfin's opposition [Docket No. 31] pursuant to Local Rule 7-3(a). Under this Court's standing orders, "[t]he failure of the opposing party to file a memorandum of points and authorities in opposition to any motion shall constitute a consent to the granting of the motion." Consequently, because there was no timely-filed opposition, the Court will grant Emeryville's motion to dismiss on this alternative basis as well.

**CONCLUSION**

Accordingly, defendant City of Emeryville's motion to dismiss [Docket No. 13] is GRANTED. Plaintiff Woodfin's complaint is dismissed with prejudice. Defendant Emeryville's request to strike plaintiff Woodfin's opposition to its motion to dismiss as untimely [Docket No. 34] is also GRANTED.

IT IS SO ORDERED.

June 7, 2007

Saundra Brown Armstrong

United States District Judge

# EXHIBIT 3

LEXSEE 1990 U.S. APP. LEXIS 20567

**JOSEPH E. MILLER, JR., Plaintiff-Appellant, v. BEST LOCK CORPORATION and BEST UNIVERSAL LOCK COMPANY, Defendants-Appellees**

**No. 89-35790**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*1990 U.S. App. LEXIS 20567*

**October 1, 1990, Submitted, ** Seattle, Washington**

** The panel finds this case appropriate for submission without oral argument pursuant to 9th Cir. R. 34-4 and Fed. R. App. P. 34(a).

**November 23, 1990, Filed**

**NOTICE:** [*1] THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION AND MAY NOT BE CITED TO OR BY THE COURTS OF THIS CIRCUIT EXCEPT AS PROVIDED BY THE 9TH CIR. R. 36-3.

**SUBSEQUENT HISTORY:** Reported as Table Case at *919 F.2d 145, 1990 U.S. App. LEXIS 24781.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding; D.C. No. CV-88-262-Z.

**JUDGES:** Kozinski, O'Scannlain, and Fernandez, Circuit Judges.

**OPINION**

*MEMORANDUM*

Plaintiff, Joseph E. Miller, Jr., appeals from the district court's grant of summary judgment in favor of defendants, Best Lock Corp. and Best Universal Lock Co. (collectively, "Best Lock"), denial of his motion for leave to amend, grant of defendants' motion to strike his supplemental brief and affidavits, and denial of his motion for reconsideration. We affirm.

*BACKGROUND*

Miller is the assignee of stockholder rights in Best Lock. The stock originally belonged to his grandmother, Lillian B. Richardson. Richardson received the stock in Best Lock by court order after her husband, Guy Stansell, died on January 17, 1937. Although she received the untransferred certificates, Richardson never received dividends, annual reports or proxy statements.

As early as the 1940s, Richardson made inquiries to Best Lock about [*2] transfer of the stock to her. Best Lock refused to transfer the stock. In 1957, Richardson's daughter, Kathleen Miller, made an inquiry, but Best Lock informed her that the stock was in the estate of Richardson's husband. Eventually, all of Richardson's interest in the stock was conveyed to Kathleen Miller, who then conveyed the stock to Miller. Miller was also appointed attorney in fact for Richardson.

Sometime between 1981 and 1983, Best Lock issued new shares to Frank and Edwin Stansell, who were Guy Stansell's children by a prior marriage. In February 1983, Miller made an inquiry to Best Lock. On July 26, 1984, Miller made a demand for the stock. Finally, on July 24, 1986, he filed this action. He asserted a number of claims, of which the relevant ones for this appeal were for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C. § 1962(b), (c),* and *(d),* and conversion under Washington law. The district court had jurisdiction under *18 U.S.C. § 1964(c)* and *28 U.S.C. § 1331.*

The court set a deadline for joining parties of March

5, 1989, a discovery cut-off date of June 2, 1989, and a motions filing date of July 6, 1989. Best Lock filed a motion for [*3] summary judgment. On June 9, 1989, Miller filed a motion for leave to amend his complaint to add the Stansell children as defendants. On the same date, which was after the due date for opposition, he also filed a supplemental brief and affidavits in opposition to the summary judgment motion. Best Lock moved to strike those tardily filed papers.

The district court granted the motion for summary judgment. The court found that all of the claims were barred by the applicable statutes of limitation. The court also granted the motion to strike and denied leave to amend. Miller then filed a motion for reconsideration, which the court denied. Miller filed a timely notice of appeal. *Fed. R. App. P. 4(a)(4)*. We have jurisdiction under *28 U.S.C. § 1291*.

*STANDARDS OF REVIEW*

We review the grant of summary judgment de novo. *Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir. 1989)*, cert. denied, __ *U.S.* __, 110 S. Ct. 3217, 110 L. Ed. 2d 664 (1990). We review the denial of a motion to amend for abuse of discretion. *McGlinchy v. Shell Chemical Co., 845 F.2d 802, 809 (9th Cir. 1988)*. The grant of a motion to strike is reviewed for abuse of discretion, *Wood v.* [*4] *Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1519 (9th Cir. 1983)*, cert. denied, *465 U.S. 1081, 104 S. Ct. 1446, 79 L. Ed. 2d 765 (1984)*, as is the denial of a motion for reconsideration. *Walker v. Bank of America Nat'l Trust and Sav. Ass'n, 268 F.2d 16, 25 (9th Cir.)*, cert denied, *361 U.S. 903, 80 S. Ct. 211, 4 L. Ed. 2d 158 (1959)*.

*DISCUSSION*

1. Grant of Summary Judgment and Denial of Motion for Reconsideration.

Miller appeals from the court's grant of summary judgment on the RICO and conversion claims. The statute of limitations on RICO claims is four years. *Agency Holding Corp. v. Malley-Duff & Assocs. Inc., 483 U.S. 143, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987)*. The period accrues when the plaintiff is aware of or has reason to be aware of the racketeering injury. *Compton v. Ide, 732 F.2d 1429, 1433 (9th Cir. 1984)*. See *Beneficial Standard Life Ins. Co. v. Madariaga, 851 F.2d 271, 275 (9th Cir. 1988)*.

The period commenced before any of Miller's inquiries to Best Lock or the transfer of the stock to the Stansell children. As early as the 1940s, Richardson and her daughter had made numerous inquiries, all of which were rebuffed by Best [*5] Lock. Best Lock made it quite clear that it did not recognize her rights and would not transfer the stock to her. Those responses gave Richardson reason to be aware of the alleged injury. Therefore, the RICO claims are barred. [1]

> [1] Of course, we recognize that the claimed injury actually occurred long before 1970, when the RICO statute was adopted. Organized Crime Control Act of 1970, tit. IX, Pub. L. No. 91-452, 84 Stat. 922, 941-48 (1970).

The limitations period on the conversion claim is three years. *Wash. Rev. Code § 4.16.080(2)* (Supp. 1990). The limitations period runs from a timely demand, but the demand must be made within a reasonable time. *Washington Sec. Co. v. State of Washington, 9 Wash. 2d 197, 114 P.2d 965, 971 (1941)*. Even if Miller's demand were considered to be the triggering event, it was delayed by at least forty years. If earlier contacts are treated as demands, the statute ran long ago. The district court's determination that the demand was not made within a reasonable time was not error. [2] [*6]

> [2] This also answers Miller's claim that the transfer of the stock to the Stansells constituted a new RICO injury which recommenced the statute of limitations. By that time -- indeed, before RICO even came into existence -- the right to recover the stock had been lost, so no new injury was inflicted. See *State Farm Mutual Automobile Ins. Co. v. Ammann, 828 F.2d 4, 5 (9th Cir. 1987)* (as to each RICO injury, the statute of limitations starts to run when the plaintiff "knows or has to reason to know of the injury"). See also *Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 238 (9th Cir. 1987)*.

Thus, the district court properly dismissed those claims. Because the district court was correct in its dismissal of those claims on limitations grounds, it also did not abuse its discretion when it denied the motion for reconsideration.

2. Motion for Leave to Amend.

A motion for leave to amend may be denied when

there is undue delay, prejudice to the opposing party, or futility of amendment. *Foman v. Davis,* [*7] *371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).* The district court denied the motion for leave to amend on those grounds. Denial for those reasons was not an abuse of discretion. Miller was aware of the facts supporting his allegations against the Stansell children at the time the complaint was filed, but delayed until after the deadline for joining parties before seeking amendment. Amendment would prejudice Best Lock, because the motion for leave to amend was filed one month before the discovery cut-off date. Moreover, the amendment would have been futile, because the limitations ground bars the claims against the Stansell defendants as it does the claims against Best Lock. Finally, plaintiff did not show good cause for his late-filed motion. See *Fed. R. Civ. P. 16(b)(1).*

3. Motion to Strike.

The district court did not abuse its discretion when it struck the untimely brief and affidavits. Those documents were filed after the due date for opposition to the summary judgment motion. It was proper to strike them. *Wood, 705 F.2d at 1519.*

*AFFIRMED.*

**EXHIBIT 4**

LEXSEE 1996 U.S. DIST. LEXIS 11696

**ADVANCED CARDIOVASCULAR SYSTEMS, INC., Plaintiff, v. MEDTRONIC, INC., Defendant. MEDTRONIC, INC., Counter-Claimant, v. ADVANCED CARDIOVASCULAR SYSTEMS, INC.; SCHNEIDER (EUROPE) AG; SCHNEIDER (USA) INC.; TASSILO BONZEL; and PAUL G. YOCK, Counter-Defendants.**

**No. C-95-3577 DLJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1996 U.S. Dist. LEXIS 11696; 36 Fed. R. Serv. 3d (Callaghan) 648*

**July 24, 1996, Decided**
**July 24, 1996, FILED**

**DISPOSITION:** [*1] Defendant's counterclaim for interpleader DISMISSED WITH PREJUDICE. Defendant's counterclaim for double patenting DISMISSED WITH PREJUDICE. Defendant's counterclaim for equitable estoppel DISMISSED WITH PREJUDICE. Defendant's counterclaim for inequitable conduct DISMISSED WITH PREJUDICE with respect to Schneider and DISMISSED WITHOUT PREJUDICE with respect to ACS. Defendant's counterclaim for laches and improper delay DISMISSED WITH PREJUDICE. The Court STRIKES WITH PREJUDICE defendant's affirmative defenses for failure to state a claim, equitable estoppel and laches for delay in prosecution, and prosecution history estoppel. The Court STRIKES WITHOUT PREJUDICE defendant's affirmative defenses for invalidity, inequitable conduct, and unclean hands and patent misuse.

**COUNSEL: PLAINTIFF ATTORNEYS:**

Timothy J. Malloy, Edward A. Mas II, David D. Headrick, McAndrews, Held & Malloy, 500 West Madison St., 34th Flr., Chicago, IL.

Leland Hansen, James Haferptepe, McAndrews, Held & Malloy, Citicorp Center, 500 West Madison St., 34th Flr., Chicago, IL.

Richard Abramson, Hope L. Hudson, Heller, Ehrman, White & McAuliffe, 525 University Ave., Ste. 1100, Palo Alto, CA.

**DEFENDANT ATTORNEYS:**

Lynn [*2] J. Grano, William W. Bunting, Robins, Kaplan Miller & Ciresi, 444 Market St., Ste. 2700, San Francisco, CA.

Michael V. Ciresi, Jan M. Conlin, Robins, Kaplan, Miller & Ciresi, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, MN.

Earnest I. Reveal III, Robins, Kaplan, Miller & Ciresi, 600 Anton Blvd., Ste. 1600, Costa Mesa, CA.

Rita Coyle DeMeules, Kevin Conneely, Robins, Kaplan, Miller & Ciresi, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, MN.

Stewart H. Foreman, Jonathan Polland, Landels, Ripley & Diamond, LLP, 350 The Embarcadero, San Francisco, CA.

Donald L. Rhoads, Leora Ben-Ami, John E. Kidd, Rogers & Wells, 200 Park Ave, New York.

**JUDGES:** D. Lowell Jensen, United States District Judge

**OPINION BY:** D. Lowell Jensen

**OPINION**

1996 U.S. Dist. LEXIS 11696, *2; 36 Fed. R. Serv. 3d (Callaghan) 648

## ORDER

On July 10, 1996, the Court heard argument on a motion to deny interpleader and to dismiss counterclaims brought by counterdefendants Schneider (Europe) AG and Schneider (USA) Inc. and joined by counterdefendant Tassilo Bonzel; a motion to dismiss for lack of personal jurisdiction brought by counterdefendant Tassilo Bonzel; and a motion to strike affirmative defenses and dismiss counterclaims brought by plaintiff Advanced Cardiovascular [*3] Systems, Inc. and counterdefendant Paul G. Yock. Timothy J. Malloy, David D. Headrick, and Edward A. Mas II of McAndrews, Held & Malloy and Hope L. Hudson of Heller, Ehrman, White & McAuliffe appeared on behalf of plaintiff Advanced Cardiovascular Systems, Inc. and counterdefendant Paul G. Yock; John E. Kidd, Donald L. Rhoads, and Leora Ben-Ami of Rogers & Wells and Jonathan Polland of Landels, Ripley & Diamond appeared for counterdefendants Schneider (Europe) AG, Schneider (USA) Inc., and Tassilo Bonzel; Michael V. Ciresi, Ernest I. Reveal III, and Lynn J. Grano of Robins, Kaplan, Miller & Ciresi appeared on behalf of defendant Medtronic, Inc.

Having considered the arguments of counsel, the papers submitted, the applicable law, and the record in this case, the Court hereby dismisses with prejudice defendant's counterclaims for interpleader, double patenting, equitable estoppel, and laches and improper delay. Defendant's counterclaim for inequitable conduct against Schneider (Europe) AG and Schneider (USA) Inc. is dismissed with prejudice; however, the inequitable conduct counterclaim against plaintiff is dismissed without prejudice. The Court strikes with prejudice defendant's affirmative [*4] defenses for failure to state a claim, equitable estoppel and laches for delay in prosecution, and prosecution history estoppel. The Court strikes without prejudice defendant's affirmative defenses for invalidity, inequitable conduct, and unclean hands and patent misuse.

## I. BACKGROUND

### A. *Factual Background and Procedural History*

Advanced Cardiovascular Systems, Inc. ("ACS") and Medtronic, Inc. ("Medtronic") are both companies engaged in developing, manufacturing, promoting, and selling interventional medical devices, including catheters used in percutaneous transluminal coronary angioplasty

("PTCA") for treating coronary artery disease. [1] These parties and others are currently involved in a complex series of patent infringement suits. The Court has ordered that all of the following cases be related pursuant to Civil Local Rule 3-12(e).

> 1 During a PTCA procedure, a balloon dilatation catheter is carried through the patient's vasculature over a guidewire to a point where deposits, or "lesions," in the coronary arteries have blocked or narrowed the arteries thereby restricting blood flow. Once the catheter is in place, the balloon is inflated to compress or break the material forming the lesion in order to open the restricted artery to improve blood flow.

[*5] On October 10, 1995, ACS filed two similar patent infringement suits. The present action, C-95-3577-DLJ, was brought against Medtronic for infringement of *Patent Nos. 3,040,548, 5,061,273,* and *5,451,233* ("the '548 patent," "the '273 patent," and "the '233 patent," respectively). These patents relate to certain kinds of "rapid exchange" catheters that can be used for PTCA. The patents were issued to the inventor, Dr. Paul G. Yock, pursuant to continuation applications relating to an original patent application filed on April 15, 1986. The rights to these patents were subsequently licensed to ACS. ACS alleges that Medtronic's "Falcon" rapid exchange PTCA catheters infringe on one or more claims of the *'548, '273,* and *'233 patents.*

The second suit ACS filed on October 10, 1995, C-95-3580-DLJ, was brought against SciMed Systems, Inc. ("SciMed"), for infringement of the *'548, '273,* and *'233 patents,* as well as for infringement of U.S. Patent No. 5,350,395 ("the '395 patent"), all of which were issued to Dr. Paul G. Yock between August 20, 1990 and September 19, 1995. Plaintiff alleges that SciMed's "Express Plus" and "Express Plus II" rapid exchange PTCA catheters infringe on the named [*6] patents.

On March 12, 1996, ACS filed two actions for infringement of U.S. Patent No. 5,496,346 ("the '346 patent"). [2] One action, C-96-0942-DLJ, was brought against Medtronic, claiming that Medtronic's "Falcon" rapid exchange catheter infringes one or more claims of the '346 patent. The other action, C-96-0950-DLJ, was brought against SciMed, claiming that SciMed's "Express Plus II" and "Leap Express Plus" catheters infringe one or more claims of the '346 patent.

Page 3

1996 U.S. Dist. LEXIS 11696, *6; 36 Fed. R. Serv. 3d (Callaghan) 648

2   The '346 patent, entitled "Reinforced Balloon Dilatation Catheter With Slitted Exchange Sleeve and Method," was issued on March 5, 1996 in the names of the inventors, Michael J. Horzewski and Dr. Paul G. Yock. The '346 patent relates generally to rapid exchange balloon dilatation catheters which are used in PTCA for treating coronary artery disease.

On December 21, 1995, Medtronic filed an answer and counterclaim in the present action. On January 4, 1996, Medtronic filed an amended answer and counterclaim. In addition to raising affirmative defenses [*7] and counterclaims against ACS, Medtronic asserts counterclaims against Schneider (Europe) AG ("Schneider Europe"), Schneider (USA) Inc. ("Schneider USA"), Dr. Tassilo Bonzel, and Dr. Paul G. Yock. These counterdefendants are brought into the suit on the basis of Medtronic's allegation that Dr. Bonzel first patented the procedures claimed in Dr. Yock's patents, and that the licensees of both Dr. Bonzel and Dr. Yock, Schneider and ACS respectively, have colluded to avoid an interference.

On March 20, 1996, counterdefendants Schneider Europe and Schneider USA filed a motion in this case, C-95-3577-DLJ, to deny interpleader and dismiss Medtronic's counterclaims, and counterdefendant Bonzel filed a motion to dismiss for lack of personal jurisdiction. On the same day, ACS and Yock filed a motion to dismiss the counterclaim and strike affirmative defenses.

B. *Legal Standard*

1. *Motion to Dismiss*

Under *Federal Rule of Civil Procedure 12(b)(6)*, a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether a plaintiff will prevail in the action, but whether she is entitled to [*8] offer evidence in support of her claim. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*.

In answering this question, the Court must assume that plaintiff's allegations are true and must draw all reasonable inferences in plaintiff's favor. *Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987)*. Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow plaintiff to develop her case at this stage of the proceedings. *United*

*States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981)*.

If the Court chooses to dismiss the complaint, it must then decide whether to grant leave to amend. In general, leave to amend is only denied if it is clear that amendment would be futile and "that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987)* (quoting *Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980)* (per curiam)); *see Poling v. Morgan, 829 F.2d 882, 886 (9th Cir. 1987)* (citing *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962))* (futility is basis for denying amendment under Rule 15).

2. *Motion to Strike*

*Federal Rule of Civil Procedure 12(f)* [*9] provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

3. *Rule 8*

Civil *Rule 8(a)* requires that a pleading contain "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claims needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City National Bank, 607 F.2d 824, 827 (9th Cir. 1979)*.

4. *Rule 9(b)*

Civil *Rule 9(b)* requires that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

5. *Interpleader*

*Federal Rule of Civil Procedure 22* provides in relevant part:

> Persons having claims against the plaintiff may be joined as [*10] defendants and required to interplead

1996 U.S. Dist. LEXIS 11696, *10; 36 Fed. R. Serv. 3d (Callaghan) 648

when their claims are such that the plaintiff is or may be exposed to double or multiple liability. . . . A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim.

*Fed. R. Civ. P. 22(1).*

II. ARGUMENTS

Medtronic's First Amended Answer asserts several affirmative defenses against ACS and six counterclaims against ACS, Schneider Europe and Schneider USA (collectively "Schneider"), Tassilo Bonzel, and Paul G. Yock. Count One is a claim for interpleader under *Federal Rule of Civil Procedure 22* between all counterdefendants. Count II alleges double patenting against all counterdefendants. Count III states an equitable estoppel claim against ACS and Schneider. Count IV asserts a claim of inequitable conduct against ACS and Schneider, and Count V alleges laches and improper delay by ACS. Finally, in Count VI, Medtronic seeks declaratory judgment of noninfringement against ACS.

Medtronic has brought these additional parties into the action based on allegations that Dr. Bonzel first patented the procedures claimed in Dr. Yock's patents, and that the licensees of both Dr. Bonzel and Dr. Yock, Schneider [*11] and ACS respectively, have colluded to avoid an interference proceeding.

Dr. Bonzel was issued U.S. Patent No. 4,762,129 ("the '129 patent"), related to rapid exchange catheters that facilitate PTCA, on August 8, 1988. Dr. Bonzel first filed a patent application on this rapid exchange catheter on November 23, 1984 in Germany. He then filed a Patent Cooperation Treaty application on November 15, 1985, designating the United States and claiming the benefit of his earlier 1984 filing date under *35 U.S.C. §§ 119* and *363*. Bonzel proceeded to license the rights to the '129 patent to Schneider Europe, which granted a sublicense to Schneider USA.

Upon the issuance of Bonzel's '129 patent, ACS and C.R. Bard, Inc. challenged the validity of the patent in the Patent & Trademark Office ("PTO"). The PTO affirmed the Bonzel patent in a total of four consolidated PTO reexamination proceedings, and Reexamination Certificate B1 4,762,129 issued on July 2, 1991.

While the validity of the '129 patent was being challenged in the PTO, in November of 1988, ACS filed an infringement suit against Schneider in the Northern District of California, C-88-20742-WAI. On August 20, 1991, after the Yock *'548 patent* [*12] issued, ACS filed another infringement suit against Schneider, alleging that Schneider's "Monorail Piccolino" rapid exchange catheter infringed the *'548 patent.* C-91-20507-WAI. In 1991, after the PTO rejected ACS' challenge to the '129 patent, ACS settled with Schneider. As part of the settlement agreement, ACS agreed to pay Schneider $ 22 million and the parties granted each other non-exclusive cross-licenses.

ACS and Schneider proceeded to file patent infringement suits to protect their respective patents. ACS has filed the actions against SciMed and Medtronic currently pending before this Court, and in 1994 Schneider filed a suit against SciMed for infringement of Bonzel's '129 patent in Minnesota district court. *Schneider (Europe) AG v. SciMed Life Sys., Inc., 852 F. Supp. 813 (D. Minn. 1994), aff'd, 60 F.3d 839 (Fed. Cir.), cert. denied, 133 L. Ed. 2d 427, 116 S. Ct. 520 (1995).* In Schneider's case against SciMed, the district court found that the '129 patent was valid, enforceable, and infringed. Consequently, the court issued an injunction against SciMed. The Federal Circuit affirmed the ruling. *60 F.3d 839 (Fed. Cir.), cert. denied, 116 S. Ct. 520 (1995).*

A. *Standing* [*13]

Schneider argues that Counts I-IV of the First Amended Answer should be dismissed, because Medtronic lacks Article III standing to assert these counterclaims in federal court. [3] More specifically, Schneider claims that Medtronic has not alleged that it has suffered some actual or threatened injury as a result of any conduct on the part of Schneider. Since Medtronic seeks declaratory relief, Schneider argues that Medtronic has failed to allege an objectively reasonable apprehension of suit by Schneider.

3    Dr. Bonzel has joined Schneider's motion to deny interpleader and dismiss counterclaims. Since Medtronic's claims against Bonzel arise out of Schneider's conduct as Bonzel's licensee, the Court's rulings with respect to Schneider also apply to Dr. Bonzel.

1996 U.S. Dist. LEXIS 11696, *13; 36 Fed. R. Serv. 3d (Callaghan) 648

In order for a cause of action to be justiciable in federal court, there must be a case or controversy that presents a real and immediate threat of injury. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*; U.S. Const., art. III. [*14] "Those who do not possess Article III standing may not litigate as suitors in the courts of the United States." *Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 476-77, 102 S. Ct. 752, 760, 70 L. Ed. 2d 700 (1982)*. The constitutional prerequisites to standing are (1) an injury in fact which is concrete and not conjectural; (2) a causal connection between the injury and defendant's conduct or omissions, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. The injury allegedly suffered by the plaintiff must be actual or a real and immediate threat of future injury. *City of Los Angeles v. Lyons, 461 U.S. 95, 101-102, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983)*; *Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975)*. The burden of establishing standing rests with the party invoking federal jurisdiction. *Id.*

Where a plaintiff seeks declaratory relief in the context of patent infringement, courts have used a two-prong analysis to determine whether there is an actual controversy:

> First, the defendant's conduct must have created on the part of the plaintiff a reasonable apprehension that the defendant [*15] will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device.

*West Interactive Corp. v. First Data Resources, 972 F.2d 1295, 1297 (Fed. Cir. 1992)* (quoting *Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed. Cir. 1987)*), cert. denied, 479 U.S. 820 (1996).

Medtronic argues that it has a reasonable apprehension of future injury due to Schneider's history of patent infringement suits against ACS and SciMed and due to the settlement agreement and alleged collusion between Schneider and ACS. The Federal Circuit has made it clear that there is no reasonable apprehension of future injury based solely on the existence of an adverse

patent. *BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 981 (Fed. Cir. 1993)*; *see also Boeing Co. v. Commissioner of Patents & Trademarks, 853 F.2d 878, 882 (Fed. Cir. 1988)* (finding that alleged injury from the continued existence of an adverse patent does not constitute injury, because "indistinguishable from any injury that the issuance of the patent might cause the general public"). [*16] Even if a patent holder has demonstrated a willingness to enforce its patent, a plaintiff must show some specific evidence that the patent holder intends to bring suit against the plaintiff. *See West Interactive Corp., 972 F.2d at 1298* (holding that although a patent owner's willingness and capacity to enforce its patent rights is pertinent to the inquiry for an actual controversy, such a showing is not conclusive in the face of evidence that the patent holder never inquired about the plaintiff's activities or infringement); *Boeing, 853 F.2d at 882* (existence of adverse patent without allegation that patent holder threatened to sue for infringement or acted in such a way to create a reasonable apprehension of suit found insufficient to confer standing). Furthermore, a patent holder's litigation against unrelated third parties does not give an objective reason to fear litigation. *Id.*

Given the fact that Schneider has not directly or indirectly communicated any intention to file suit against Medtronic, the Court finds that there is insufficient evidence of a reasonable apprehension of injury. Therefore, Medtronic does not have Article III standing to bring its counterclaims [*17] against Schneider.

### B. *Personal Jurisdiction Over Dr. Bonzel*

Dr. Bonzel makes a special/limited appearance to move the Court to dismiss Medtronic's counterclaims against him for lack of personal jurisdiction. Bonzel resides in and is a citizen of Germany. He does not own, use or possess any property in California. In 1986, Bonzel licensed his '129 patent to Schneider Europe, which in turn sublicensed the patent to Schneider USA. Bonzel is not involved in the manufacture, marketing or sale of his invention in California or elsewhere in the United States, and he has not visited California since 1992.

Due process requires that a nonresident defendant have minimum contacts with the forum state such that exercise of personal jurisdiction does not offend notions of fair play and substantial justice. *International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90*

1996 U.S. Dist. LEXIS 11696, *17; 36 Fed. R. Serv. 3d (Callaghan) 648

*L. Ed. 95 (1945).* [4] Two types of jurisdictional tests have been recognized as satisfying due process concerns: (1) general jurisdiction, a showing that defendant's contacts with the forum are "substantial" or "continuous and systematic," *Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 839 (9th Cir.* [*18] *1986);* and (2) specific jurisdiction, a showing that "there is a strong relationship between the quality of the defendant's forum contacts and the cause of action." *Id.* (citing *Burger King v. Rudzewicz, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).* In either case, the court must find that the defendant "purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283 (1958).* [5]

> 4   The California long-arm statute extends the reach of personal jurisdiction to the limits of the Federal Constitution. *See Cal. Code Civ. Proc. § 410.10* (West 1973); *Michigan Nat'l Bank v. Superior Ct., 23 Cal. App. 3d 1, 6, 99 Cal. Rptr. 823 (1972).* Thus, although Medtronic wishes to pursue federal claims against Bonzel, the personal jurisdiction issue would be the same under either the *Fifth Amendment* or California's long-arm statute.

> 5   Ownership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia. *35 U.S.C. § 293; see also Williams v. Canon, 432 F. Supp. 376, 380 (C.D. Cal. 1977)* (ownership of trademark does not establish purposeful availment of a California forum).

[*19] Medtronic argues that Bonzel has contacts with California sufficient to satisfy the requirements of due process. Medtronic points to three basic types of contacts Bonzel allegedly had with California. First, Medtronic alleges that Bonzel voluntarily came to California on a number of different occasions between 1987 and 1992 for the purpose of attending medical symposia and giving presentations on his catheterization technique. Second, defendant alleges that Bonzel actively participated in and received a financial benefit from Schneider's patent infringement action against ACS in this district. Third, Medtronic argues that Bonzel should be subject to suit in California because he purposefully directed his patented product into the California forum.

Medtronic concedes that these contacts are not systematic and continuous enough to justify general jurisdiction over Bonzel in California. Therefore, the only issue is whether the nature of these contacts is sufficiently related to Medtronic's causes of action against Bonzel to confer specific jurisdiction over Bonzel.

Dr. Bonzel's lectures and presentations in California were not specifically related to protection of the '129 patent, which [*20] forms the basis of Medtronic's counterclaims. During these events, Bonzel was not marketing or talking about the '129 patent, but rather was giving scientific presentations in his professional capacity as a cardiologist.

The second type of contact identified by Medtronic, participation in Schneider's patent litigation, also fails to provide a basis for exercising personal jurisdiction over Bonzel. None of Bonzel's actions in relation to Schneider's litigation demonstrate purposeful availment of this forum. Bonzel was not a party to the litigation between Schneider and ACS and has submitted a declaration stating that he did not direct or plan that litigation. *See* Bonzel Decl. at 2-3. Bonzel also was not a party to Schneider's settlement agreement with ACS and was only made aware of the agreement after it occurred. Bonzel Decl. at 2-3. Although Bonzel has given depositions in California, he received no fees relating to his testimony and was not subject to service while he was in California for that purpose. *See Moylan v. AMF Overseas Corp., 354 F.2d 825, 829 (9th Cir. 1965)* (holding that a forum visit for purposes of a deposition does not establish the type of "purposeful availment" [*21] necessary to confer jurisdiction over the deponent).

Medtronic's final argument for this Court's exercise of personal jurisdiction rests upon a "stream of commerce" theory. According to Medtronic, Bonzel should be subject to suit in California because he purposefully directed his patented product towards this forum. It is undisputed that Bonzel licensed his patent to Schneider. However, the forum activities of a licensee cannot support the assertion of jurisdiction over a non-resident patentee, even if the patentee receives royalty payments. *See Bib Mfg. Co. v. Dover Mfg. Co., 804 F. Supp. 1129, 1132-34 (E.D. Mo. 1992).* Moreover, without evidence that Bonzel actually retains some control over the distribution or marketing of the patent, a "steam of commerce" jurisdictional analysis is

Case 3:08-cv-01002-EDL     Document 74-2     Filed 08/05/2008     Page 26 of 34

Page 7

1996 U.S. Dist. LEXIS 11696, *21; 36 Fed. R. Serv. 3d (Callaghan) 648

inappropriate. *See e.g. Seltzer Sister Bottling Co., Inc. v. Source Perrier S.A., 1991 U.S. Dist. LEXIS 18206, 19 U.S.P.Q.2D (BNA) 1898, 1903 (N.D. Cal. 1991).* Because there is no evidence that Bonzel directed the sales or marketing of the patented product or participated in any way in the distribution of that product, the Court finds that Bonzel did not purposefully avail himself of the benefits of conducting business in California.

[*22] Thus, Medtronic has failed to show that any of Dr. Bonzel's contacts with California are strongly related to Medtronic's causes of action against Bonzel. Therefore, this Court lacks personal jurisdiction over Dr. Bonzel.

C. *Count I: Interpleader*

Medtronic's interpleader claim is based on the allegation that the three Yock patents at issue in this case and Bonzel's '129 patent are interfering patents. Medtronic claims that ACS and Schneider, as the respective licensees of these patents, "have worked in a concert of action to avoid an interference" and have exposed their competitors to multiple liability and inconsistent results. Accordingly, Medtronic argues that interpleader for interference under *35 U.S.C. §§ 291 and 146* is warranted.

*Federal Rule of Civil Procedure 22(1)* provides that persons having claims against a party may be joined as defendants and required to interplead when their claims are such that the party is or may be exposed to double or multiple liability. Medtronic concedes that the use of interpleader to force an interference proceeding is a novel application of *Rule 22*. Therefore, the Court must look to the underlying purposes of both interpleader and [*23] interference procedures to determine whether Medtronic's interpleader claim is proper.

Interpleader under *Rule 22* is an equitable procedure intended to protect a stakeholder from multiple liability and "the vexation of defending multiple claims to the same fund." *Washington Electric Cooperative, Inc. v. Paterson, Walke & Pratt, 985 F.2d 677, 679 (2d Cir. 1993).* Therefore, the principle requirement for interpleader is "a real and reasonable fear of double liability or vexatious, conflicting claims." *Id.* (quoting *Indianapolis Colts v. Mayor of Baltimore, 741 F.2d 954, 957 (7th Cir. 1984), cert. denied, 470 U.S. 1052, 84 L. Ed. 2d 817, 105 S. Ct. 1753 (1985)).* The requirement that the claims for which interpleader is sought be adverse to

each other is not satisfied where the stakeholder could be liable to both claimants. *Bradley v. Kochenash, 44 F.3d 166, 168 (2d Cir. 1995).*

In the present case, the parties Medtronic seeks to interplead do not have clearly conflicting claims. Under *35 U.S.C. § 282,* a patent must be presumed valid; therefore, the Court must presume that the Yock patents and Dr. Bonzel's patent are not identical. Since a single product can be found to infringe more than one patent, [*24] *Milliken Research Corp. v. Dan River, Inc., 739 F.2d 587, 594 (Fed. Cir. 1984),* it is possible that Medtronic could be liable to both claimants here. Therefore, the claimants' interests are not adverse.

In addition, as discussed with respect to standing, there is not a reasonable likelihood that Medtronic will be subject to a patent infringement claim by Schneider. Even though Schneider has demonstrated a willingness to enforce its patent against others, Medtronic has failed to provide specific evidence that Schneider intends to bring suit against Medtronic. Without a "real and reasonable fear" of double liability, Medtronic cannot assert an interpleader claim.

Furthermore, as a practical matter, it does not make sense to allow interpleader here. The claimants Medtronic seeks to force into litigation do not believe that they have adverse interests. Adverse claims are necessary to interpleader, because a court cannot force two parties to litigate against each other where the parties do not believe there is a controversy. In the present case, ACS and Schneider assert that their patents are distinct and that they do not wish to engage in an interference proceeding. It is not the [*25] role of this Court or a third-party to force them into unwanted litigation.

Congress' intent in authorizing interference proceedings also indicates that Medtronic's interpleader claim is improper. *35 U.S.C. § 291* authorizes a civil action to determine the validity of interfering patents. Congress enacted this section for the explicit purpose of providing relief to "the owner of an interfering patent." By interpleading an interference here, Medtronic is seeking to circumvent *§ 291*'s limited grant of standing to patent holders.

In addition, the Code of Federal Regulations provides that applicants may seek to have an interference declared, but that it is within the discretion of the PTO to initiate the interference. *See 35 C.F.R. §§ 1.603-611.*

Page 8

1996 U.S. Dist. LEXIS 11696, *25; 36 Fed. R. Serv. 3d (Callaghan) 648

Although *35 U.S.C. § 146* authorizes civil actions to adjudicate interference claims, these actions are only permitted *after* a decision has been rendered by the PTO. *See 35 U.S.C. § 146* (providing for remedy by civil action where a party is dissatisfied with the decision of the Board of Patent Appeals and Interferences). Thus, Congress intended that the PTO would be the primary arbitrator of interference actions.

In the present [*26] case, the PTO was clearly aware of the similarities between the Yock patents and the Bonzel patent; nonetheless, the PTO did not declare an interference. 6 To allow Medtronic to interplead an interference where the PTO has decided not to initiate such a proceeding would be contrary to Congressional intent. Since Medtronic's interpleader claim does not meet the requirements for either an interpleader or an interference, the Court hereby dismisses this counterclaim with prejudice.

> 6    The same PTO examiner conducted the consolidated reexaminations of the Bonzel patent and the examinations of the applications that resulted in the Yock patents at issue in this case. Each time the PTO considered a new Yock patent application, it considered whether there was an interference with the Bonzel patent. *See* Manual of Patent Examining Procedure § 2301.01(b). Therefore, the PTO clearly was aware of the similarities between the Yock and Bonzel patents.

D. *Count II: Double Patenting*

Schneider argues that Count [*27] II should be dismissed, because a legally cognizable double patenting claim requires that the patents at issue be invented by a common inventor or held by a common owner or assignee. Medtronic argues that double patenting is applicable to the present case, because the cross-licenses granted in the settlement agreement between ACS and Schneider "effectively" created common ownership of the Bonzel and Yock patents. In addition, Medtronic argues that the policy considerations underlying the doctrine of double patenting apply to the present case -- namely, the prevention of prolonged monopoly and the hazards of harassment from multiple assignees.

The prohibition against double patenting "precludes one person from obtaining more than one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention." *In re Longi, 759*

*F.2d 887, 891 (Fed. Cir. 1985).* Defendant admits that its theory of double patenting is an extension of established doctrine. The Court finds insufficient justification for broadening the concept of double patenting to include "effective" common ownership. Therefore, Medtronic's counterclaim for double patenting is dismissed with [*28] prejudice.

E. *Count III: Equitable Estoppel*

Count III alleges an equitable estoppel claim against Schneider and ACS. Medtronic claims that ACS should be estopped from enforcing any Yock patents containing interfering subject matter, because ACS and Schneider were aware of the existence of interfering subject matter in the Yock patents and failed to determine the priority of the patents. In addition, Medtronic claims that ACS and Schneider knowingly concealed from the PTO and the public the fact that the Yock and Bonzel patents had common subject matter. 7 Therefore, Medtronic seeks to estop ACS and Schneider from asserting the Yock and Bonzel patents against Medtronic. Since the Court has found that Schneider was improperly joined as a party in this action, Medtronic cannot raise an estoppel claim against Schneider. Therefore, Count III can only be asserted against ACS.

> 7    Since ACS is the exclusive licensee of the Yock patents, the Court shall refer to ACS as the party responsible for any communications to the PTO during the prosecution of the Yock patents.

[*29]

To plead equitable estoppel, a party must allege three essential elements: (1) the party to be estopped, who usually must have had knowledge of the true facts, communicated something in a misleading way, either by words, conduct or silence; (2) the pleading party relied upon that communication; and (3) the pleading party would be harmed materially if the other party is permitted to assert any claim inconsistent with his earlier conduct. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1041 (Fed. Cir. 1992)* (en banc).

Medtronic argues for estoppel against ACS based on the allegation that ACS misled the PTO and the public by claiming that the Yock patents were distinct from the Bonzel '129 patent. This claim is essentially an allegation of inequitable conduct. *See Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 872*

1996 U.S. Dist. LEXIS 11696, *29; 36 Fed. R. Serv. 3d (Callaghan) 648

*(Fed. Cir. 1988)* (holding that the doctrine of inequitable conduct applies where the patent applicant acted inequitably in prosecuting the patent before the PTO, such as deceiving, defrauding, or failing to disclose material information to the PTO), *cert. denied, 490 U.S. 1067, 104 L. Ed. 2d 633, 109 S. Ct. 2068 (1989).* Medtronic has not alleged how it relied [*30] on ACS' representations to the PTO, and, more importantly, ACS' patent infringement claims are not inconsistent with its representations to the PTO that it had a valid patent. Since the factual basis for this counterclaim does not support an estoppel claim, the Court hereby dismisses Count III of Medtronic's First Amended Answer with prejudice.

### F. Count IV: Inequitable Conduct

Medtronic's counterclaim for inequitable conduct is based on Schneider's and ACS' failure to file a copy of their settlement agreement with the PTO as required by *35 U.S.C. § 135(c)* and their avoidance of an interference proceeding in the PTO. [8] Again, since the Court has found that Schneider was improperly joined as a party in this action, Medtronic cannot assert a claim of inequitable conduct against Schneider. Therefore, the only issue here is whether this claim is proper with respect to ACS.

> 8   Medtronic also claims that the Yock patents are unenforceable because of Dr. Yock's unreasonable delay in prosecution. The Court's ruling with respect to Count V applies to this part of Medtronic's inequitable conduct claim.

[*31] Paragraph 88 of Medtronic's First Amended Answer alleges that ACS' failure to comply with the filing requirements of *35 U.S.C. § 135(c)* renders the Yock patents unenforceable. However, at the July 10, 1996 hearing and in its opposition papers, Medtronic argued that this claim is based on the failure to disclose information material to the patentability of the Yock patents, as required under the general duty of candor to the PTO.

*35 U.S.C. § 135(c)* requires that "any agreement or understanding between parties to an interference, . . . made in connection with or in contemplation of the termination of the interference, . . . be in writing and a true copy thereof filed in the Patent and Trademark Office before the termination of the interference." This statute only requires patent holders to file copies of agreements that settle pre-existing interference

proceedings, not settlement agreements related to patent infringement suits. In *Carella v. Starlight Archery, 804 F.2d 135 (Fed. Cir. 1986)*, the Federal Circuit upheld a district court decision that *§ 135(c)* is inapplicable to the private settlement of a lawsuit, finding that failure to disclose a settlement agreement in the [*32] context of an interference proceeding in the PTO is completely different from failure to disclose a settlement of a declaratory judgment action. *Id. at 140.* Given that Medtronic's allegations are based on ACS' failure to disclose the settlement of an infringement action, Medtronic has failed to state a claim for inequitable conduct on this basis.

The failure to disclose the settlement agreement also did not violate the duty of candor to the PTO. The duty of candor is a generalized duty. It cannot create the specific duty to disclose a settlement of a patent infringement suit. Therefore, Medtronic cannot state a claim of inequitable conduct based on ACS' failure to disclose its settlement agreement.

With respect to Medtronic's claim that ACS' avoidance of an interference proceeding constituted inequitable conduct, the Court also finds Medtronic's pleading insufficient. The doctrine of inequitable conduct renders a patent unenforceable and thereby provides a defense to a patent infringement suit, if the patent applicant acted inequitably in prosecuting the patent before the PTO. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988), cert.* [*33] *denied, 490 U.S. 1067 (1989).* Inequitable conduct includes fraud, deception, or failure to disclose material information. *Id.*

Under *Rule 9(b)*, fraud defenses must be pled with particularity. *Fed. R. Civ. P. 9(b). Rule 9(b)* is designed to give an opposing party notice of particular misconduct. *Semegen v. Weidner, 780 F.2d 727, 731-35 (9th Cir. 1985).* This court has previously held that *Rule 9(b)* should be applied to pleadings of inequitable conduct as well. *See Chiron Corp. v. Abbott Labs., 156 F.R.D. 219, 220 (N.D. Cal. 1994).* According to the court's reasoning, "a plain reading of the Federal Rules, the weight of authority, and sound public policy all require that pleadings which allege inequitable conduct before the PTO comply with *Rule 9(b)*." *Id.*

Medtronic claims that ACS acted inequitably in prosecuting its patents before the PTO, because ACS failed to disclose to the PTO that it was pursuing a patent

1996 U.S. Dist. LEXIS 11696, *33; 36 Fed. R. Serv. 3d (Callaghan) 648

identical to the '129 patent. Since this allegation is essentially a fraud claim, defendant must plead this claim with the particularity required under *Rule 9(b)*. Accordingly, defendant is required to "state the time, place, and specific content of the false representations [*34] as well as the identities of the parties to the misrepresentation." *Schreiber Distributing v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)*.

The Court finds that Medtronic's pleading is not sufficiently specific. Not only must Medtronic allege the particulars of what ACS failed to disclose, but Medtronic also must describe the circumstances indicating ACS' intent to mislead the PTO. ACS' failure to state to the PTO that it was trying to obtain an invalid patent does not constitute inequitable conduct, because anyone seeking to obtain a patent has a right to make good faith arguments in support of their application; however, if ACS failed to disclose information that was pertinent to the determination of whether it was presenting an interfering patent with an intent to deceive the PTO, then Medtronic has grounds for an inequitable conduct claim. Based on the foregoing, the Court hereby dismisses Medtronic's inequitable conduct counterclaim without prejudice. However, Medtronic is only granted leave to amend to state a claim comporting with *Rule 9(b)* against ACS for failure to disclose information regarding a possible interference.

### G. Count V: Laches and Improper [*35] Delay

Medtronic asserts a counterclaim for laches and improper delay against ACS, based on alleged improper delay and "subterfuge" in the prosecution of the Yock patents. To invoke a defense of laches, a defendant must allege "neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992)* (en banc). In the context of patent litigation, "the period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of the suit." *Id. at 1032.* The Federal Circuit has explicitly stated that "the period [of delay] does not begin prior to issuance of the patent." *Id.; see also Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1576 (Fed. Cir. 1994)* ("The laches period does not accrue until [the] patent issues . . . "). Since the only delay that can form the basis

of a laches defense is delay between the issuance of the patent and the filing of the infringement action, defendant's [*36] theory of laches based on delay in prosecution of the patent is not cognizable.

Furthermore, since there is no allegation that plaintiff violated any of the statutory or regulatory rules for prosecuting patents, there was no improper delay in the prosecution of this patent to justify a laches defense. The Yock patents issued from a series of "continuation" applications relating back to the original application filed on April 15, 1986. Under *35 U.S.C. § 120*, the prosecution of these patents dates back to the filing of the original application. *Transco Prods., Inc. v. Performance Contracting, Inc., 38 F.3d 551, 556 (Fed. Cir. 1994)*. By providing this relation back doctrine, Congress evidenced a clear intent to regulate the timing of continuation applications. Accordingly, only Congress can determine what constitutes unreasonable delay in the filing of such an application. It is not for this Court to decide that the prosecution of a patent according to the rules of the PTO is unreasonable and inequitable. Since defendant's laches defense asks the Court to make precisely this determination, the Court hereby dismisses this counterclaim with prejudice.

### H. *Affirmative Defenses*

[*37] Medtronic's First Amended Answer asserts the following affirmative defenses: (1) failure to state a claim upon which relief can be granted; (2) invalidity; (3) inequitable conduct; (4) unclean hands and patent misuse; (5) equitable estoppel and laches for delay in prosecution; (6) noninfringement; and (7) prosecution history estoppel. ACS and Dr. Yock move for dismissal of Medtronic's affirmative defenses for inequitable conduct, unclean hands, equitable estoppel and laches for delay in prosecution, and prosecution history estoppel. With respect to the remaining affirmative defenses, ACS and Yock request that the Court either strike the defenses or order a more definite statement pursuant to *Rule 12(e)*.

### 1. Failure to State a Claim

*Federal Rule of Civil Procedure 12(b)* provides that the defense of failure to state a claim upon which relief can be granted may be "asserted in [a] responsive pleading" or "made by motion." If a court finds that the plaintiff has stated a valid claim, however, the court may strike the defense. *See Federal Savings and Loan Ins. Corp. v. Maio, 736 F. Supp. 1039, 1042 (N.D. Cal. 1989)*

In order to state a claim of patent infringement, a plaintiff [*38] must allege that the defendant makes, uses, offers to sell, or sells the patented invention within the United States, during the term of the patent, and without the authority of the patent holder. *See 35 U.S.C. § 271(a)*. Plaintiff here has pled that "ACS has an exclusive license under the rights, interest, and legal title" to the *'548, '273,* and *'233 patents*, Compl. at PP 8, 10, 12, and that "Medtronic has manufactured, used, sold, or distributed PTCA catheters . . . which infringe one or more claims" of the *'548, '273,* and *'233 patents*. Compl. at PP 15, 20, 25. For purposes of evaluating the sufficiency of pleadings, all averments must be taken as true and construed in the light most favorable to the pleading party. *Pillsbury, Madison & Sutro v. Lerner, 31 F.3d 924, 928 (9th Cir. 1994)*. Given that plaintiff has alleged the essential elements of patent infringement, the Court finds plaintiff's pleading sufficient and strikes this affirmative defense with prejudice.

## 2. *Invalidity*

Medtronic asserts as an affirmative defense that the *'548, '273,* and *'233 patents* "are invalid, unenforceable and/or void for failure to meet the requirements of the United States patent laws, [*39] including but not limited to *35 U.S.C. §§ 101-112*, 120-121, *135, 146,* and *291*." First Amended Answer at P 28. Under *Rule 8 of the Federal Rules of Civil Procedure*, an affirmative defense must be pled with the minimal specificity necessary to give the plaintiff "fair notice" of the defense. *Wyshak, 607 F.2d at 827*. Since the sections referred to by defendant provide numerous grounds for finding a patent invalid, defendant must provide a more specific statement of the basis for this defense in order to give ACS fair notice of the claims being asserted. Accordingly, the Court hereby strikes this affirmative defense with leave to amend. [9]

> [9] Defendant should note the Court's ruling on this issue in response to a similar motion brought by ACS in *Advanced Cardiovascular Systems, Inc. v. SciMed Systems, Inc., 1996 U.S. Dist. LEXIS 11702* C-96-0950-DLJ. The Court has approved a proposed amended answer submitted by SciMed in response to ACS' motion to strike. The factual specificity of SciMed's amended invalidity defense would be sufficient in this case as well.

## [*40] 3. *Inequitable Conduct*

Medtronic's affirmative defense of inequitable conduct states that the *'548, '273,* and *'233 patents* are invalid "due to inequitable conduct in connection with the prosecution of those applications before the United States Patent Office." First Amended Answer at P 29. As discussed with respect to Medtronic's counterclaim for inequitable conduct, inequitable conduct must be pled with the specificity required under *Rule 9(b)*. Therefore, defendant is required to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distributing v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)*. The Court strikes this defense without prejudice. However, defendant is only granted leave to amend in compliance with the rulings contained in this Order.

## 4. *Unclean Hands and Patent Misuse*

To the extent that defendant's affirmative defense for unclean hands and patent misuse rests on allegations of inequitable conduct before the PTO, defendant must plead these defenses with the specificity required under *Rule 9(b)*. With respect to patent misuse, under *35 U.S.C. [*41] § 271(d)*, a patent owner cannot be denied relief or found guilty of misuse simply by reason of seeking to enforce his or her patent. Therefore, defendant must provide a factual basis for alleging that ACS knew the Yock patents were invalid or unenforceable at the time this action was filed. Since defendant's First Amended Answer does not provide any factual basis for this affirmative defense, the Court hereby strikes the defense without prejudice.

## 5. *Equitable Estoppel and Laches for Delay in Prosecution*

For the reasons discussed with respect to defendant's counterclaim for laches and improper delay in prosecution, the Court hereby strikes this affirmative defense with prejudice.

## 6. *Prosecution History Estoppel*

Prosecution history estoppel is a defense to the assertion of the doctrine of equivalents. The doctrine of equivalents provides that an accused product which does not literally infringe the claims of a patent may infringe the patent nonetheless, if the differences between the

Case 3:08-cv-01002-EDL    Document 74-2    Filed 08/05/2008    Page 31 of 34

Page 12

1996 U.S. Dist. LEXIS 11696, *41; 36 Fed. R. Serv. 3d (Callaghan) 648

accused product and the claimed invention are so insubstantial that the accused product falls within the patent's "range of equivalence." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,* [*42] *62 F.3d 1512, 1516-22 (Fed. Cir. 1995)* (en banc), *cert. granted, 116 S. Ct. 1014 (1996).* "The essence of prosecution history estoppel is that a patentee should not be able to obtain, through the doctrine of equivalents, coverage of subject matter that was relinquished during prosecution to procure issuance of the patent." *Hoganas AB v. Dresser Indus., Inc., 9 F.3d 948, 951-52 (Fed. Cir. 1993).* Since prosecution history estoppel is only applicable where the doctrine of equivalents has been raised as a means of constructing an infringement claim, prosecution history estoppel is not an affirmative defense. [10] Accordingly, the Court strikes with prejudice Paragraph 33 of Medtronic's First Amended Answer. This ruling, however, does not preclude defendant from raising prosecution history estoppel should plaintiff assert a patent infringement claim based on the doctrine of equivalents. [11]

> 10  In *Carman Industries, Inc. v. Wahl, 724 F.2d 932, 942 (Fed. Cir. 1983),* the court made an off-hand reference to prosecution history estoppel as an affirmative defense. However, the remark was made in the context of finding that a party cannot raise the defense of prosecution history estoppel for the first time on appeal. Therefore, this case does not specifically authorize pleading prosecution history estoppel as an affirmative defense.

[*43]

> 11  The Court notes that the parties have violated Civil Local Rule 3-4(c)(2), which requires that the written text of all papers presented to the Court for filing, including footnotes and quotations, be no less than pica size typewriting. In addition, all papers must be double-spaced and contain no more than 28 lines per page. Any violation of these rules is grounds for sanctions. *See* Civil Local Rule 1-4.

## III. CONCLUSION

Based on the foregoing, the Court hereby ORDERS as follows:

1.  Defendant's counterclaim for interpleader is DISMISSED WITH PREJUDICE.

2.  Defendant's counterclaim for double patenting is DISMISSED WITH PREJUDICE.

3.  Defendant's counterclaim for equitable estoppel is DISMISSED WITH PREJUDICE.

4.  Defendant's counterclaim for inequitable conduct is DISMISSED WITH PREJUDICE with respect to Schneider and DISMISSED WITHOUT PREJUDICE with respect to ACS.

5.  Defendant's counterclaim for laches and improper delay is DISMISSED WITH PREJUDICE.

6.  The Court STRIKES WITH PREJUDICE defendant's affirmative defenses for failure to state a claim, equitable estoppel and laches for [*44] delay in prosecution, and prosecution history estoppel.

7.  The Court STRIKES WITHOUT PREJUDICE defendant's affirmative defenses for invalidity, inequitable conduct, and unclean hands and patent misuse.

Any amended answer must be filed by August 16, 1996.

IT IS SO ORDERED.

Dated: July 24, 1996.

D. Lowell Jensen

United States District Judge

**EXHIBIT 5**

LEXSEE 2008 U.S. DIST. LEXIS 31654

**TERRI ESPINOZA, Plaintiff, v MICHAEL J ASTRUE, Commissioner of Social Security, Defendant.**

**No C 07-3115 VRW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2008 U.S. Dist. LEXIS 31654*

**March 26, 2008, Filed**

**COUNSEL:** [*1] Terri Espinoza, Plaintiff, Pro se, San Bruno, CA.

For Commissioner of the Social Security Administration, Defendant: Gina Shin, Social Security Administration, San Francisco, CA.

**JUDGES:** VAUGHN R WALKER, United States District Judge.

**OPINION BY:** VAUGHN R WALKER

**OPINION**

ORDER

On June 13, 2007, plaintiff Terri Espinoza, acting *pro se,* filed this action, together with the filing fee, seeking judicial review of the final determination of the decision of the Social Security Administration denying her application for social security benefits.

On the same date, the "Procedural Order for Social Security Actions" of the United States District Court for the Northern District of California was filed in the court's file for this action and served on plaintiff. Doc # 3. That order sets forth five procedural steps pursuant to *Civil Local Rule 16-5,* below. Of relevance here, the second such step is that plaintiff is required to serve and file a motion for summary judgment or for remand within thirty days of service of defendant's answer.

On February 6, 2008, defendant commissioner filed his answer together with the administrative transcript. Doc # 4. Plaintiff failed to file her motion for summary judgment as required by the court's [*2] Procedural Order and *Local Rule 16-5.*

*Civil Local Rule 16-5* governs procedure in actions for review on an administrative record and provides in pertinent part:

> Within 30 days of receipt of defendant's answer, plaintiff must file a motion for summary judgment pursuant to *Civil LR 7-2* and *FRCP 56.* Defendant must serve and file any opposition or counter-motion within 30 days of service of plaintiff's motion. Plaintiff may serve and file a reply within 14 days after service of defendant's opposition or counter-motion.

Plaintiff's failure to file a motion for summary judgment may warrant dismissal for failure to prosecute pursuant to *FRCP 41(b).* Plaintiff's pro se status is not an excuse. "Pro se litigants must follow the same rules of procedure that govern other litigants." *King v Atiyeh, 814 F2d 565, 567 (9th Cir 1987).* Lack of knowledge of the applicable rules and procedures is no excuse for failure to comply with those rules. See *Swimmer v IRS, 811 F2d 1343, 1344 (9th Cir 1987).*

Accordingly, plaintiff is now ordered to file her summary judgment motion on or before April 11, 2008 or show cause why the court should not dismiss this action for failure to prosecute pursuant to *Rule 41(b).* [*3] Should plaintiff fail to respond to this order in a timely fashion, the matter will be dismissed.

2008 U.S. Dist. LEXIS 31654, *3

IT IS SO ORDERED.                                    VAUGHN R WALKER

   /s/ Vaughn R Walker                          United States District Judge