1   RAMONDETTA, *in propria persona*
2   2335 Stewart Avenue
    Walnut Creek, CA 94596
3   Telephone: (925) 989-2525
    Facsimile: (925) 945-1655
4

5   Suzanne Martin
    Lewis and Roca LLP
6   3993 Howard Hughes Parkway, Ste. 600
    Las Vegas, NV 89119
7   (702) 949-8200

8

9   July 29, 2008

10

11

12

13

14              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
15

16  LOU RAMONDETTA,                    ) CASE NO.: C08-01002 EDL
                                       )
17          Plaintiff,                 ) **PLAINTIFF'S POINT OF AUTHORITY**
                                       ) **IN OPPOSITION TO DEFENDANTS**
18      v.                             ) **MOTION TO COMPEL ARBITRATION**
                                       ) **AND DETERMINE APPLICABLE LAW**
19  KONAMI                             )
                                       ) Date: August 19, 2008
20                                     ) Time: 9:30 a.m.
21          Defendants.                ) Courtroom: 15th floor
                                         Before: Hon. Judge Elizabeth LaPorte
22  _____

23

24  This is Plaintiff's opposition to Defendant's Motion to compel Arbitration and determine
25  applicable State law. It is based on the following Points of Authority, Declaration of Lou
    Ramondetta, attached exhibits, the pleadings and papers before the court and any oral arguments.
26

27

28

FILED

JUL 2 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1    **TABLE OF AUTHORITIES**

2

3    **Cases:**
     Abramson v. Juniper Networks, Inc. (2004) 115 Cal.App.4th 638, 651–652 [9 Cal. Rptr. 3d 422],
4    2004
     Armendariz v. Found. Health Psychcare Servs., 24 Cal. 4th 83, 2000
5    47 Baylor L.Rev. 591, 608-609
     Cole v. Burns Intern. Security Services (D.C. Cir. 1997) 323 U.S. App. D.C. 133 [105 F.3d 1465,
6    1482]
     Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at p. 812
7    Stirlen v. Supercuts, Inc., supra, 51 Cal.App.4th at p. 1533
     McCoy v. Superior Court, 87 Cal. App. 4th 354, 2001
8    Neal v. State Farm Ins. Cos. (1961) 188 Cal. App. 2d 690, 694, 10 Cal. Rptr. 781
     Little v. Auto Stiegler, Inc., 92 Cal. App. 4th 329, 2001
9    Hull v. Norcom, Inc., supra, 750 F.2d 1547
10   Mercuro v. Superior Court, 96 Cal. App. 4th 167, 2002
     Fitz v. NCR Corp., 118 Cal. App. 4th 702, 2004,
11   Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267, 2004
12   Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041
     Kinney v. United HealthCare Services, Inc., supra, 70 Cal.App.4th at p. 1329.
13   California Teachers Assoc. v. State of California (1999) 20 Cal. 4th 327, 975 P.2d 622
     Cheng-Canindin v. Renaissance Hotel Associates (1996) 50 Cal. App. 4th 676 [57 Cal. Rptr. 2d
14   867]
     Gilmer v. Interstate/Johnson Lane Corp., supra, 500 U.S. at p. 31 [114 L. Ed. 2d at pp. 40-41].)
15   Hall v. Superior Court (1983) 150 Cal. App. 3d 411 [197 Cal. Rptr. 757]
16   ABF Capital Corp. v. Grove Properties Co., 126 Cal. App. 4th 204
     Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 1992:
17   Ashland Chemical Co. v. Provence, 129 Cal. App. 3d 790, 1982:

18   **Other Authorities:**
     California Civil Code Statute 1717
19
     **Rules:**
20   Federal Rule of Civil Procedure

21   **Restatement Conflict Laws:**
     RESTATEMENT (SECOND) OF CONFLICTS OF LAW

22

23

24

25

26

27

28

## STATEMENT OF ISSUES

Ramondetta hopes the Court takes into consideration that he is a "pro se" litigant and he is trying his best to defend his position and identify cases that support the position. Although potentially not legally worded or presented as a attorney would do with years of experience and a number of associates to gather data and provide support, Plaintiff hopes the Court will indulge his lack of experience and evaluate his position on its merits, especially since he is arguing against a multi-million dollar corporation with a highly paid legal firm.

In Plaintiff's Statement of Facts and History, he has added a few of the more pertinent Case law comments but he majority are under his Legal Arguments.

Ramondetta has also taken the liberty to respond to KONAMI'S ANSWER TO PLAINTIFF'S COMPLAINT AND COUTERCLAIMS in this document.

Konami's arbitration provision is substantive and procedural unconscionable and in violation of unwaivable public policy rights.

California law is applicable to Plaintiff's claims due to California's Relevant Contracts Choice of Law test and the Civil Code Section 1717 regarding public policy interest of citizens in California

## MEMORANDUM OF POINTS OF AUTHORITIES

### I.    SUMMARY OF ARUMENT:

**The Arbitration provision is unconscionable:**

The arbitration clause unconscionable leveraging Konami's superior bargaining power and should not apply in this agreement. The arbitration clause is not fairly or appropriately worded. The agreement is unfairly one-sided in requiring terms like, Plaintiff, "you agree" to arbitration of all claims but exempts from arbitration all claims of interest by Konami. Plaintiff was required under pressure exerted from Konami to sign the arbitration provision. Plaintiff was also required to pay the arbitration costs. In addition, the Clause was purposely written vaguely by Konami to favor Konami. The agreement failed to specify a procedure to initiate arbitration, identification of a neutral arbitrator, location, fees distribution and state law. (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal. 4th at pp. 114-115, 2000) and Mercuro v. Superior court 96 Cal. App. 4th 167, 2002. The Defendant's motion should be dismissed.

**California law is applicable and does apply in this case:**

Under California the Relevant Contracts, the choice of law is best supported and represented using California law. Additionally, under the Civil Code Section 1717 regarding the interests of California public policy are served to support their citizens and residents.

1

## II.    INTRODUCTION:

2

The Defendant's offer was initially presented on February 27, 2006 in a signed offer letter by
3    Steve Sutherland titled "JOB OFFER – KONAMI GAMING, INC". The first sentence said,
"Outlined below are the terms of the offer from Konami Gaming, Inc." The only identified
4    contingencies indicated in the "JOB OFFER" were that the "Final offer subject to company drug
test and compliance approval. It should be noted employees must be willing to submit to
5    background checks of multiple gaming jurisdictions" (see Exhibit 1). The offer letter had no
indication of any pending or future arbitration provisions. On March 3, 2006 another offer letter
6    was sent signed by Satoshi Sakamoto with a number of changes that Ramondetta had not agreed
to. Plaintiff wrote notes on the offer regarding changes and faxed to Konami including
7    underlining and questioning the arbitration clause that required Plaintiff to "give up my legal
rights" (see Exhibit 2). Plaintiff also discussed these changes with Sutherland by phone from
8    California and with Eve Nam, Senior Associate at Korn-Ferry in her California office. Despite not
being mentioned in Konami's initial written offer letter or in any discussions, Sutherland said
9    "Konami would not even discuss much less negotiate the arbitration provision". Sutherland said it
was "company policy for all contracts" even though it was not included in the original offer letter
10    sent on February 27th. The arbitration provision will be shown to be unconscionable.

11

12    "Given the lack of choice and the potential disadvantages that even a fair arbitration system can
harbor for employees, we must be particularly attuned to claims that employers with superior
13    bargaining power have imposed one-sided, substantively unconscionable terms as part of an
arbitration agreement." (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.
14    4th at pp. 114-115.) " few employees are in a position to refuse a job because of an arbitration
requirement." (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal. 4th at p.
15    115.)

16

Ramondetta initially tried to work directly with Konami to resolve our differences. Despite
17    Plaintiff's efforts, Konami was uncooperative in resolving the matter and required Plaintiff work
with their attorney, Howard Cole. Konami would not accept arbitration unless it was on their
18    terms in Nevada under Nevada law. When that was unsuccessful, Plaintiff turned to the California
Labor Commissioner and American Arbitration Association. These efforts were also unsuccessful
19    which is why the case is now being addressed in this Court. For reasons to be discussed, the
20    arbitration provision is unfair and puts Plaintiff at a material disadvantage. I respectfully request
this court to dismiss Defendant's motion to Compel Arbitration.

21

22           Regardless of a decision on arbitration, resolution of this agreement should be covered by
California law. California courts apply the relevant contracts test set forth in RESTATEMENT
23    (SECOND) OF CONFLICTS OF LAW Section 188. Additionally Civil Code Section 1717
represents a fundamental policy of California. The interests of California public policy are best
24    served to support their citizens and residents.

25    I respectfully request that this case should be heard in your Court under California law.

26

27

28

1    **III.    STATEMENT OF FACTS AND HISTORY**

2    Ramondetta has been a California citizen and resident for many years and Konami employed
3    Plaintiff from around April 10th to June 14th, 2006 while he resided in California. Plaintiff was
     hired as the Vice President of Sales and Marketing. As an employee and representative of
4    Konami, Plaintiff was hired and worked for the Konami Gaming and Systems Division. Per his
     offer letter, Plaintiff's role and responsibilities were approved by Konami Corporation in Japan.
5    In his role, Plaintiff was also measured and responsible for the support, marketing and sale of
     Konami Gaming products and indirectly Systems products and services. Konami Corporation is
6    headquartered at 9-7-2, Akasaka, Minato-ku, Tokyo, 107-8323 in Japan has three major divisions
     including Digital Entertainment, Health and Fitness and Gaming & Systems. The CEO for
7    Konami Gaming Inc. (KGI), Satoshi Sakamoto, reports directly to the President, Director and
     CEO for Konami Corporation based in Japan, Kagemasa Kozuki. Per Konami's website, Japan
8    corporate has a U.S. based holding company for all three divisions headquartered at 2381
     Rosecrans Ave., Ste 200, El Segundo, CA 90245 (See Exhibit 13). Konami also has another
9    office in California at 1400 Bridge Pkwy, Redwood City, CA. Konami Gaming's main office
     may be Las Vegas but based on Plaintiff's interview notes, their principal place of business and
10   where they get a substantial percentage of their revenues, is from California (see exhibit 4). Per
     Restatement section 188, subdivision (2) states: "(2) In the absence of an effective choice of law
11   by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6
     to determine the law applicable to an issue include: [¶] (a) the place of contracting, [¶] (b) the
12   place of negotiation of the contract, [¶] (c) the place of performance, [¶] (d) the location of the
     subject matter of the contract, and [¶] (e) the domicil, residence, nationality, place of
13   incorporation and place of business of the parties.", Konami has an office and revenue presence
     in California (see Legal Argument B, 3).

14   On or about January 2006, Plaintiff was contacted by Eve Nam, Senior Associate, at Korn/Ferry
15   International recruiters, based at 2600 Michelson Drive in Irvine, CA for the Vice President of
     Sales and Marketing role for Konami. Ramondetta had a number of extensive interviews and
16   negotiations with Nam and her boss Elliot Gordon, Senior Client Partner, also in the Irvine office
     (see Legal Argument B, 1). Although Konami claims on page 2, line 5 in their Motion to
17   Compel Arbitration, to have "hired international search firm Korn Ferry International ("Korn
     Ferry")" because they were an international search firm, both Sutherland and Gordon told
18   Ramondetta they had a personal and business relationship which is largely why Sutherland hired
     that specific California branch of Korn/Ferry to recruit for this role. Addressing Konami's
19   COUNTERCLAIMS, in paragraphs 1, 2 and 3, although a preference for relocation was
     mentioned, it was not positioned as a requirement Ramondetta's expressed position on
20   relocation is that he and his family would evaluate it based on the company, role and location but
     would definitely not do anything while his kids were in school or before the end of the summer.

21   A recruiter like Korn-Ferry, acts as a direct representative for the employer and indirect
22   representative for the potential employee. As the third part intermediary, Prior to, during and
     after the offer was tendered, Ramondetta talked with and negotiated with Nam and Elliot in
23   California to develop, initiate and finalize the offer letter. Plaintiff additionally negotiated with
     Sutherland via phone from California. Per Restatement section 188, subdivision (2) states: "(2)
24   In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken
     into account in applying the principles of § 6 to determine the law applicable to an issue include:
25   [¶] (a) the place of contracting, [¶] (b) the place of negotiation of the contract, [¶] (c) the place of
     performance, [¶] (d) the location of the subject matter of the contract, and [¶] (e) the domicile,
26   residence, nationality, place of incorporation and place of business of the parties.", the offer
     contract was largely contracted and negotiated from California (see Legal Argument B, 3).

27   The Position Specification describing the role was very detailed, 6 pages covering very specific
28   Responsibilities and Professional Qualifications etc., (see Exhibit 3). Despite this attention to
     details, Las Vegas, Nevada was only mentioned once in the document. No where on the Position

PLAINTIFF'S PTS OF AUTHORITY 7/29/08        -5-

CASE NO. C08-01002 EDL

1    Specification does it say relocation is required nor does it elaborate on it (see Legal Argument A,
2    5). Additionally, in the notes that Plaintiff took during his interview, no mention of required
     relocation was added (see exhibit 4).

3    On February 17th, Plaintiff flew to Las Vegas for a 1:30 PM interview with Steve Sutherland and
4    Satoshi Sakamoto (SS). The discussion encompassed a number of issues identified in Plaintiff's
     notes including the very poor historical performance of Konami v. it's competitors, needed
5    upgrading of the team, reasons for termination of a number of prior individuals in the role Plaintiff
6    was interviewing for etc., (see exhibit 4). The meeting encompassed questions by Sutherland and
     Sakamoto on Plaintiff's experiences and fit for the role and questions by Plaintiff on the role and
7    its responsibilities. There was no negotiation since the parties were evaluating fit (see Legal
     Argument B, 1). It was acknowledged that Konami had major financial and personnel issues that
8    required a turn-around. For various reasons tied to Konami's commitment and financial stability,
     Plaintiff purposefully negotiated a severance and benefits package into his Offer Letter. There
9    was also mention of the regulatory nature of the industry and relocation. Ramondetta's stated
     position on relocation was consistent with his earlier comments to Korn-Ferry.
10

11   Contrary to Defendant's claims on page 2, line 25 of their Motion to Compel Arbitration, "during
     the second round of interviews", Ramondetta has no recollection of a formal "second round of
12   interviews" occurring with Thomas Jingoli, Director Legal Compliance, or Bobbi Youngblood,
     Director, Human Resources prior to the initial February 27th offer being extended (see Legal
13   Argument B, 1). This questions Konami's COUNTERCLAIMS in paragraph's 4 & 5.
     Ramondetta flew to Las Vegas twice after the initial February 27th offer letter was faxed.
14   Ramondetta did talk with Jingoli and Youngblood to get procedural information after the offer
15   was extended.

16   Ramondetta negotiated his multiple offer letters in California. Plaintiff counter signed the final
     agreement, consummating and executing it in California. (See Ramondetta's Declarations and
17   Legal Argument B, 1). On February 27, 2006, the first offer from Konami titled "JOB OFFER –
     KONAMI GAMING, INC" was faxed to Plaintiff in California already pre-signed by Sutherland
18   (exhibit 1). The only identified contingencies indicated in this offer was that the "Final offer
     subject to company drug test and compliance approval. It should be noted employees must be
19   willing to submit to background checks of multiple gaming jurisdictions". Plaintiff had a
20   subsequent phone call(s) with Sutherland and Nam regarding changes but never heard any
     mention of an arbitration clause being added to the revised offer letter. On March 3, 2006 another
21   offer letter was faxed, this time it was signed by Satoshi Sakamoto (SS) with a number of changes
     added that Plaintiff had not discussed or agreed to (see Exhibit 2). In addition to removing some
22   of Plaintiff's agreed to responsibilities for managing Systems' Sales team, Konami added an
23   arbitration provision. Nowhere in the offer letter or in the arbitration provision was Nevada law
     specified. Ramondetta's comments on this offer letter included underlining part of the arbitration
24   clause and a note questioning why he "give up my legal rights". Plaintiff faxed these changes and
     discussed them with Sutherland via phone. Despite the arbitration provision not being included in
25   any prior written or discussed correspondences, Sutherland said, "Konami would not remove or
     change the arbitration provision since it was a non negotiable company policy for all contracts".
26   He said it had never been used since any issues would "likely be resolved before it was enacted".
27   (for the above paragraph see Legal Arguments A, 2, 3 and 5) **Fitz v. NCR Corp., 118 Cal. App.**
     **4th 702, 2004:** Nevertheless, pursuant to "general contract law principles," California courts may
28

PLAINTIFF'S PTS OF AUTHORITY 7/29/08          -6-

CASE NO. C08-01002 EDL

invalidate arbitration agreements when they contain provisions that are "unconscionable or contrary to public policy." ( Armendariz, supra, 24 Cal.4th at p. 99

( Armendariz, supra, 24 Cal.4th at p. 114.) The procedural element generally takes the form of an adhesion contract, which " 'imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " ( Id. at p. 113, quoting Neal v. State Farm Ins. Cos. (1961) 188 Cal. App. 2d 690, 694 [10 Cal. Rptr. 781].)

The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party. [Citations.]" (Kinney v. United HealthCare Services, Inc., supra, 70 Cal.App.4th at p. 1329.)

We recently—in Abramson—rejected a similar argument by the employer: "Plaintiff's ability to negotiate other aspects of his employment with [his employer] has no bearing on the question of whether he had power to negotiate the arbitration provision." (Abramson, supra, 115 Cal.App.4th at p. 662; see also Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at p. 812 [unconscionability claim upheld, notwithstanding plaintiff's status as "an experienced promoter and producer of musical concerts"]; Stirlen v. Supercuts, Inc., supra, 51 Cal.App.4th at p. 1533 [contract determined to be adhesive, despite plaintiff being "a successful and sophisticated corporate executive"].)

**McCoy v. Superior Court, 87 Cal. App. 4th 354, 2001:**
"Given the lack of choice and the potential disadvantages that even a fair arbitration system can harbor for employees, we must be particularly attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable terms as part of an arbitration agreement." (Armendariz, 24 Cal. 4th at p. 115.)

Konami's claim on page 1, line 10 which is also reiterated a number of times in their Motion to Compel Arbitration was that Ramondetta "did not even attempt to negotiate the binding arbitration provision". That is incorrect and indicates Konami's lack of understanding of the actual offer process and calls into question Sutherland's Declaration that Ramondetta "never attempted to negotiate the arbitration provision". The final letter was faxed from Konami on March 16th. The Plaintiff discussed by phone and added some hand written changes and signed and dated the offer contract on March 24th with the discussed and agreed to changes. Despite Ramondetta's concerns, Sutherland was not willing to negotiate on the arbitration provision so it was not changed or removed. The Offer Agreement was sent to Ramondetta pre-signed by Sakamoto, (see Exhibit 12). Ramondetta signed the Offer Letter in California making the agreement executed and consummated in Northern California (for the above paragraph see Legal Arguments A, 2, 3 and 5).

For various reasons, the sign-on bonus, severance and benefits package were purposefully negotiated into Ramondetta's Offer Letter and agreed to by Konami. It seems like in Konami's COUNTERCLAIMS i.e. paragraphs 10, 27 & 28, they are now "crying over spilt milk" regarding the sign-on bonus, severance, vacation etc. but these items were all implicitly agreed to by Konami without any indication of reservations. It was Konami not Ramondetta who chose to terminate his employment based on their "beliefs" that are not substantiated by the facts related to Ramondetta's relocation evaluation and search.

This arbitration provision is unconscionable. The arbitration provision said in part, "By accepting this offer of employment, you agree to settle any and all claims, disputes or controversies …exclusively by final and binding arbitration before a neutral arbitrator…" The term "you agree" is one sided. It requires Ramondetta to handle his claims through "binding arbitration" but requires no constraints on Konami to use any procedure including the judicial system. It will be shown that despite being unemployed with no income, Plaintiff was required to pay all arbitration fees, Plaintiff was required to find an arbitrator and try to initiate arbitration. Ramondetta received no support from Konami or their Counsel for this process other than to inflame and prolong it. Konami and their counsel used their superior bargaining power to try to impose one sided solutions even while the Plaintiff was trying to initiate use of Konami's unfair arbitration provision they required him to sign. Ramondetta was told if he did not agree to the arbitration clause, the offer would be rescinded. The provision was added with no negotiation or discussion after the fundamental terms of the agreement were already agreed to. Based on the agreed to terms of the initial February 27th signed offer letter, Ramondetta had made changes to his existing responsibilities not expecting the addition of the new non discussed terms. Konami is trying to enforce an Arbitration clause as part of an offer letter agreement while ignoring the other terms they don't like such as the severance package and vacation pay. The Defendants cannot pick and choose which parts of the contact they want to honor without accepting responsibility for the terms of the entire agreement. (for the above paragraph see Legal Arguments A, 2, 3 and 5). **Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041**: (See Stirlen, 51 Cal. App. 4th at p. 1534.) The clause was substantively unconscionable because it unilaterally required her to submit her claims to arbitration while reserving the employer's right to go to court. (Kinney, supra, 70 Cal. App. 4th at p. 1332; Stirlen, supra, 51 Cal. App. 4th at p. 1536

**Mercuro v. Superior Court, 96 Cal. App. 4th 167:** Also contends the arbitration is fatally flawed **because it does not guarantee a neutral arbitrator which, our Supreme Court has held, "is essential to ensuring the integrity of the arbitration process. . . ." [18]

**Hull v. Norcom, Inc., supra, 750 F.2d 1547**: The Eleventh Circuit held the arbitration clause invalid and unenforceable under New York law that "an arbitration agreement will not be enforced unless it is 'mutually binding,' and an agreement is not mutually binding where one party reserves the option to raise any and all disputes that it may have against the other party in a court of law rather than through arbitration." ( Id., at p. 1549, citing Miner v. Walden (1979) 101 Misc.2d 814 [422 N.Y.S.2d 335].)

**McCoy v. Superior Court, 87 Cal. App. 4th 354, 2001:** "In the case of pre-employment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal. 4th at p. 115.

Plaintiff commuted from California for the two months during his employment to learn his new role, travel all around North America to meet customers, evaluate his team and attend trade shows (see Legal Arguments B, 1). Given the business challenges of a Konami's turn-around situation with extensive weekly and weekend travel, Plaintiff had little time to evaluate housing options prior to learning the business. Expense documentation can be provided to support this. Plaintiff is not sure how much experience Konami has had with relocations but Plaintiff has relocated and

1  relocated others numerous times and the process takes minimally six months plus to a year not less
2  than two months. Konami chose to terminate Ramondetta's employment on June 14th before his
3  kids were out of school for the summer and a relocation could potentially take place. Only a very
   small percentage of Plaintiff's employment time was spent in Konami's Las Vegas office (see
   Legal Argument B, 2). Most of Plaintiff's time was spent traveling to various customers and at
4  trade shows or in California. Plaintiff never relocated, had residence or a driver's license etc. in
   Nevada (see Ramondetta's Declarations).
5

6  It will be shown that Konami withheld salary and expense payments until Plaintiff was forced to
   sign documents under duress (see Legal Arguments A, 2, 3, 6 and B, 4 for below paragraph).
7  Konami's Human Resources Director, Bobby Youngblood sent Ramondetta an e-mail on May 1,
   2006 requiring him to sign forms including falsely claimed that he was a Nevada resident (see
8  Exhibit 8). This request was performed under substantial duress. It will be shown Ramondetta
   had no income since Konami had withheld all salary and expense payments up to that point unless
9  Ramondetta signed a number of forms including one that unethically stated that he had a
   permanent residence in Nevada. There was no history of salary or expense payments until after
10 Plaintiff was forced to sign those forms. Plaintiff was even told by Youngblood to miss scheduled
   customer commitments to "require you coming to Las Vegas to sign documents and the other
11 necessary forms. Even if you have to miss the MS Gaming Show,". There was a strong rivalry
12 and personal dislike between Sutherland and Youngblood so Plaintiff was generally instructed by
   Sutherland not to take Youngblood's direction since she was not my boss and would likely be
13 gone soon; but she was still the HR Director. Youngblood's employment was terminated not long
   after Plaintiff's departure. Other employees can support this Sutherland/Youngblood feud.
14 **McCoy v. Superior Court, 87 Cal. App. 4th 354, 2001:** "In the case of pre-employment
15 arbitration contracts, the economic pressure exerted by employers on all but the most sought-after
   employees may be particularly acute, for the arbitration agreement stands between the employee
16 and necessary employment, and few employees are in a position to refuse a job because of an
   arbitration requirement." (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24
17 Cal. 4th at p. 115.

18 A few days after Plaintiff signed forms, Youngblood sent Ramondetta another e-mail on May 4,
19 2006 that Konami was finally "processing your first expense report". After less than a month of
   employment Konami had decided not to pay Plaintiff's travel expenses to Nevada, "please note
20 that further submission of hotel, rental car, food and other items will not be authorized or
   approved for reimbursement." (see Exhibit 8A and Arguments A, 2, 3, 7 & B, 4). Ramondetta felt
21 this was a strong arm tactic to force his immediate relocation to Nevada. At the time, Ramondetta
22 explained to his boss, Sutherland, that he was traveling a lot to learn the business and meet his
   customers and team but was in the process of considering relocation options and needed some
23 time. During the employment discussions, Ramondetta made it very clear to Sutherland that he
   would not consider relocation immediately since his children were still in school. This serves to
24 address a number of accusations from Konami's COUNTERCLAIMS including paragraph 20.
25 Sutherland agreed to resolve the issue with Youngblood; Ramondetta did not hear anything after
   that. There was never agreement on relocation much less a time frame to do it in. Plaintiff is not
26 sure how much experience Konami has had with relocations but Plaintiff has relocated and
   relocated others numerous times and the process takes minimally six months plus to a year not less
27 than two months.

28

1   Regarding Konami's COUNTERCLAIMS in paragraph's 18, 19 and 20, despite Plaintiff's limited
2   time, the facts are and will show that he spent substantial time to view and evaluate the housing
    market. Plaintiff traveled with numerous real estate agents looking at high rise condos and homes
3   in i.e. Anthem, Green Valley, Henderson etc. and even visited some schools. Konami obviously
    has no real facts other than their perceptions or "beliefs" in COUNTERCLAIMS i.e. paragraphs 3
4   & 23 etc., "On information and belief, Ramondetta had no intention of relocating from California
    to Nevada, nor did he have the approval or support of his family to relocate from California to
5   Nevada." Konami certainly had the right to terminate Ramondetta on their "belief's" but that does
    not absolve them from paying him the agreed to benefits in his offer contract including severance
6   and vacation pay. The fact that Konami withheld income and expense payments until forcing
7   Ramondetta to sign documents falsely stating he was a Nevada resident made Ramondetta believe
    Konami's intentions were unethical. Ramondetta was evaluating the housing market to make an
8   informed decision since per the offer letter (see Exhibit 12) if a relocation took place "the
    employee is responsible for the repayment of all relocation costs to Konami." Housing prices in
9   Las Vegas had risen to a height in a highly accelerated market that was than well on it's way into
    an aggressive down turn which complicated matters. Today, Nevada has one of the highest
10  foreclosures in the country.

11  It should be stressed that Ramondetta provided volumes of data and filled out multiple gaming
12  documents for submission for State and province gaming authorities. An employee at
    Ramondetta's level is required to submit forms, documents and get approval for each state and or
13  province that Konami is registered in. The process Konami used for Ramondetta to provide
    all the documents to Carol Zmunda, Plaintiff does not recall her title or Denise, Plaintiff does not
14  recall her last name or title. Carol was the administrative "Guru" that everyone turned to for
15  processing documents. They both worked for Jingoli who ran the department. While traveling all
    over North America and learning a new job, Plaintiff was having to provide in some cases 5 to 25
16  years or more of W2's, bank accounts and statements with dates opened and closed, mortgage
    documents with purchased dates, values and balances, 5 years of tax returns, birth certificates,
17  passports, Social Security cards, marriage certificates and marriage history, high school and
    college degrees and transcripts, wife's personal and professional information, 25 years of past
18  residences, references with their detailed personal information, family members with their detailed
19  personal information and that of their spouses, education history, lawsuit history, 25 years or since
    being 18 of employment history, stock certificates with purchase dates, automobiles, net worth,
20  credit card statements, trust documents, safe deposit information, etc, etc, (see Exhibit 9 &
    Argument A, 6). Plaintiff considers himself well organized but even for him especially from
21  California, this was a lengthy and time consuming process especially given his hectic travel
22  schedule. As you can imagine, it would have been incredible challenging if Plaintiff tried to
    collect and find all these documents in the middle of a relocation (see Argument B, 3).

23  On the state or province submission forms, Plaintiff manually filled out the New Jersey or Ontario
24  submission, contrary to COUNTERCLAIMS in paragraph 17, he believes an "incident" prior to
    his 18th birthday was definitely disclosed. The Ontario submission also had a number of
25  supplements that it may have been disclosed on (see Argument A, 6). Konami is required to keep
    these documents in Plaintiff's file so Konami must have them. The process Konami used for
26  Ramondetta and likely all employees is for the employee to pull together all their personal and
27  financial data. The employee also manually fills out a couple of state or province submission
    forms usually being New Jersey and Ontario. Since many of the questions are similar, those
28  submission forms are used by the Konami's Compliance Department personnel to extract data for

PLAINTIFF'S PTS OF AUTHORITY 7/29/08        -10-

CASE NO. C08-01002 EDL

1  additional state and province submissions. Ramondetta was instructed to provide all his
2  information regularly to Carol Zmundo. After providing all the information, Plaintiff only signed
   the final documents prepared by the Compliance Department for submission to the appropriate
3  state or province. It is largely the Compliance Department's responsibility including Jingoli as the
   Compliance Department Director, Carol Zmundo and the Compliance Department's team to
4  properly transfer and submit all the information from the manually filled out submissions and
   documents regularly provided to a formal type written submission for each state or province like
5  Ontario. Contrary to Konami's COUNTERCLAIMS in paragraph 16, Ramondetta sat with Jingoli
   to review the wording of his submission to make sure Jingoli was comfortable with what was
6  written including Plaintiff's disclosure of the incident before he was 18. There is likely e-mail
7  evidence to support this (see Argument A, 6). On October 8, 1999, the trial court tentatively ruled
   to deny the employer's motion. It found that the arbitration clause was both procedurally and
8  substantively unconscionable in that (1) the employer had access to the courts while the employee
   did not; (2) the parties' rights to discovery were limited, a factor which had significantly greater
9  impact on the employee than on the employer; and (3) if the employee initiated a court or
   administrative remedy, she would have to bear all costs, expenses, and attorney fees, even if she
10 prevailed.

11 **Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041;** In finding the arbitration clause
12 **herein to be invalid, the trial court found that "the parties rights to discovery are limited" and
   this limitation "has a significantly greater impact on plaintiff than defendant."
13

14 It is largely the responsibility of the Compliance Department to track that all employee provided
   information was stored, transfer it for other submissions and input the data. Someone from the
15 Compliance Department like Zmundo, Denise or Jingoli would aggressively e-mail or voice mail
   an employee if they were missing documents for their submissions. Plaintiff recalls one or two of
16 those. Plaintiff would also check with Compliance regularly to see if he was missing anything to
   avoid a e-mail or call. Plaintiff does not recall the Compliance Department making him aware he
17 was missing any documents including credit card statements or bank statements in preparation for
18 the Ontario interview (see Argument A, 6). Being new to this process, there were volumes of data
   and records that Plaintiff needed to provide for himself and his family. It was not an issue
19 providing any required documentation but it was involved to make sure everything needed was
   provided especially if you hadn't been through the process before and were traveling a lot. This
20 process would have been even more complicated if Plaintiff was in the middle of a relocation.

21 As stated earlier, in documents and at meetings with Jingoli, Plaintiff voluntarily disclosed an
22 incident before he was 18. Jingoli was well aware of this "incident" and commented that "it didn't
   matter if you were an axe murderer as long as you disclosed it." Jingoli cannot claim that he was
23 unaware of this "incident". Additionally, at Ramondetta's meeting with the gaming detectives,
   Ramondetta voluntarily disclosed the minor misdemeanor breach of peace incident that happened
24 in high school before he was 18. The charges for the incident were completely dropped and
   Ramondetta's record was completely expunged of the incident. Ramondetta was told by
25 authorities subsequent to and at the time that it was completely legal and acceptable for him to
26 answer "NO" when asked if he was ever been arrested or charged with a crime. This is why the
   incident was initially not disclosed on the Konami Employment Disclosure Form prior to
27 Plaintiff's hire., referencing COUNTERCLAIMS in paragraphs 13, 14 & 15. Despite this,
   Plaintiff volunteered the information to Jingoli and the Ontario Inspectors. Since records of the
28 incident had been removed, no one would have known unless Ramondetta volunteered the

1   information. Plaintiff was in no way trying to hide the incident since it was voluntarily disclosed
    to Jingoli and on submission documents. Prior to either the New Jersey or Ontario submission,
2   Ramondetta sat with Jingoli to review the wording of his submission to make sure Jingoli was
    comfortable with what was written including Plaintiff's disclosure of the incident before he was
3   18. Jingoli told Ramondetta he had all the documentation needed for submissions including for
4   Ontario. Plaintiff doesn't recall either Jingoli, Zmundo or anyone from the Compliance
    Department mentioning that Plaintiff was missing statements or accounts in preparation for the
5   Ontario inspectors (see Argument A, 6).

6   On or about June 8, 2006, Ramondetta had a meeting with two Gaming Inspectors from the
    Province of Ontario, Canada, Wilf Muller, Detective Sergeant, from the Alcohol and Gaming
7   Commission of Ontario Investigation and Enforcement Bureau and Rob Knudsen, Detective
8   Inspector, Director Investigations Branch. These are lengthy meetings similar to a police
    interrogation where the regulators question you and review documents on all aspects of your
9   personal, business and financial background. Coming from outside the industry, this was the
    Plaintiff's first meeting with any regulatory gaming organization and Plaintiff was given virtually
10  no preparation from Konami prior to the meeting (see Argument A, 7). Both Sutherland and
    Thomas Jingoli, Director Legal Compliance where out of town for the meeting. It will be shown
11  that it is standard practice for someone from Konami, usually Jingoli, to spend a substantial
    amount of time preparing an employee prior to an interview with gaming detectives. It is also
12  standard practice for Jingoli to be available during the meeting in case questions arise, especially
13  with someone from outside of their industry like Ramondetta. Other employees can testify to the
    support they received and there is likely an employee record of it. Ramondetta had tried to talk
14  directly with Jingoli and contacted Jingoli via e-mail to request spending some preparation time
15  with him prior to the meeting (see Argument A, 6). Jingoli was leaving for meetings with Konami
    corporate in Japan sometime that week and he did not seem overly interested. Jingoli felt the
16  interview should be "no big deal". Plaintiff believes it was highly likely that by that time Konami
    had already considered or made the decision to terminate Ramondetta's employment which
17  happened a few days later.

18  In an e-mail to Jingoli, Muller, the Ontario Detective mentioned Plaintiff "was missing a few
19  things" in his meeting including "a bank account", "recent credit card statements" and "he failed
    to disclose on his personal Disclosure Form the "incident" as a minor when he was arrested."
20  During the meeting, the detectives simply gave Ramondetta a preprinted form titled "Checklist"
    with ten boxes that could be checked for photocopies of various items. Apparently the items are
21  routinely missing by others otherwise the detectives wouldn't have had a standard form (see
22  Exhibit 10). Regarding the bank statement, Plaintiff neglected to disclose it. It is an old business
    account with a few thousand dollars in it. Plaintiff apologizes for this. Regarding the credit card
23  statements, Ramondetta doesn't understand how this could not have been included for Ontario
    meeting. Ramondetta believes the statements were submitted to the Compliance Department but
24  may not have been included by them in the Ontario submission (see Argument A, 6). Given all
    the records and data Plaintiff provided, he may have missed some documents especially given his
25  lack of experience, travels and limited input from the Compliance Department. Regarding the
    incident prior to Plaintiff's 18th birthday, Plaintiff believes he did disclose this (see Argument A,
26  6). Plaintiff was not intentionally trying to hide anything. Per the inspectors' request, Plaintiff
27  was planning on sending Muller copies of the statements for arrival the following week but was
    terminated a few days later. Muller said there was "no rush since he was going on vacation for
28  two weeks". There was nothing to hide in these accounts and Ramondetta still has the statements

1  available for review. Konami should also have records of Plaintiff's documents in his file. Above
2  is Plaintiff's response to Konami's COUNTERCLAIMS in paragraphs 7, 8 & 17.

3  Immediately after Plaintiff's termination on June 15th, he called and spoke with Wilf Muller, the
   Detective Sergeant and also tried to call Rob Knudsen, Detective Inspector. Muller said that
4  "although you were missing some items; assuming the information you provided has no issues, I'd
   be recommended for registration". Thomas Jingoli had told Plaintiff that Jingoli had a strong
5  personal and business relationship with the Ontario detectives and briefly described some joint
   "drinking events" that he couldn't elaborate on. Regarding Jingoli, it is almost definitely in
6  Jingoli's personnel file but he was reprimanded and given an official leave for a drunken incident
7  on a plane where he supposedly harassed a flight attendant in front of numerous customers and
   employees. Jingoli also likely has another incident on his personnel file regarding an alleged fight
8  with an employee that led to pushing after a trade show in the Konami hospitality suite for
   customers (see Argument A, 6).
9
10 Konami chose to terminate Ramondetta before any potential relocation could happen and before
   any potential regulatory registrations were completed. After my termination Howard Cole,
11 Konami counsel, sent me an e-mail on June 16, 2006 in response to my phone conversation with
   Cole on June 14th regarding my intention to pursue claims against Konami (see Exhibit 5).
12 Verbally and in that e-mail Cole states, "it would be the intention of KGI to request a panel of
   arbitrators from Nevada and/or California" (see Argument A, 1, 3, & 7). Konami subsequently
13 never supported this position which should be required via the "neutral arbitrator" part of the
   arbitration provision. Also in his e-mail, Cole included the names of so called "neutral"
14 arbitrators. Upon calling those firms to inquire about their services, it was evident to Ramondetta
15 that most of them had some historical non neutral relationship with Mr. Cole or his firm.

16 The California Supreme Court had previously held that a neutral arbitrator is essential to ensuring
   the integrity of the arbitration process. ( Graham v. Scissor-Tail, Inc. (1981) 28 Cal. 3d 807, 825,
17 171 Cal. Rptr. 604, 623 P.2d 165.) As in Armendariz, no one in this case challenges the
18 requirement for a neutral arbitrator.

19 **Mercuro v. Superior Court, 96 Cal. App. 4th 167:**
   Also contends the arbitration is fatally flawed because it does not guarantee a neutral arbitrator
20 which, our Supreme Court has held, "is essential to ensuring the integrity of the arbitration
   process. . . ." [18]
21
22 Cole also reinforced Konami's intent to have Ramondetta incur all the arbitration fees despite
   being unemployed with no income saying, "I believe that there is a fee for filing an arbitration
23 claim with the AAA although I do not know the amount" (see Arguments A, 4, 3 & B, 4). He also
   tries to scare Ramondetta from arbitration by saying "it would be the intention of KGI to
24 counterclaim…". Konami expects Plaintiff as a California resident and employee to plead his case
25 in Nevada which is a less employee balanced state, where he had no residence nor would he have
   any resources to support his case. It would be virtually impossible to get a fair review under
26 Nevada law. Konami is one of the world's biggest global gaming companies with ties to
   regulators, government officials and police services. Mr. Cole's, prior firm, Lionel, Sawyer and
27 Collins lists minimally 70+ attorneys on their letterhead, many likely have similar contacts,
   making it impossible to have a fair review of Plaintiff's case.
28

PLAINTIFF'S PTS OF AUTHORITY 7/29/08     -13-

CASE NO. C08-01002 EDL

1 **Pinedo v. Premium Tobacco Stores, 85 Cal. App. 4th 774, 2000:**

2 The court also concluded that requiring the plaintiff to share the costs of arbitration was unreasonable: "Accordingly, consistent with the majority of jurisdictions to consider this issue, we

3 conclude that when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any type

4 of expense that the employee would not be required to bear if he or she were free to bring the action in court.

5

6 In <u>Cole v. Burns International Security Services (D.C. Cir. 1997) 323 U.S. App. D.C. 133, 105 F.3d 1465</u>, the court held an employer could not require an employee to submit his statutory

7 claims to arbitration and then require him to pay all or part of the arbitrators' fees....The court concluded these costs "necessarily and impermissibly deter[] teachers from exercising their due

8 process right to a hearing" (<u>id. at p. 357</u>), bolstering its reasoning with a reference to Cole

9 On October 8, 1999, the trial court tentatively ruled to deny the employer's motion. It found that the arbitration clause was both procedurally and substantively unconscionable in that (1) the

10 employer had access to the courts while the employee did not; (2) the parties' rights to discovery were limited, a factor which had significantly greater impact on the employee than on the

11 employer; and (3) if the employee initiated a court or administrative remedy, she would have to

12 bear all costs, expenses, and attorney fees, even if she prevailed.

13 Around June of 2007, Ramondetta had filled out and filed the proper forms with AAA to initiate arbitration. On July 24, 2007 in a letter to Michele Jackson with the American Arbitration

14 Association (see Exhibit 6), Cole states, "Konami Gaming, Inc. ("KGI") does <u>not</u> consent to the

15 AAA acting as the administrating agency pursuant to the terms applicable law detailed in the demand for arbitration. <u>KGI cannot consent to the AAA serving as the administering agency for</u>

16 <u>several compelling reasons including, without limitation, the underlying dispute is governed by</u> <u>Nevada law because the employment at issue was based in Nevada.  California law referenced in</u>

17 <u>the Demand For Arbitration does not apply to the instant dispute, and the proper venue for any</u> <u>arbitration is exclusively in Clark County, Nevada.</u>"  At no time did Konami pay fees to support

18 the arbitration provision or file papers (see Argument A, 1, 2, 3, 4 & B, 4). It was evident to

19 plaintiff that Konami's position was not in anyway helping to initiate the arbitration provision. Additionally, in this letter and others, Konami uses inflammatory assertions like, "It is illogical

20 and absurd for Ramondetta to apparently claim that California law governs this dispute... Mr. Ramondetta must have made false statements and/or withheld material information in filing the

21 Demand For Arbitration" and "Mr. Ramondetta has historically pursued a course of venue

22 shopping". In his August 16th letter to Ramondetta. In his August 16, 2007 letter (see Exhibit 7), Cole reinforces Konami's intention to have Ramondetta pay all arbitration fees saying, "Since

23 receipt of your letter, additional information has come to light...The AAA notified you on July 30th that filing deficiencies existed in your Demand that needed to be rectified, including

24 furnishing all requisite information as well as the appropriate filing fee."... it would appear that

25 you failed and/or refused to rectify said deficiencies leading to closure of the matter by AAA." The letter from AAA did not state Ramondetta was at fault for the unsuccessful arbitration (see

26 Argument A, 1 & B, 4). In the August 15, 2007 letter from Ms. Jackson of the American Arbitration Association (see Exhibit 7A), she refers to "Dear Parties: On July 30, 2007 you were

27 notified that the filing requirements for the above matter have not been met." She says nothing

28 about "you (Plaintiff) failed and/or refused to rectify said deficiencies leading to closure of the matter by AAA."

1

2   Upon Plaintiff's termination and in good faith, Ramondetta had tried repeatedly to resolve his
    issues civilly and amiably.  Ramondetta initially tried to work directly with Sutherland and
3   Youngblood.  Plaintiff was directed by them to work with Konami's counsel, Howard Cole.
    Around March of 2007, Ramondetta filed a claim with the California Department of Labor
4   Standards Enforcement that accepted jurisdiction over the Plaintiff's expense case.  On April 19th,
    2007 in a letter from Ms. Ellen Shaffer, Sr., Deputy Labor Commissioner, she stated that
5   "California does have Jurisdiction over the matter" (see Exhibit 11 and Arguments B, 3 & 4).  As
    described above, on around June 2007 Ramondetta filed a claim with the American Arbitration
6   Association.  On or about August 10, 2007, Plaintiff sent Defendants' a final Demand Letter.
    Rather than proactively work to resolve our issues Konami and their Council are playing a big
7   company Samson vs. Goliath game and strong arm tactics in an effort to scare Plaintiff into
    dropping this issue or doing it on their terms.  Since Konami did not respond to Plaintiff's efforts,
8   he began proceedings through this Court in February of 2008.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S PTS OF AUTHORITY 7/29/08        -15-

CASE NO. C08-01002 EDL

1    **IV.    LEGAL ARGUMENT**

2    **A.    This arbitration provision is Substantive and Procedural unconscionable and in
     violation of unwaivable public policy right:**

3    **Fitz v. NCR Corp., 118 Cal. App. 4th 702, 2004**: Arbitration agreements permit parties to

4    voluntarily submit their disputes for resolution outside of a judicial forum and are "valid,
     enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract."

5    (Code Civ. Proc., § 1281.) California law favors the enforcement of arbitration agreements and
     any "doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration.

6    [Citations.]" ( Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street (1983)

7    35 Cal.3d 312, 323 [197 Cal. Rptr. 581, 673 P.2d 251]; see also Armendariz, supra, 24 Cal.4th at
     p. 97 .) Nevertheless, pursuant to "general contract law principles," California courts may

8    invalidate arbitration agreements when they contain provisions that are "unconscionable or
     contrary to public policy." ( Armendariz, supra, 24 Cal.4th at p. 99.)

9

10   There are three steps in reviewing the validity of arbitration agreements. The first step involves
     identifying "whether the agreement implicates public or private rights." ( Abramson v. Juniper

11   Networks, Inc. (2004) 115 Cal.App.4th 638, 651–652 [9 Cal. Rptr. 3d 422] (Abramson).) Public
     rights are those that affect " 'society at large' rather than the individual" and include

12   discrimination claims under FEHA. ( Little v. Auto Stiegler, Inc. (2003) 29 Cal.4th 1064, 1077

13   [130 Cal. Rptr. 2d 892, 63 P.3d 979] (Little); see also Armendariz, supra, 24 Cal.4th at p. 100.)

14   The second step is to apply the enforceability standards applicable to those rights. "Where **the
     plaintiff's claims arise from unwaivable public rights, whether statutory or nonstatutory, the

15   arbitration agreement must satisfy the minimum requirements set forth in Armendariz." (
     Abramson, supra, 115 Cal.App.4th at p. 652.) "Where the plaintiff asserts private rights rather

16   than (or in addition to) unwaivable public rights, the agreement to arbitrate those claims is tested
     only against conscionability standards." (Ibid.)

17

18   The California Supreme Court has stated that an arbitration agreement between employer and
     employee cannot be made to serve as a vehicle for the waiver of statutory rights. ( Armendariz,

19   supra, 24 Cal.4th at p. 101.) Furthermore, there is no need to "distinguish" between public rights
     derived from statute or common law when "arbitration agreements … harbor terms, conditions and

20   practices that undermine the vindication of unwaivable rights." ( Little, supra, 29 Cal.4th at p.
     1079.)

21

22   Konami uses an argument of "strong public policy in favor of arbitration" but they neglect to
     mention that the Plaintiff has unwaivable public rights that are neglected in Konami's

23   unconscionable Konami arbitration provision that serves as a vehicle for the waiver of statutory
     rights.

24

25   The doctrine of unconscionability contains two components: procedural unconscionability and
     substantive unconscionability. Procedural unconscionability focuses on "oppression" or "surprise"

26   due to unequal bargaining power. ( Armendariz, supra, 24 Cal.4th at p. 114.) **The procedural
     element generally takes the form of an adhesion contract, which " 'imposed and drafted by the

27   party of superior bargaining strength, relegates to the subscribing party only the opportunity to
     adhere to the contract or reject it.' "** ( Id. at p. 113, quoting Neal v. State Farm Ins. Cos. (1961)

28   188 Cal. App. 2d 690, 694 [10 Cal. Rptr. 781].) Substantive unconscionability, on the other hand,

1   focuses on overly harsh or one-sided results. ( Armendariz, supra, 24 Cal.4th at p. 114.)

2   Substantively unconscionable terms may "generally be described as unfairly one-sided." ( Little, supra, 29 Cal.4th at p. 1071.) For example, an agreement may lack "a modicum of bilaterality"

3   and therefore be unconscionable if the agreement requires "arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." ( Armendariz, supra, 24

4   Cal.4th at p. 119.)

5   Fitz v. NCR Corp., 118 Cal. App. 4th 702, 2004, In order to ensure that mandatory arbitration agreements are not used to curtail an employee's public rights, the California Supreme Court in

6   Armendariz set forth five minimum requirements (the Armendariz requirements). Arbitration

7   agreements in the employer-employee context must provide for: (1) neutral arbitrators, (2) more than minimal discovery, (3) a written award, (4) all types of relief that would otherwise be

8   available in court, and (5) no additional costs for the employee beyond what the employee would incur if he or she were bringing the claim in court. ( Armendariz, supra, 24 Cal.4th at pp. 102,

9   110–111, citing Cole v. Burns Intern. Security Services (D.C. Cir. 1997) 323 U.S. App. D.C. 133

10  [105 F.3d 1465, 1482]; see also Little, supra, 29 Cal.4th at p. 1081.)

11  The Konami arbitration provision fails on all these requirements. 1) Although the provision states "exclusively by final and binding arbitration before a neutral arbitrator", in their actions, Konami

12  tried to "stack the deck" in their favor by requiring arbitration in Nevada under Nevada law putting the Plaintiff at a distinct disadvantage (exhibit 6). When Plaintiff phoned the so called

13  "neutral arbitrators" Konami recommended, they all had a "relationship" with Konami's counsel. Even when Plaintiff tried to initiate arbitration through AAA who Konami recommended, Konami

14  still would not accept or support the process. 2) Konami's arbitration provision does not say

15  anything about "minimal discover". This factor would have a significantly greater impact of the Plaintiff since most records, documents; witnesses etc are controlled by Konami. 3) There is no

16  stipulation in the Konami arbitration agreement requiring a "written award". 4) There is nothing in the Konami arbitration provision requiring "relief that would otherwise be available in court".

17  To the contrary, it is one-sided by saying "you agree", giving Konami access to the courts while

18  Ramondetta has none. 5) By the actions of Konami (exhibits 6 & 7), the arbitration provision implies that Konami's intent on "costs" is for the Plaintiff to bear the full burden of the fees and

19  costs of arbitration.

20  Fitz v. NCR Corp., 118 Cal. App. 4th 702, 2004: "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion ... ." ( Little, supra, 29 Cal.4th at p.

21  1071.) Even if a party is aware of some of the contractual terms, procedural unconscionability may

22  still be found. When a contract is oppressive, awareness of its terms does not preclude a finding that the arbitration agreement is unenforceable. ( Kinney v. United HealthCare Services, Inc.,

23  supra, 70 Cal.App.4th at p. 1330.)

24  Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267, 2004: "Despite the strong policy favoring arbitration, there are circumstances in which California courts may invalidate or limit

25  agreements to arbitrate. Employing 'general contract law principles,' courts will refuse to enforce

26  arbitration provisions that are 'unconscionable or contrary to public policy.' [Citation.]"
(Abramson, supra, 115 Cal.App.4th at p. 651, quoting Armendariz, supra, 24 Cal.4th at p. 99.)

27  The Konami agreement is "unconscionable or contrary to public policy" since it does not meet the

28  standard identified in Plaintiff's argument.

PLAINTIFF'S PTS OF AUTHORITY 7/29/08          -17-

CASE NO. C08-01002 EDL

1

2    While procedural unconscionability usually occurs through a finding that the contract is one of

3    adhesion, this is not necessarily the case. "So let us be quite clear about it: Adhesion is not a

4    prerequisite for unconscionability." (Harper v. Ultimo (2003) 113 Cal.App.4th 1402, 1409 [7

5    Cal. Rptr. 3d 418].) "What was oblique in Graham [v. Scissor-Tail, Inc. (1981) 28 Cal.3d 807

6    [171 Cal. Rptr. 604, 623 P.2d 165]], though, has now become clear in Little. 'The procedural

7    element of an unconscionable contract generally takes the form of a contract of adhesion.'

8    (Little, supra, 29 Cal.4th at p. 1071, italics added; [citation.]) That is, you can show procedural

9    unconscionability by a showing of adhesion, but it is not the only way. There will be cases ...

10    where procedural unconscionability is obvious without the need to establish that the contract is

     one of adhesion." (Harper v. Ultimo, supra, at p. 1410

11

12    The Konami provision was a contract of adhesion being imbalance in favor of Konami, "By
      accepting this offer of employment, you agree to settle any and all claims, disputes…". The term
13    "you agree" means that they are not mutually agreeing to the same provisions and can resolve their
      claims as they choose It is unfair and unbalanced and imposes a unilateral obligation to arbitrate.
14    Despite Plaintiff's amiable efforts to initiate the arbitration provision, Konami still tried to exert
15    their Sampson v. Goliath power to make an already unconscionable provision even more unfair.

16    " 'Procedural unconscionability' concerns the manner in which the contract was negotiated and
      the circumstances of the parties at that time. [Citation.] It focuses on factors of oppression and
17    surprise. [Citation.] The oppression component arises from an inequality of bargaining power of
      the parties to the contract and an absence of real negotiation or a meaningful choice on the part of
18    the weaker party. [Citations.]" (Kinney v. United HealthCare Services, Inc., supra, 70 Cal.App.4th
19    at p. 1329.) "The component of surprise arises when the challenged terms are 'hidden in a prolix
      printed form drafted by the party seeking to enforce them. [Citation.]' (Kinney v. United
20    HealthCare Services, Inc., supra, 70 Cal.App.4th at p. 1329.) Where an adhesive contract is
      oppressive, surprise need not be shown." (Abramson, supra, 115 Cal.App.4th at p. 656.)

21

22    Plaintiff initially negotiated a offer letter with Konami titled, "JOB OFFER – KONAMI
      GAMING, INC" and signed by Sutherdand. There was no written or verbal discussion regarding
23    an arbitration provision being added to the agreement including under terms and contingencies of
      the written offer. The first sentence said, "Outlined below are the terms of the offer from Konami
24    Gaming, Inc. Once we agree to the final terms, I will forward a formal job offer letter for the
      position". The only identified contingencies indicated are that the "Final offer subject to company
25    drug test and compliance approval. It should be noted employees must be willing to submit to
      background checks of multiple gaming jurisdictions" (Exhibit 1). The Plaintiff never agreed to or
26    discussed an arbitration provision with Sutherland prior to it unilaterally being added. Plaintiff
      disputed it in his response, in his notes and verbally. The provision is adhesive and was a surprise
27    to Plaintiff after he believed the terms or the agreement were discussed and agreed to. Sutherland
28    was very specific in saying the arbitration provision was a "take it or leave it" provision with no
      room for negotiation since according to Sutherland, it was "standard in all Konami contracts". It

PLAINTIFF'S PTS OF AUTHORITY 7/29/08        -18-

CASE NO. C08-01002 EDL

would be interesting to analyze if an arbitration provision is in all Konami's contracts. The provision was included at a time when Plaintiff had limited options due to making changes in his current responsibilities based on what he thought was a mutually agreed to offer letter. Although Plaintiff did negotiate other aspects of his employment, Plaintiff did not have any options to negotiate the arbitration provision and even underlined wording and wrote in his notes that it "gave up legal rights". Although Plaintiff is a successful executive, he is not experienced at offer letter agreements. Sutherland reinforced that the arbitration provision should not be an issue since it had never been used and any issues would likely be resolved prior to enacting it.

Further, we cannot agree that the facts emphasized by defendant negate a finding of procedural unconscionability. Plaintiff had been unemployed for nearly three years while the prior case was pending and he needed the job from defendant to support his family. The fact that plaintiff was able to negotiate a three-year "good cause" provision in the employment agreement did not, of itself, place him on equal footing with defendant in the negotiation process. We recently—in Abramson—rejected a similar argument by the employer: "Plaintiff's ability to negotiate other aspects of his employment with [his employer] has no bearing on the question of whether he had power to negotiate the arbitration provision." (Abramson, supra, 115 Cal.App.4th at p. 662; see also Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at p. 812 [unconscionability claim upheld, notwithstanding plaintiff's status as "an experienced promoter and producer of musical concerts"]; Stirlen v. Supercuts, Inc., supra, 51 Cal.App.4th at p. 1533 [contract determined to be adhesive, despite plaintiff being "a successful and sophisticated corporate executive"].)

Admittedly, plaintiff's negotiating position in this case is not at the far end of the spectrum customarily seen in cases where the employee has an absence of any bargaining power. [17] There was nonetheless—based upon the evidence presented, including the absence of negotiation of the standard form arbitration clause and plaintiff's need for employment—a degree of "inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party." (Kinney v. United HealthCare Services, Inc., supra, 70 Cal.App.4th at p. 1329.)

As we have noted, the mandatory arbitration clause in the employment agreement has at least three features that make it substantively unconscionable. Of the greatest overall significance is the fact that it imposes on the employee only a unilateral obligation to arbitrate: "In assessing substantive unconscionability, the paramount consideration is mutuality." (Abramson, supra, 115 Cal.App.4th at p. 664.) Given the high degree of substantive unconscionability therefore, we readily hold that this fact—coupled with the lower quantum of procedural unconscionability discussed ante—warrants the conclusion that the mandatory arbitration agreement is unconscionable.

**1.    The arbitration is fatally flawed because it does not guarantee a neutral arbitrator:**
Flores v. Transamerica HomeFirst, Inc. (2001) 93 Cal. App. 4th 846, 851 [113 Cal. Rptr. 2d. 376. In this case our review is controlled by our Supreme Court's decision in Armendariz v. Foundation Health Psychcare Services, Inc. [2] In Armendariz, the court concluded the arbitration agreement in question was procedurally and substantively unconscionable. In addition, the agreement failed to provide an adequate forum for the vindication of the employees' statutory rights under the Fair Employment and Housing Act (FEHA).

The Konami arbitration provision violates the Plaintiff's unwaivable public rights under since it is unconscionable and Plaintiff has no recourse.

**Mercuro v. Superior Court, 96 Cal. App. 4th 167:**  Also contends the arbitration is fatally flawed **because it does not guarantee a neutral arbitrator which, our Supreme Court has held, "is essential to ensuring the integrity of the arbitration process. . . ." [18]

The California Supreme Court had previously held that a neutral arbitrator is essential to ensuring the integrity of the arbitration process. ( Graham v. Scissor-Tail, Inc. (1981) 28 Cal. 3d 807, 825, 171 Cal. Rptr. 604, 623 P.2d 165.) As in Armendariz, no one in this case challenges the requirement for a neutral arbitrator. ( Armendariz, supra, 24 Cal. 4th at p. 103.) The integrity and neutrality of the JAMS/Endispute organization when conducting arbitration hearings is not in question.

Even though Konami uses the term "neutral arbitrator", their intent is to take full advantage of their bargaining power and pressure Plaintiff into an arbitration process that is anything but neutral.

**2.     The arbitration provision is unfairly one sided in requiring arbitration for one party: Mercuro v. Superior Court, 96 Cal. App. 4th 167:**
Makes two arguments going to the substantive unconscionability, i.e., basic fairness, of the arbitration agreement. The agreement is unfairly one-sided in requiring arbitration of most claims of interest to employees but exempting from arbitration most claims of interest to Countrywide. [9]

**Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041**: (See Stirlen, 51 Cal. App. 4th at p. 1534.) The clause was substantively unconscionable because it unilaterally required her to submit her claims to arbitration while reserving the employer's right to go to court. (Kinney, supra, 70 Cal. App. 4th at p. 1332; Stirlen, supra, 51 Cal. App. 4th at p. 1536

On October 8, 1999, the trial court tentatively ruled to deny the employer's motion. It found that the arbitration clause was both procedurally and substantively unconscionable in that (1) the employer had access to the courts while the employee did not; (2) the parties' rights to discovery were limited, a factor which had significantly greater impact on the employee than on the employer; and (3) if the employee initiated a court or administrative remedy, she would have to bear all costs, expenses, and attorney fees, even if she prevailed. Following a hearing, the court adopted its tentative ruling. The court's order denying the employer's motion to compel arbitration was filed on that same date. [4]

**Hull v. Norcom, Inc., supra, 750 F.2d 1547**:  Which was relied upon in Chase, supra, has particular relevance to the instant case, because it indicates that an arbitration clause in an employment contract similar in some respects to that before us may be found unenforceable as too one-sided under state contract law requiring mutuality of obligation. The arbitration clause of the contract at issue in Hull compelled both parties to submit disputes arising out of the agreement to binding arbitration. However, another provision of the contract rendered this mutual obligation illusory, because it granted the employer the unilateral right to a judicial forum if the employee breached confidentiality and non competition provisions in the employment contract, or "for any breach of this Agreement." The Eleventh Circuit held the arbitration clause invalid and unenforceable under New York law that "an arbitration agreement will not be enforced unless it is 'mutually binding,' and an agreement is not mutually binding where one party reserves the option to raise any and all disputes that it may have against the other party in a court of law rather than

1  through arbitration." ( Id., at p. 1549, citing Miner v. Walden (1979) 101 Misc.2d 814 [422
2  N.Y.S.2d 335].) The court concluded that application of such a general provision of state contract
   law to the determination of the making of an arbitration agreement "does not contravene the
3  Federal Arbitration Act or its underlying policy." (750 F.2d at p. 1551.)

4  "Civil Code section 1670.5, subdivision (a) provides, in pertinent part, that a contract clause found
   to be unconscionable is unenforceable, unless the court severs the clause or so limits its
5  application as to avoid any unconscionable result. Under this statute, a court may not refuse to
   enforce a contract clause unless it determines that the clause is both procedurally and substantively
6  unconscionable. (Armendariz, supra, 24 Cal.4th at p. 114; A & M Produce Co. v. FMC Corp.
   (1982) 135 Cal. App. 3d 473, 486–487 [186 Cal. Rptr. 114] … .)" (Gutierrez v. Autowest, Inc.
7  (2003) 114 Cal.App.4th 77, 87 [7 Cal. Rptr. 3d 267], fn. omitted.) Civil Code section 1670.5,
8  subdivision (a) states: "If the court as a matter of law finds the contract or any clause of the
   contract to have been unconscionable at the time it **was made the court may refuse to enforce
9  the contract, or it may enforce the remainder of the contract without the unconscionable clause, or
   it may so limit the application of any unconscionable clause as to avoid any unconscionable
10  result."

11  3.    **The arbitration provision is imposed as a condition of employment by a superior**
12  **bargaining strength with no opportunity to negotiate:**
   **McCoy v. Superior Court, 87 Cal. App. 4th 354, 2001:** It is beyond dispute that the Firm's
13  arbitration agreement here, having been imposed as a condition of employment with no
   opportunity to negotiate, was adhesive. (Armendariz v. Foundation Health Psychcare Services,
14  Inc., supra, 24 Cal. 4th at pp. 114-115.) And while we agree there must be more to render a
   contract unenforceable, an adhesive contract fulfills the first step in the unconscionability analysis.
15  Especially in the context of an employment agreement, the adhesive nature of a compulsory
16  predispute arbitration agreement is the filter through which the rest of the analysis is performed.
   "Given the lack of choice and the potential disadvantages that even a fair arbitration system can
17  harbor for employees, we must be particularly attuned to claims that employers with superior
   bargaining power have imposed one-sided, substantively unconscionable terms as part of an
18  arbitration agreement." (Armendariz, 24 Cal. 4th at p. 115.)

19  "In the case of pre-employment arbitration contracts, the economic pressure exerted by employers
20  on all but the most sought-after employees may be particularly acute, for the arbitration agreement
   stands between the employee and necessary employment, and few employees are in a position to
21  refuse a job because of an arbitration requirement." (Armendariz v. Foundation Health Psychcare
   Services, Inc., supra, 24 Cal. 4th at p. 115.)
22

23  The policy in favor of arbitration does not apply when the contract cannot be interpreted in favor
   of arbitration. There is no policy in favor of arbitrating a dispute the parties did not agree to
24  arbitrate. ( Lawrence v. Walzer & Gabrielson (1989) 207 Cal. App. 3d 1501, 1505 [256 Cal. Rptr.
   6].)
25

26  **Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041:** In opposition to the employer's
   motion to compel arbitration, Shubin renewed her arguments that the agreement she had signed
27  was both procedurally and substantively unconscionable. Relying primarily on Kinney v. United
   HealthCare Services, Inc. (1999) 70 Cal. App. 4th 1322 (Kinney) and Stirlen v. Supercuts, Inc.
28  (1997) 51 Cal. App. 4th 1519 (Stirlen), she argued that the arbitration clause was procedurally

unconscionable in that it was contained in a contract of adhesion drawn up by the employer that Shubin had no realistic ability to modify.

The Court stated that unconscionability analysis begins with an inquiry into whether the contract is one of adhesion, i.e., " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' ( Neal v. State Farm Ins. Cos. (1961) 188 Cal. App. 2d 690, 694, 10 Cal. Rptr. 781.)" (Armendariz, supra, at p. 113.) If the contract is adhesive, a court must then decide if there are other factors present which operate to make it unenforceable. Citing Graham v. Scissor-Tail, Inc., supra, 28 Cal. 3d 807, the Supreme Court recognized two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. ( Armendariz, supra, 24 Cal. 4th at p. 113, 99 Cal. Rptr. 2d 745, 6 P.3d 669.) One is that if such a contract or provision does not fall within the reasonable expectations of the weaker party, it will not be enforced against that party. The second is that a contract or provision, "even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' [Citations.]" ( Graham v. Scissor-Tail, Inc., supra, 28 Cal. 3d at p. 820.)

**Stirlen v. Supercuts, 51 Cal. App. 4th 1519, 1997:** The judicially developed criteria for determining whether an arbitration clause is unconscionable and therefore unenforceable are set forth in Graham v. Scissor-Tail, Inc. (1981) 28 Cal. 3d 807 [171 Cal. Rptr. 604, 623 P.2d 165] (Scissor-Tail), which the trial court explicitly relied upon. The analysis commences with the determination whether the agreement to arbitrate is a contract of adhesion. If it is, the court must then determine whether other factors operate to render it unenforceable. "Generally speaking,"the court declared, "there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second--a principle of equity applicable to all contracts generally--is that a contract or provision, even if consistent with the reasonable expectation of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' [Citations.]" ( Id., at p. 820.) In other words, an adhesive contract "would remain fully enforceable unless (1) all or part of the contract fell outside the reasonable expectations of the weaker party or (2) it was unduly oppressive or unconscionable under applicable principles of equity." ( Izzi v. Mesquite Country Club (1986) 186 Cal. App. 3d 1309, 1317 [231 Cal. Rptr. 315], italics added, citing Keating v. Superior Court (1982) 31 Cal. 3d 584, 594 [183 Cal. Rptr. 360, 645 P.2d 1192].)

Supercuts maintains that the contract here is not adhesive because it did not have superior bargaining strength. It emphasizes that Stirlen was not a person desperately seeking employment but a successful and sophisticated corporate executive Supercuts sought out and "hired away" from a highly paid position with a major corporation "by offering him an annual salary of $ 150,000, and then agreeing to remunerative 'extras' not included in the standard executive employment agreement," such as generous stock options, a bonus plan, a supplemental retirement plan, and a $ 10,000 "signing bonus." We are unpersuaded.

In the present case Stirlen appears to have had no realistic ability to modify the terms of the employment contract...Stirlen's assertions that the employment contract was presented to him on a "take it or leave it basis" and that every other corporate officer was required to and had signed an identical agreement, were not disputed.

1   Supercuts claims Stirlen is "estopped" from claiming the arbitration clause is unconscionable
2   because he "was too bright and too well experienced in the machinations of corporate management
    to sign an agreement that was 'unduly oppressive.' " This argument relates not so much to whether
3   the contract is unduly oppressive as to whether it is adhesive, a matter we need not revisit. The
    suggestion that a contract or clause cannot be unconscionable if it is accepted by a knowledgeable
4   party has been repudiated by our Supreme Court. As explained in Scissor-Tail, an adhesion
    contract or provision thereof will be denied enforcement if it is unduly oppressive "even if
5   consistent with the reasonable expectations of the parties." (Scissor-Tail, supra, 28 Cal. 3d at p.
    820, italics added, citing, as examples, Steven v. Fidelity & Casualty Co. (1962) 58 Cal. 2d 862,
6   878-879 [27 Cal. Rptr. 172, 377 P.2d 284] and Jacklich v. Baer (1943) 57 Cal. App. 2d 684 [135
7   P.2d 179].) Scissor-Tail shows that our Supreme Court is among the many courts that "have begun
    to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised
8   by unconscionable contract terms. [Citations.]" ( A & M Produce Co. v. FMC Corp., supra, 135
    Cal. App. 3d 473, 489-490.)
9
    **Pinedo v. Premium Tobacco Stores, 85 Cal. App. 4th 774, 2000:** The court also concluded that
10  requiring the plaintiff to share the costs of arbitration was unreasonable: "Accordingly, consistent
    with the majority of jurisdictions to consider this issue, we conclude that when an employer
11  imposes mandatory arbitration as a condition of employment, the arbitration agreement or
    arbitration process cannot generally require the employee to bear any type of expense that the
12  employee would not be required to bear if he or she were free to bring the action in court. This
13  rule will ensure that employees bringing FEHA claims will not be deterred by costs greater than
    the usual costs incurred during litigation, costs that are essentially imposed on an employee by the
14  employer." (Armendariz, supra, 24 Cal. 4th at pp. 110-111, italics in original.)
15
    The court then turned to the issue of whether the arbitration agreement was unconscionable. It first
16  concluded that the agreement was one of adhesion: "[I]n the case of preemployment arbitration
    contracts, the economic pressure exerted by employers on all but the most sought-after employees
17  may be particularly acute, for the arbitration agreement stands between the employee and
    necessary employment, and few employees are in a position to refuse a job because of an
18  arbitration requirement. While arbitration may have its advantages in terms of greater expedition,
19  informality, and lower cost, it also has, from the employee's point of view, potential
    disadvantages: waiver of a right to a jury trial, limited discovery, and limited judicial review.
20  Various studies show that arbitration is advantageous to employers not only because it reduces the
    costs of litigation, but also because it reduces the size of the award that an employee is likely to
21  get, particularly if the employer is a 'repeat player' in the arbitration system. [Citation.] It is
    perhaps for this reason that it is almost invariably the employer who seeks to compel arbitration.
22  [Citation.]" (Armendariz, supra, 24 Cal. 4th at p. 115.)
23
    **4.    The arbitration provision requires employee to pay all or part of the arbitrator fees:**
24  In Cole v. Burns International Security Services (D.C. Cir. 1997) 323 U.S. App. D.C. 133, 105
    F.3d 1465, the court held an employer could not require an employee to submit his statutory
25  claims to arbitration and then require him to pay all or part of the arbitrators' fees. Observing that
    the average arbitrator's fee is $ 700 per day, the court characterized these fees as "prohibitively
26  expensive" for an employee who has lost his job, rendering him unable to pursue his statutory
    claims. (105 F.3d at p. 1484.) Cole was cited with approval by the California Supreme Court in
27  California Teachers Assoc. v. State of California (1999) 20 Cal. 4th 327, 975 P.2d 622, which
28  invalidated a provision in the Education Code imposing half of the costs of an administrative law

1    judge on teachers who unsuccessfully challenged a threatened suspension or dismissal. The court
2    concluded these costs "necessarily and impermissibly deter[] teachers from exercising their due
     process right to a hearing" (id. at p. 357), bolstering its reasoning with a reference to Cole: "The
3    invalidity of a provision requiring dismissed public teachers to pay for the public cost of the
     administrative law judge is apparent when we consider decisions holding that even private
4    employees who have agreed to private arbitration of statutory wrongful termination claims cannot
     be compelled to pay half the cost of the arbitrator." (California Teachers Assoc., 20 Cal. 4th at pp.
5    354-355.)

6    **Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041:** Further, under the
7    "JAMS/Endispute" rules incorporated into the employer's agreement, the parties to arbitration
     involving employment disputes are limited to taking the deposition "of one individual under the
8    control of the opposing Party" and each must pay a pro rata share of Jams/Endispute fees. (See
     JAMS/Endispute Arbitration Rules and Procedures for Employment Disputes (Jams/Endispute
9    rules).) Citing Cole v. Burns International Security Services (D.C. Cir. 1997) 323 U.S. App. D.C.
10   133, 105 F.3d 1465 (Cole),Shubin argued that an employer could not require an employee to
     submit his or her statutory claims to arbitration and then require the employee to pay all or part of
11   the arbitrators' fees. ( Cole, 105 F.3d at pp. 1483-1485.)

12   The Cole court held that it was unlawful to require an employee who is the subject of a mandatory
     employment arbitration agreement to have to pay the costs of arbitration. ( Cole, supra, 105 F.3d
13   at pp. 1483-1485.) Our Supreme Court had previously applied this rule in California Teachers
     Assn. v. State of California (1999) 20 Cal. 4th 327, 355, 975 P.2d 622, in which it considered
14   whether it was constitutionally permissible to statutorily require a teacher who loses an
15   administrative challenge to a dismissal to pay one-half of the administrative law judge's fees. The
     Supreme Court held it was not. (Ibid.)

16
17   **5.      The arbitration provision is purposely written vague, unintelligible and ambiguous:**
     There is no shortage of pertinent cases holding that the FAA is not offended by the refusal to
18   enforce an arbitration agreement under state contract law principles similar to the doctrine of
     unconscionability. For example, in Chan v. Drexel Burnham Lambert, Inc. (1986) 178 Cal. App.
19   3d 632 [223 Cal. Rptr. 838], a stockbroker brought a wrongful discharge action against her former
     employer, a securities brokerage firm. The firm moved to compel arbitration under the
20   employment agreement, which assertedly incorporated a stock exchange rule requiring arbitration
     of employment disputes. The trial court denied the motion and the Court of Appeal affirmed. The
21   appellate court held that although the FAA governs the interpretation of arbitration clauses, "[t]he
     existence of a valid agreement to arbitrate involves general contract law principles and state law
22   governs disposition of that question." ( Id., at p. 640, italics in original; accord, Cheng-Canindin v.
23   Renaissance Hotel Associates (1996) 50 Cal. App. 4th 676 [57 Cal. Rptr. 2d 867], and cases there
     cited.) The court found that the agreement did not clearly and unequivocally incorporate the stock
24   exchange rule nor specifically refer to arbitration. Applying California law construing any
     ambiguity in a contract as to the formation of an agreement to arbitrate, the court held that the
25   motion to compel arbitration was properly denied. The state law relied upon in Chan is no more
26   generally applicable to contracts than the doctrine we rely upon here.

27   **McCoy v. Superior Court, 87 Cal. App. 4th 354, 2001:** While the agreement recited the
     employee's "understanding" that the employer gave up its right to a jury trial, it only obligated the
28   employee, not the employer, to arbitrate claims arising from his employment. At best, the

1   agreement is ambiguous; at worst, it is a deliberate attempt to obfuscate the Firm's retention of
2   litigation rights. Contrast the clearly expressed mutual obligation to arbitrate that was upheld in 24
    Hour Fitness, Inc. v. Superior Court (1998) 66 Cal. App. 4th 1199: "'If any dispute arises from
3   your employment with Nautilus, you and Nautilus agree that you both will submit it exclusively to
    final and binding arbitration.'" (Id. at p. 1205, italics omitted.) The agreement here did not clearly
4   require the employer to arbitrate its claims against the employee.

5   The Konami arbitration provision is deliberately written in favor of Konami to obfuscate their
    retention of legal rights and put the Plaintiff at a distinct disadvantage.  It is very ambiguous since
6   it does not outline what arbitration organization should be used for arbitration, where the
7   arbitration should take place, what law should be used, what the procedure it to initiate arbitration,
    how the fees and costs will be divided etc, etc.

8
    ### 6.    The Arbitration does not provide for equal discovery:
9   There is a substantial amount of documents and communications that Plaintiff desires access to in
    order to better defend his case.  Plaintiff already has copies of some of these documents but wants
10  to compare them to what Konami has.

11
    **Shubin v. William Lyon Homes, Inc., 84 Cal. App. 4th 1041;**  In finding the arbitration clause
12  **herein to be invalid, the trial court found that "the parties rights to discovery are limited" and
    this limitation "has a significantly greater impact on plaintiff than defendant." Shubin had argued
13  that under the JAMS/Endispute rules, each party has a limited "right to take the deposition of the
    opposing party or of one individual under the control of the opposing Party." (See
14  **JAMS/Endispute rules, supra, P 13(b).)  In Armendariz, the employees argued that employers
15  typically possess the documents relevant to an employment discrimination case and employ many
    of the relevant witnesses. Denying adequate discovery would lead to the frustration of the
16  employee's rights. ( Armendariz, supra, 24 Cal. 4th at p. 104, 99 Cal. Rptr. 2d 745, 6 P.3d 669.)

17  ( Armendariz, supra, 24 Cal. 4th at pp. 105-106.) "Accordingly, whether or not the employees in
    this case are entitled to the full range of discovery provided in Code of Civil Procedure section
18  1283.05, they are at least entitled to discovery sufficient to adequately arbitrate their statutory
19  claim, including access to essential documents and witnesses, as determined by the arbitrator(s)
    and subject to limited judicial review pursuant to Code of Civil Procedure section 1286.2." ( Id., at
20  p. 106, fn. omitted.)  The Supreme Court therefore held "that **the employer, by agreeing to
    arbitrate the FEHA claim, has already impliedly consented to such discovery. Therefore, lack of
21  discovery is not grounds for holding a FEHA claim inarbitrable." (Ibid.)

22  While it may often be advantageous for employees to submit employment disputes to arbitration,
23  it may also be disadvantageous. For example, arbitral discovery is ordinarily much more limited
    than judicial discovery, which may seriously compromise an employee's ability to prove
24  discrimination or unfair treatment. (Bales, Compulsory Arbitration of Employment Claims: A
    Practical Guide to Designing and Implementing Enforceable Agreements (1995) 47 Baylor L.Rev.
25  591, 608-609 [It "would be impossible" for employees to prove disparate treatment "without the
    opportunity to obtain from [employers] statistical information about the employment practice in
26  question."]; but see Gilmer v. Interstate/Johnson Lane Corp., supra, 500 U.S. at p. 31 [114 L. Ed.
27  2d at pp. 40-41].)  Procedural protections available in arbitration are inferior in other ways to those
    employees may obtain in a judicial forum. As the Ninth Circuit noted in Prudential Ins. Co. of
28  America v. Lai (9th Cir. 1994) 42 F.3d 1299, in California ". . . the privacy rights of victims of

1  sexual harassment are protected by statutes limiting discovery and admissibility of plaintiff's

2  sexual history in a judicial proceeding." ( Id., at p. 1305, fn. 4.) No such statutory protection is
   provided an employee compelled to arbitrate a claim of sexual harassment against an employer

3  under an agreement of the sort presented here, in which the parties do not agree that the civil
   discovery statutes shall apply. (See Code Civ. Proc., § 1283.05, subd. (a), 1283.1.) [10]

4
   In short, the arbitration clause provides the employer more rights and greater remedies than would

5  otherwise be available and concomitantly deprives employees of significant rights and remedies
   they would normally enjoy. Considering the terms of the arbitration clause in the light of the

6  commercial context in which it operates and the legitimate needs of the parties at the time it was

7  entered into, we have little difficulty concluding that its terms are " 'so extreme as to appear
   unconscionable according to the mores and business practices of the time and place.' . . . ."

8  (Williams v. Walker-Thomas Furniture Co. (D.C. Cir. 1965) 350 F.2d 445, 450 [121 App.D.C.
   315, 18 A.L.R.3d 1297].)

9
   Fitz v. NCR Corp., 118 Cal. App. 4th 702, 2004:  , Adequate discovery is indispensable for the

10 vindication of statutory claims. (See Armendariz, supra, 24 Cal.4th at p. 104.) " '[A]dequate'
   discovery does not mean unfettered discovery … ." ( Mercuro v. Superior Court (2002) 96

11 Cal.App.4th 167, 184 [116 Cal. Rptr. 2d 671] (Mercuro).) And parties may "agree to something

12 less than the full panoply of discovery provided in Code of Civil Procedure section 1283.05." (
   Armendariz, supra, 24 Cal.4th at pp. 105–106 .) However, arbitration agreements must "ensure

13 minimum standards of fairness" so employees can vindicate their public rights. ( Little, supra, 29
   Cal.4th at p. 1080).

14

15 **7.    Contractual and Tortuous Breach of contract or the Implied Covenant of Good Faith
   and Fair Dealing:**

16 Konami.breached the offer letter contract; and breached the implied covenant of good faith and
   fair dealing. Konami did this by not accepting and adhering to the terms our offer contract

17 including but not limited to severance package or vacation pay. They did not deal in good faith by
   forcing him Plaintiff to sign a unconscionable arbitration provision. They also did not deal in

18 good faith by not supporting the arbitration provision unless it was on their terms. Konami forced

19 Plaintiff by withholding payment of salary and expenses to sign documents that were untrue
   asserting he was a Nevada resident so they could pay him from Nevada.  Konami did not properly

20 prepare Plaintiff for the regulatory process including filling out, providing, tracking documents
   and preparation for interviews.  Konami terminated Ramondetta's employment despite his best

21 efforts to perform in his job simply because of a "belief" of misrepresentations.

22

23 **B.    California choice of law applies here for resolution of claims:**
   California law should apply to resolution of Plaintiff's claims.  California courts follow the

24 relevant contracts test from the RESTATEMENT (SECOND) OF CONFLICTS OF LAW.  The
   relevant contracts are:  [¶] (a) the place of contracting, [¶] (b) the place of negotiation of the

25 contract, [¶] (c) the place of performance, [¶] (d) the location of the subject matter of the
   contract, and [¶] (e) the domicil, residence, nationality, place of incorporation and place of

26 business of the parties."  California law is indisputably the relevant and applicable law that
   governs Plaintiff's claims.

27
   Additionally, Plaintiff's rights and the state's public policy would be substantially violated and

28 diminished if he were required to litigate under Nevada law.  Choices of Law should favor the

state whose interests would be "more impaired" if the states law was not applied, in this case California.

**1   The place of negotiating and contracting (consummating and executing):**
Ramondetta was contacted on or about January 2006, by Eve Nam, Senior Associate, at Korn/Ferry International recruiters, based at 2600 Michelson Drive in Irvine, CA for the Vice President of Sales and Marketing role for Konami. Ramondetta had a number of extensive interviews with Nam and her boss Elliot Gordon, Senior Client Partner, also in the Irvine office. Although Konami claims on page 2, line 5 in their Motion to Compel Arbitration, to have "hired international search firm Korn Ferry International ("Korn Ferry")" because they were an international search firm, both Sutherland and Gordon told Ramondetta they have a personal and business relationship which is largely why Sutherland hired that specific California branch of Korn/Ferry to recruit for this role. Although a preference for relocation was mentioned, it was not positioned as a requirement.

A recruiter like Korn-Ferry, acts as a direct representative for the employer and indirect representative for the potential employee. As the third party intermediary, prior to, during and after the offer was tendered, Ramondetta talked with and negotiated with Nam and Elliot in California to develop, initiate and finalize the offer letter in numerous phone calls. After the February 17, 2006 interview, Nam contacted Ramondetta regarding interest by Konami in making an offer. Ramondetta discussed and negotiated terms with Nam from his home office and Nam's Irvine California office. Eventually Sutherland phoned Ramondetta in California to discuss and negotiate Sutherland's perception of those terms that Sutherland eventually finalized in his February 27, 2006 "JOB OFFER – KONAMI GAMING, INC". Before, during and after the interview, Ramondetta called Nam in California to gather information prior to the interview, provide input and expectations following the interview and negotiate Plaintiff's expectation of what he would require in an offer. Sutherland was contacted just prior to the offer being tendered.

On February 17th, Plaintiff flew to Las Vegas for a 1:30 PM interview with Steve Sutherland and Satoshi Sakamoto (SS). The interview was not a forum for negotiations but rather the interview consisted of Sutherland and Sakamoto questioning Plaintiff on his background as a potential fit for the position and Plaintiff asking questions to better understand the company, industry and role.

Contrary to Defendant's claims on page 2, line 25 of their Motion to Compel Arbitration, "during the second round of interviews", Ramondetta has no recollection of a formal "second round of interviews" occurring with Thomas Jingoli, Director Legal Compliance, or Bobbi Youngblood, Director, Human Resources prior to the initial February 27th offer being extended.    Ramondetta flew to Las Vegas twice after the initial February 27th offer letter was faxed. Ramondetta phoned Jingoli and Youngblood to get procedural information after the offer was extended.

All the offer letters were faxed to the Plaintiff pre-signed including the final offer letter dated March 16th, that was faxed pre-signed by Sakamoto. Ramondetta counter-signed the final offer letter and dated it on March 24th. Ramondetta signed the Offer Letter in California making the agreement signed, executed and consummated in Northern California.

**2   The place of performance:**
The offer letter did not specifically mention a place of performance. Per his offer letter, Ramondetta was responsible to oversee Konami's "sales in the North American market", (Exhibit 13). No where in the offer letter does it require relocation nor does it outline the timing associated

with relocation. Ramondetta made it very clear that he would not consider or execute any potential relocation until minimally the end of the summer. Konami has a number of employees who perform their duties from outside of Las Vegas including in Oregon and Louisiana. It is not unique for a sales employee to work remotely.

As can be shown by travel and expenses that the majority Plaintiff's time during his employment was spend traveling in North America or in California vs. the Konami Las Vegas office.

The Position Specification describing the role was very detailed, 6 pages covering very specific Responsibilities and Professional Qualifications etc., (Exhibit 3). Despite this attention to details, Las Vegas, Nevada was only mentioned once in the document. No where on the Position Specification does it say relocation is required. Additionally, in the notes that Ramondetta took during his interview with Sutherland and Sakamoto, no mention of required relocation was added (Exhibit 4).

### 3 The domicil, residence, nationality, place of incorporation and place of business of the parties:

Ramondetta has been a long time Citizen and resident of California. Ramondetta has paid California taxes during that time including property taxes, income taxes and sales taxes etc. While employed with Konami, Ramondetta was a California resident. Ramondetta never relocated, established residence or a drivers license etc. in Nevada.

Konami repeatedly claims licensing was so important in their Motions and COUTERCLAIMS i.e. paragraph 7 "it was also explained to Ramondetta that, due to the highly regulated nature of the gaming industry, if hired, he would be required to become licensed and/or registered by the gaming control". Most of the Plaintiff personal and financial information and documents including bank statements, taxes, mortgages and references etc., etc., listed at length earlier on page 10 that Ramondetta had to gather were near his California residence. Trying to locate and gather this data in the middle of a relocation would have put licensing and Ramondetta's job in jeopardy.

Konami may be a Nevada corporation but Konami Corporation in Japan has a U.S. based holding company for all three divisions headquartered at 2381 Rosecrans Ave., Ste 200, El Segundo, CA 90245. Konami also has another office in California at 1400 Bridge Pkwy, Redwood City, CA.

Konami's office location may be Las Vegas but one of their principal places of business and where they get a substantial portion of their revenues generated, is from California. According to the notes Ramondetta took during the interview with Sutherland and Sakamoto (exhibit 4), California was a major strategic revenue and growth market for Konami and a substantial portion, "upwards of 50%", of their overall revenues. Ramondetta's notes noted, revenues decline in percentage from California to Canada, followed by Michigan and lastly, Las Vegas which was one of the smallest revenue base areas. Although that may not be accurate that is what the Plaintiff noted during the interview. Konami also has employees regularly traveling to California.

The California Department of Labor Standards Enforcement accepted jurisdiction over Ramondetta's expense case filed against Konami that Plaintiff addressed separately with them setting precedence for California law being the law of choice. On April 19th, 2007 in a letter from Ms. Ellen Shaffer, Sr. Deputy of Labor Commissioner, she stated that "California does have Jurisdiction over the matter", (exhibit 13). That case was dropped without prejudice since my travels would not allow me to attend the hearing date.

**4   The rights of the state's citizen's and public policy would be substantially violated and diminished since choices of law should favor the state whose interests would be "more impaired" if the state's law is not applied:**

Ramondetta, was and is a California citizen and resident and never relocated to Nevada, he must be treated as a California employee. Employment and labor laws in Nevada are not as employee balanced as in California. Ramondetta as a long time resident and employee based in California would be harmed. Plaintiff's rights and the state's public policy would be substantially violated and diminished if he was required to litigate under Nevada law. Choices of Law should favor the state whose interests would be "more impaired" if the states law was not applied, in this case California. It would be contrary to fundamental public policy in California. Ramondetta had no relationship, business or interests etc. in Nevada other than what Konami wants you to believe in the hopes that Nevada's less employee friendly law can be applied to this case. Konami on the other hand has relationships, business and interests in California. The legislature has ensured that the rights afforded to California citizens against unfair practices should not be diminished.

The implications of using less employee friendly Nevada law would be a hardship and oppressive on the Plaintiff. Ramondetta was a lone unemployed individual trying to plead his case against a multinational, multimillion dollar company to get justice. Konami expects Ramondetta, a long time California resident and employee, to plead his case under Nevada law which is a less labor balanced. It would also be virtually impossible for Ramondetta to get a fair review under Nevada law.

**In Hall v. Superior Court (1983) 150 Cal. App. 3d 411 [197 Cal. Rptr. 757] (Hall):**
Two California investors exchanged their interests in an oil and gas limited partnership in return for stock in one of their co-investors, Imperial Petroleum, Inc., a Utah corporation. Closer to the facts of this case, the contract embodying their exchange agreement contained both forum selection and choice of law provisions identifying Nevada as the selected forum and governing law. A dispute arose, and the two investors sued Imperial in California. ( Id. at pp. 413-415.) Imperial asserted the forum selection clause, and the trial court found the forum selection clause was enforceable.

**ABF Capital Corp. v. Grove Properties Co., 126 Cal. App. 4th 204:** If there is no contractual choice-of-law provision, and California is the forum state, California employs a three-step examination to determine which law to apply: " ' "[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event [that party] must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it."' [Citations.] ... the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California... . [I]f the relevant laws of each state are identical, there is no problem and the trial court may find California law applicable to class claims. [Citations.] [¶] If, however, the trial court finds the laws are materially different, it must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case. [Citation.] Despite materially different laws, 'there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied. [Citations.] [¶] Only if the trial court determines that the laws are materially different and that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be 'more impaired' if its law were not applied. [Citations.] In making this comparative impairment analysis, the trial court must determine 'the relative commitment of the respective states to the laws involved' and consider 'the history and current status of the states' laws' and 'the function and purpose of those laws.' [Citation.] These

1   rules apply whether the dispute arises out of contract or tort [citations], and a separate conflict of
    laws inquiry must be made with respect to each issue in the case [citations]." ( Washington
2   Mutual Bank v. Superior Court (2001) 24 Cal.4th 906, 919–920 [103 Cal. Rptr. 2d 320, 15 P.3d
    1071].)
3
    Here, of course, the contract did include an express choice-of-law provision. We therefore
4   undertake the Restatement analysis, as explained by the California Supreme Court in Nedlloyd
    Lines B.V. v. Superior Court, supra, 3 Cal.4th 459.
5
    1. New York Has a Substantial Relationship to the Parties or Transaction
6
    The express choice-of-law provision in the contract elected to apply and to construe the contract
7   under New York law.

8   Under the initial inquiry outlined in Nedlloyd, there can be little doubt that New York has a
    sufficient connection to the contract and the parties to meet the "substantial relationship" test
9   under Nedlloyd. Plaintiff, although a Delaware corporation, nonetheless has its principal place of
    business in New York. The limited partnership which defendants joined was a New York
10  partnership.

11  2. **Civil Code Section 1717 Represents a Fundamental Policy of California**

12  We turn to the next part of the Nedlloyd analysis: whether the New York law on the issue is
    contrary to a fundamental public policy of California, "'in the determination of the particular
13  issue.'" ( Nedlloyd Lines B.V. v. Superior Court, supra, 3 Cal.4th at p. 466) The "particular
    issue" to be determined is the reciprocity of attorney fees clauses, a very narrow issue indeed.
14
    3. California Has a Materially Greater Interest Than New York in the Subject of the Litigation
15
    Plaintiff argues that Ribbens is inapplicable for a second reason: that its facts are significantly
16  different from those here. Thus, even though California has a fundamental policy embodied in
    Civil Code section 1717, and this fundamental policy conflicts with New York law on the same
17  subject, the circumstances here, unlike those in Ribbens, do not show that California has a
    materially greater interest in the subject of the litigation, so as to require the application of
18  California law, rather than New York law, to the attorney fees issue. We also reject this
    contention.
19
    Plaintiff points out certain factual distinctions between Ribbens and the instant case. Ribbens did
20  involve a California contract to buy and sell goods in California. Here, by contrast, the
    transaction was a New York partnership agreement to be performed (payment rendered) in New
21  York, and concerned oil and gas operations in Oklahoma and Texas. Nonetheless, in both cases,
    the party choosing the litigation availed itself of California courts. Fair access to California
22  courts is a significant part of the policy underlying Civil Code section 1717. ( Ribbens Intern.,
    S.A. v. Transport Intern. Pool, supra, 47 F. Supp. 2d at p. 1123.)
23
    Restatement section 188, subdivision (2) states: "(2) In the absence of an effective choice of law
24  by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6
    to determine the law applicable to an issue include: [¶] (a) the place of contracting, [¶] (b) the
25  place of negotiation of the contract, [¶] (c) the place of performance, [¶] (d) the location of the
    subject matter of the contract, and [¶] (e) the domicil, residence, nationality, place of
26  incorporation and place of business of the parties."

27  **Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 1992:**
    . The proper test
28  We have not previously considered the enforceability of a contractual choice-of-law provision.
    We have, however, addressed the closely related issue of the enforceability of a contractual
    PLAINTIFF'S PTS OF AUTHORITY 7/29/08          -30-

    CASE NO. C08-01002 EDL

1   choice-of-forum provision, and we have made clear that, "No satisfying reason of public policy
    has been suggested why enforcement should be denied a forum selection clause appearing in a
2   contract entered into freely and voluntarily by parties who have negotiated at arm's length." (
    Smith, Valentino & Smith, Inc. v. Superior Court (1976) 17 Cal.3d 491, 495-496 [131 Cal.Rptr.
3   374, 551 P.2d 1206] (Smith).) The forum selection provision in Smith was contained within a
    choice-of-law clause, and we observed that, "Such choice of law provisions are usually respected
4   by California courts." ( Id., at p. 494.) We noted this result was consistent with the modern
    approach of section 187 of the Restatement Second of Conflict of Laws (Restatement). (17
5   Cal.3d at p. 494.) Prior Court of Appeal decisions, although not always explicitly referring to the
    Restatement, also overwhelmingly reflect the modern, mainstream approach adopted in the
6   Restatement. ( Mencor Enterprises, Inc. v. Hets Equities Corp. (1987) 190 Cal.App.3d 432, 435-
    436 [235 Cal.Rptr. 464] [explicit reference to Rest. § 187]; Hall v. Superior Court (1983) 150
7   Cal.App.3d 411, 417 [197 Cal.Rptr. 757] [no explicit reference]; Ashland Chemical Co. v.
    Provence (1982) 129 Cal.App.3d 790, 794-795 [181 Cal.Rptr. 340] [no explicit reference];
8   Gamer v. duPont Glore Forgan, Inc. (1976) 65 Cal.App.3d 280, 287 [135 Cal.Rptr. 230] [explicit
    reference to Rest. § 187].) [1]
9
    Implied covenant of good faith and fair dealing
10
    1. Substantial relationship or reasonable basis
11
    As to the first required determination, Hong Kong--"the chosen state"--clearly has a "substantial
12  relationship to the parties." (Rest., § 187, subd. (2)(a).) The shareholders' agreement, which is
    incorporated by reference in Seawinds' first amended complaint, shows that Seawinds is
13  incorporated under the laws of Hong Kong and has a registered office there. The same is true of
    one of the shareholder parties to the agreement--Red Coconut Trading Co. The incorporation of
14  these parties in Hong Kong provides the required "substantial relationship." (Id.,) com. f
    [substantial relationship present when "one of the parties is domiciled" in the chosen state];
15  Carlock v. Pillsbury Co. (D.Minn. 1988) 719 F.Supp. 791, 807 ["A party's incorporation in a
    state is a contact sufficient to allow the parties to choose that state's law to govern their
16  contract."]; Hale v. Co- Mar Offshore Corp. (W.D.La. 1984) 588 F.Supp. 1212, 1215 [same
    effect].)
17
    Moreover, the presence of two Hong Kong corporations as parties also provides a "reasonable
18  basis" for a contractual provision requiring application of Hong Kong law. "If one of the parties
    resides in the chosen state, the parties have a reasonable basis for their choice." ( Consul Ltd. v.
19  Solide Enterprises, Inc., supra, 802 F.2d 1143, 1147.) The reasonableness of choosing Hong
    Kong becomes manifest when the nature of the agreement before us is considered. A state of
20  incorporation is certainly at least one government entity with a keen and intimate interest in
    internal corporate affairs, including the purchase and sale of its shares, as well as corporate
21  management and operations. (See Corp. Code, § 102 [applying California's general corporation
    law to domestic corporations].)
22
    2. Existence of fundamental public policy
23
    We next consider whether application of the law chosen by the parties would be contrary to "a
24  fundamental policy" of California. We perceive no fundamental policy of California requiring
    the application of California law to Seawinds's claims based on the implied covenant of good
25  faith and fair dealing. The covenant is not a government regulatory policy designed to restrict
    freedom of contract, but an implied promise inserted in an agreement to carry out the presumed
26  intentions of contracting parties. ( Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 689-690
    [254 Cal.Rptr.211, 765 P.2d 373] (Foley) ["When a court enforces the implied covenant it is in
27  essence acting to protect 'the interest in having promises performed' [citation]--the traditional
    realm of a contract action--rather than to protect some general duty to society which the law
28  places on an employer without regard to the substance of its contractual obligations to its
    employee."].)

PLAINTIFF'S PTS OF AUTHORITY 7/29/08          -31-

CASE NO. C08-01002 EDL

1

2  Seawinds directs us to no authority exalting the implied covenant of good faith and fair dealing over the express covenant of these parties that Hong Kong law shall govern their agreement. We have located none. Because Seawinds has identified no fundamental policy of our state at issue

3  in its essentially contractual dispute with Nedlloyd, the second exception to the rule of section 187 of the Restatement does not apply.

4

5  **Ashland Chemical Co. v. Provence, 129 Cal. App. 3d 790, 1982:** Ashland unmeritoriously contends the court erred in ruling California's statute of limitations, rather than Kentucky's, applied to the guaranty contract. According to "traditional" choice of law theory, statutes of

6  limitation are procedural and are governed by forum law (Rest., Conflict of Laws, §§ 603, 604). This principle has been widely followed in California. (See e.g., State of Ohio ex rel. Squire v.

7  Porter (1942) 21 Cal.2d 45 [129 P.2d 691, 143 A.L.R. 1432] (cert. den. 318 U.S. 757 [87 L.Ed. 1131, 63 S.Ct. 531]); Biewend v. Biewend (1941) 17 Cal.2d 108 [109 P.2d 701, 132 A.L.R.

8  1264]; cases cited 2 Witkin, Cal. Procedure (2d ed. 1970) § 57.) However, in Reich v. Purcell (1967) 67 Cal.2d 551 [63 Cal.Rptr. 31, 432 P.2d 727], the Supreme Court abandoned the

9  "traditional" approach to choice of law problems and adopted instead Professor Brainerd Currie's governmental interest analysis approach. Under this approach, the courts examine the policies

10  underlying the competing laws of the involved states to determine which states are "interested" in having their laws applied to the issues in question. A state will have an interest in having its

11  law applied if the policies underlying the law would be thereby advanced. When only one of two potentially concerned states has an interest in having its law applied, the conflict of laws is said

12  to be "false"; the court simply applies the law of the only interested state ( Hurtado v. Superior Court (1974) 11 Cal.3d 574, 580 [114 Cal.Rptr. 106, 522 P.2d 666]; see Currie, Selected Essays

13  on the Conflict of Laws (1963) p. 189).

14  Here California is the only interested state. Statutes of limitation are designed to protect the enacting state's residents and courts from the burdens associated with the prosecution of stale

15  cases in which memories have faded and evidence has been lost ( McGee v. Weinberg (1979) 97 Cal.App.3d 798, 804 [159 Cal.Rptr. 86]). Here California courts and a California resident would

16  be protected by applying California's statute of limitations because California is the forum and the defendant is a California resident. Applying California's statute of limitations would thus

17  advance its underlying policy. In choice of law terms, California has an "interest" in applying its law. In contrast, Kentucky has no interest in having its statute of limitations applied because here

18  there are no Kentucky defendants and Kentucky is not the forum. This case, like Reich v. Purcell, supra, is "the very paradigm of the false conflict." (Cavers, Comments on Reich v.

19  Purcell 15 UCLA L.Rev. 647.) The court properly applied California law.  [1]

20  Am. Online v. Superior Court, 90 Cal. App. 4th 1, 2001:
    We conclude the court properly denied AOL's motion. First, one of the causes of action seeks

21  class action relief under the California Consumers Legal Remedies Act (CLRA) ( Civ. Code, § 1750 et seq.). This act contains a provision that voids any purported waiver of rights under the

22  CLRA as being contrary to California public policy. Enforcement of the contractual forum selection and choice of law clauses would be the functional equivalent of a contractual waiver of

23  the consumer protections under the CLRA and, thus, is prohibited under California law.

24  Second, we conclude that Virginia law does not allow consumer lawsuits to be brought as class actions and the available remedies are more limited than those afforded by California law.

25  Accordingly, the rights of Mendoza and the California consumer class members would be substantially diminished if they are required to litigate their dispute in Virginia, thereby violating

26  an important public policy underlying California's consumer protection law. For this independent reason, the forum selection clause is unenforceable.

27

28  While the remedial aspects of each statutory scheme are indigenous to the business practices regulated, in both cases the Legislature has ensured that the rights afforded to California citizens against unfair practices cannot be diminished or avoided by contract. Where

PLAINTIFF'S PTS OF AUTHORITY 7/29/08        -32-

CASE NO. C08-01002 EDL

1    the effect of transfer to a different forum has the potential of stripping California consumers of
     their legal rights deemed by the Legislature to be nonwaivable, the burden must be placed on the
2    party asserting the contractual forum selection clause to prove that the CLRA's antiwaiver
     provisions are not violated. For this reason we too embrace the rationale of the Wimsatt decision
3    and conclude that the CLRA claim pleaded by Mendoza, like the FIL claims asserted in Wimsatt,
     mandates departure from the general rule which normally places the burden of proving
4    unfairness or unreasonableness of the forum selection clause on the party opposed to its
     enforcement.
5
     Enforcement of the Forum Selection Clause Violates Strong California Public Policy
6
     California courts will refuse to defer to the selected forum if to do so would substantially
7    diminish the rights of California residents in a way that violates our state's public policy. For
     example, in CQL Original Products, Inc. v. National Hockey League Players' Assn. (1995) 39
8    Cal. App. 4th 1347 [46 Cal. Rptr. 2d 412], a dispute arose following the termination of a
     merchandise licensing agreement between CQL Original Products, Inc. and the National Hockey
9    League (NHL). The merchandiser's breach of contract suit in California was met with a motion
     filed by the NHL to dismiss based on a forum selection clause contained in the licensing
10   agreement. ( Id. at p. 1353.) The trial court granted the NHL's motion. In affirming the trial
     court's ruling, the appellate court noted that "a forum selection clause will not be enforced if to
11   do so will bring about a result contrary to the public policy of the forum. . . ." ( Id. at p. 1354,
     citing Cal-State, supra, 12 Cal. App. 4th at p. 1680.) After reviewing the agreement in question,
12   the court concluded there was no public policy reason to deny enforcement of the provision. (39
     Cal. App. 4th at p. 1356.)
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

### V. CONCLUSION:

3

Ramondetta's claims should not be compelled to arbitration and should be heard in The United

4   States District Court, Northern District of California.

5

California law is the proper choice of law to resolve this dispute.

6

For the reason outlined, this Court should Deny Konami's Motion to Dismiss and Compel

7   Arbitration and to Determine Applicable Law.

8

9   Dated:  July 29, 2008                          Respectfully Submitted,

10

11

12

13   LOU RAMONDETTA
     in propria persona

14

15   Cc Served via mail to:

16   Suzanne Martin
     Lewis and Roca LLP
17   3993 Howard Hughes Parkway, Ste. 600
     Las Vegas, NV 89119
18   (702) 949-8200

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S PTS OF AUTHORITY 7/29/08          -34-

CASE NO. C08-01002 EDL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS

# KONAMI
## GAMING

Leo,

SS and I will talk
this afternoon re: your
requests.

Steve

February 27, 2006

Mr. Lou Ramondetta
2335 Stewart Ave.
Walnut Creek, CA 94596

Dear Lou,

JOB OFFER - KONAMI GAMING, INC.

Outlined below are the terms of the job offer from Konami Gaming, Inc.  Once we agree to the final terms, I will
forward a formal job offer letter for the position.

Title:          VP of Sales

Reporting to:   Steve Sutherland, Exec. VP/COO

Responsibility: Game Sales, Sales Administration, Product Management, and System's Sales (note: recommend
focus on Game Sales for 1st Year, however, involved in systems oversight and general management.)

Compensation:

- Salary:  $220,000 paid bi-weekly

- Bonus:   $180,000 based on game unit sales and paid as below

| Quantity | Bonus Amount | Accumulated Amount |
|----------|--------------|--------------------|
| 4,500 units | $25,000 | $25,000 |
| 5,000 units | $25,000 | $50,000 |
| 5,500 units | $50,000 | $100,000 |
| 6,000 units | $80,000 | $180,000 |
| 6,001 – 10,000 units | $37.50/unit | per calculation |
| 10,001 & units | $50.00/unit | per calculation |

Relocation:     Total relocation cost plus gross up on taxable components.  Repayable if you leave Konami
Gaming, Inc. within 12-months of employment.

Vacation:       Three (3) Weeks.

Benefits:       Konami 401K, 50.0% match of contribution with no limits, plus Konami Medical Plan (Health,
Dental, Eye Care).

Contingencies:  Final offer subject to company drug test and compliance approval.  It should be noted employee
must be willing to submit to background checks of multiple gaming jurisdictions.

Sincerely,

Steve Sutherland
Executive Vice President/COO

**Konami Gaming, Inc.**
585 Trade Center Drive  -  Las Vegas, NV 89119
Tel: 702-616-1419  Fax: 702-616-1466



# KONAMI
## GAMING

585 Trade Center Drive
Las Vegas, Nevada 89119
702.616.1400

March 3, 2006

Lou Ramondetta
2335 Stewart Avenue
Walnut Creek, CA 94596

Dear Lou:

Konami Gaming, Inc. is pleased to offer you the position of Vice President, Sales and
Marketing at an annual rate of $220,000, payable in biweekly installments; a sign on
bonus of $30,000 (minus applicable taxes) payable within 30 days after your date of hire;
and an additional bonus based on game unit sales in the North American market to
include game units and participation units, as specified below:

| Quantity | Bonus Amount | Accumulated Amount |
|---|---|---|
| 4,500 units | $25,000 | $25,000 |
| 5,000 units | $50,000 | $75,000 |
| 5,500 units | $75,000 | $150,000 |
| 6,000 units | $100,000 | $250,000 |
| 6,001 – 10,000 units | $37.50/unit | per calculation |
| 10,001 & units | $50.00/unit | per calculation |

Second year annual salary will be no less than $250,000, or as agreed to by CEO Satoshi
Sakamoto. This is a full-time exempt position reporting to Steve Sutherland, Executive
Vice President and COO of Konami Gaming, Inc. Your start date will be on or about
March 27, 2006.

Relocation costs will be based on mutually agreed upon standards to include:
- current home closing costs, such as sales commission, legal and recording fees
  (excluding outstanding taxes, liens, etc)
- closing costs on the purchase of new residence in Las Vegas, Nevada such as title
  fees, application, etc (excluding 'points')
- cost of packing and moving household goods from California to Nevada and the
  transportation of one vehicle (excluding car collections; RV, etc)
- cost associated with moving one family, including mileage, airfare, hotel, meals

Ramondetta/page two          *A 10K*

- general fund of $7,500 to include painting, carpet cleaning, miscellaneous preparatory expenses associated with new residence
- total amount (based on submission of verified receipts) to be grossed up and agreed upon by your start date at Konami Gaming, Inc.                    *Yes*
- relocations costs are recoverable by Konami Gaming, Inc. should you ~~terminate~~ *Voluntarily* *Job* your employment within twelve months of your start date.

The scope of this letter is to outline our offer of employment and is not to be perceived as an employment contract. Konami Gaming, Inc. (KGI) is an "At Will" employer meaning that either you or KGI can terminate the employment relationship at any time, with or without notice, and with or without reason. Immediate roles and responsibilities will include Konami Game Sales, Product Management, and Sales Administration, with additional responsibility of system sales upon successful demonstration to executive *?* management that the game sales group is performing per plan. You will be assisting *Why not immediate* Steve Sutherland with the strategic positioning and organization of game and system *or guaranteed* divisions, ensuring cohesive and tactical sales efforts in the marketplace between both departments. It should be noted KGI considers an essential job function of your position to include travel. By signing the acceptance below, you are warranting that you will be able to conform to the reasonable expectations of KGI and fulfill the job functions. As a condition of employment, you may be required to sign Confidentiality and Intellectual Property Agreement(s) covering, without limitation, use, disclosure and/or ownership of confidential, proprietary, and/or trade secret information of KGI and its affiliates during and following the tenure of employment.

BENEFITS
- You are eligible to participate in the KGI Health, Dental, Vision, and other benefit plans on the first of the month following the date of hire
- Term Life insurance equal to two (2) times your annual salary   *Can you buy more*
- Four weeks paid vacation
- Our current 401K benefit includes a company match of 50% up to 15% contributed for this calendar year
- Three months severance including a three-month non-compete agreement.   *4 months*
  *→ 4 mo*

Because we operate in a heavily regulated industry, the position offered to you is subject to a criminal background check. This offer is contingent upon Compliance approval, a *What involved* pre-employment drug test, and final approval from our Japanese parent company. Should *Chance not approved* you fail to receive Compliance approval, or test positive for the presence of an illegal or controlled substance, or not be approved by our parent company, this offer will be withdrawn. All necessary paperwork and drug test forms need to be completed at your earliest convenience. Additionally, as a key employee of Konami Gaming, Inc. you will be subject to further criminal background checks by multiple gaming jurisdictions throughout your tenure of employment.

Ramondetta/page three

By accepting this offer of employment, you agree to settle any and all claims, disputes or
controversies arising out of or relating to your application or candidacy for employment,
employment and/or cessation of employment with KGI, *exclusively* by final and binding
*arbitration* before a neutral arbitrator. By way of example only, such claims include
claims under federal, state, and local statutory or common law, such as the Age
Discrimination in Employment Act, Title VII of the Civil Rights Act, as amended,
including the amendments of the Civil Rights Act of 1991, the American With
Disabilities Act, the law of contract and the law of tort.

*[handwritten: ? Give up legal rights]*

Please indicate your acceptance of the terms of this offer by signing on the line provided.
Your signature confirms that you do not have any restrictive covenant with your
employer that would prevent you from accepting employment with KGI. Additionally, as
professionals operating within this competitive industry, you have our commitment that
we will not ask for, nor should you divulge, any proprietary information, including
customer lists. All confidential material relative to your previous employer must and
shall remain confidential.

*[handwritten: Trip by wife]*

Sincerely,                                          Accepted by:

*[signature]* 3/3/06                          _____

Satoshi Sakamoto, Chief Executive Officer        Lou Ramondetta          (Date)
Konami Gaming, Inc.

Ƙ    KORN/FERRY INTERNATIONAL    *Exhibit 3*

**COMPANY**    CONFIDENTIAL    *Korem*

**POSITION**    Vice President or Senior Director of Sales

**LOCATION**    Las Vegas, Nevada

**REPORTING**    This position reports to the Executive Vice President and
**RELATIONSHIP**    Chief Operating Officer of the company and directs an
organization of approximately 20 employees

## COMPANY BACKGROUND

The company is a provider of technology (hardware and software) products and
systems serving companies in a highly specialized market. This growing company is
generating approximately $50 million in revenue and expects to continue growing
aggressively through a combination of organic growth and acquisition.

The industry this company serves is undergoing a major technological transformation.
The current industry architecture is very product-centric but is evolving into a more
systems-centric orientation. Our client is committed to being a key player in this large
and growing industry.

## RESPONSIBILITIES

The individual in this position will be responsible for achieving the revenue goals of
the organization through the development, implementation and execution of an
approved sales and marketing strategy. The position will be responsible for the
development and oversight of the sales team, the fulfillment of the necessary
forecasting and reporting to executive management, as well as the establishing of
professional and effective communications throughout the organization.

Specific duties and responsibilities will include, but not be limited to, the following:

- Ensuring revenue goals of the company are achieved by strong leadership of
  the sales team.

KORN/FERRY INTERNATIONAL

- Developing and communicating comprehensive sales plans and the setting of performance goals for the organization.
- Monitoring performance versus plan on an ongoing basis and ensuring accountability by sales team members.
- Providing necessary mentoring and development activities to the sales team.
- Establishing, overseeing, and ensuring the cost controls of the department are followed.
- Developing and implementing strategies consistently across all N. American jurisdictions.
- Managing and overseeing the proposal development process to ensure all responses meet the company standards.
- Managing and overseeing the order administrative functions to ensure the needs of the company are fulfilled and ensures accurate order placement to minimize manufacturing and customer issues.
- Effectively working with the candidate's peers on a professional basis.
- Coordinating and acting as a liaison with departmental heads within the business to ensure that customer satisfaction is achieved and the needs of the sales function are supported.
- Participating and being a key member of the company's executive committee.
- Providing strategic market and sales input into the business planning processes of the company
- Developing, implementing, and monitoring the sales strategy for the market, and taking necessary actions to ensure company plan is achieved.
- Maintaining close working relationships with key customers and directing the management of key corporate accounts.
- Maintaining and communicating customer and competitor intelligence and developing proactive strategies to maintain the company's competitive advantage.
- Effectively communicating customer and competitive intelligence to appropriate departments for appropriate product development.
- Developing appropriate business models and pricing strategies

KORN/FERRY INTERNATIONAL

- Developing, maintaining and simplifying relevant systems, processes and procedures to support business growth.
- Directing the implementation of a cohesive marketing strategy that improves both brand awareness and brand equity.
- Overseeing Product Management, the product release strategy, and the release of new products to the market.
- Providing to the company all required forecast and reporting activities.
- Providing input into the company's business planning and budgeting process.
- Providing monthly reports and forecasts of sales activity and projected revenues.

## PROFESSIONAL QUALIFICATIONS

The company is seeking a highly skilled sales executive that can develop, implement, and execute a sales and marketing strategy meeting the objectives of the aggressive growth goals of the company. The selected candidate must be willing to operate in a highly regulated environment which will require significant personal financial and family background disclosure to governmental agencies, as well as the requirement to ensure the sales team adheres to the company compliance program of selling only approved products to licensed entities. In conjunction with the highly regulated environment of the industry, the selected candidate must also operate within the requirements of Sarbanes Oxley.

The company is a multi-cultural organization and the selected candidate must be able to work with the various departments in a professional and diplomatic manner. The candidate must also be able to effectively work with his/her counterparts of a sister organization serving other assigned international markets. As part of this industry, the sale of product to the industry requires the establishment of strong personal relationships with key industry executives; however, the selected candidate must be able to separate established personal relationships when making business decisions.

Additionally, prospective candidates will have:

KORN/FERRY INTERNATIONAL

- 8+ years of experience in senior level sales management in the computer or IT industry.
- Demonstrated track record of strong performance in a sales leadership role.
- Experience in scaling an organization for rapid growth.
- Solid understanding of technology products and/or services.
- History of building successful relationships based on superior customer service.
- Experience in an environment that requires strong customer orientation/relationships, however, maintains ability to make strong business decisions to benefit of the company.
- Experience in working with both short and extended sales cycles.
- Strategic, process oriented approach to sales management.
- Excellent verbal, written, and interpersonal skills.

**PERSONAL CHARACTERISTICS**

The ideal candidate will command respect through self-initiative, technical competence and leadership. The individual will work effectively as a team player with all departments in the company. He/she will demonstrate commitment to the company's values of customer focus, innovation, high standards, integrity and ethics, and respect for all constituents. In addition, he/she will demonstrate the intellect and leadership required to further the success of this business.

**EDUCATION**

An undergraduate degree is required.

Appropriately qualified and motivated candidates will be highly attracted to this opportunity to handle full sales and marketing responsibilities for a rapidly growing company committed to being a key player in a large and growing industry, and to

## KORN/FERRY INTERNATIONAL

have an attractive compensation package which provides the opportunity for rewards commensurate with performance.

## CONTACT INFORMATION

For further information, please contact the following:

**Elliot Gordon**
Senior Client Partner
Korn/Ferry International
2600 Michelson Drive
Irvine, CA 92612
Phone:  (949) 260-9500
Fax:      (949)833-7608
Email:  gordone@kornferry.com

**Eve Nam**
Senior Associate
Korn/Ferry International
2600 Michelson Drive
Irvine, CA 92612
Phone:  (949) 260-9503
Fax:      (949)833-7608
Email:  eve.nam@kornferry.com

*All submissions will be handled in the strictest confidence.*

Mail - lcramondetta@yahoo.com

*Deli - 246 Via Antona Ave off Street (LVBI Bermuda)
of seating on Mandeley Bay*

*Exhibit 4*

Yahoo!  My Yahoo!  Mail

YAHOO! MAIL   Welcome, lcramondetta
[Sign Out, My Account]

Mail Home - Mail Tutorials - Help

| Mail Plus | Addresses | Calendar | Notepad | | What's New - Mail For Mobile - Upgrades - Options |

| Check Mail | Compose | | Search Mail ▽ | Search the Web |

**Folders**   [Add - Edit]

Inbox
Draft
Sent
Bulk (10)   [Empty]
Trash   [Empty]

*Some Korn-Ferry notes* (handwritten)

Previous | Next | Back to Messages

| Delete | Reply ▽ | Forward ▽ | Spam | Move... ▽ |

This message is not flagged. [ Flag Message - Mark as Unread ]   Printable View

**Subject:** Meeting at Konami
**Date:** Mon, 13 Feb 2006 18:04:01 -0800
**From:** "Eve Nam" <Eve.Nam@kornferry.com>   Add to Address Book   Add Mobile Alert
**To:** lcramondetta@yahoo.com

Hi Lou,

You will be meeting with Steve Sutherland (COO) and SS (President) on Friday, February 17 at 1:30 pm. Depending on your travel arrangements (which I believe should be finalized relatively soon), Steve will either have someone pick you up or he will do that himself around 1:30 pm. (If Steve does pick you up himself, he drives a white BMW.) I would anticipate that you will spend the majority of your time with Steve, and that SS will participate for only a portion of that meeting (but will likely meet with you in conjunction with Steve).

I would recommend that just prior to your meeting, you call Steve on mobile at (702) 496-7743 to determine where you should meet (e.g. hotel lobby or valet parking if at a hotel or at passenger pick-up/drop-off at the airport, or some other location). And, if you have difficulty getting through to him or in meeting him, feel free to call me either at the office or on my mobile at 949.887.6756.

Let me know when you would like to talk before your meeting so I can help prep you. In addition, I ask that you call me after your meeting with Steve to de-brief.

Kind Regards,
Eve

Eve Nam
Korn/Ferry International
Office: 949.260.9503
Fax: 949.833.7608

*Handwritten left-margin notes:*
KONAMI - on NY Stock exch.
Act important
Be yourself
2c sales people
2 directors of sales
Games - slot machines
Systems - casino mgmt / tracking
New manage people or scale up
will have questions
Hands on mgmt
Steve - Partners systems
Quick Serv. Restr.
Appears more CPA than sales
Many regulators - greet when meet them
Don't ask to see financials
Can talk performance
Satoshi - Sony, S.S.
Env Multimedia
Online
Amusement
Toys + Hobby
Computer Video
Gaming Systems

702-595-4883

Hierarchy

% of bus in div. - Systems 20%, 80% Machines

% of bus Geographic - CA 50, Ontario CND, MI, (fragmented), LV smaller

Expectation for role

Gross, Margin - 60% , Net 20%

Priority initiatives needing attention - product launch, team individual
people upgrade performance, Trng, Comp Accts.

Historical trends - Grew quickly but this yr. down went down.

Prior person - person in role now (A person but out of role.)

How double or triple Sales ?

Working Japan Co.

Sutherland/SS
Interv. notes

3 Div.

Digital Entertainment $1,500

Sports + Fitness - $900

Casino + Systems $100

Want to Grow $200M - Plan?

Each style requires

Cost of entry high

Must Grow No Am.

Licensing time very involved.

Personal 11 screening $10M

DGT - 6500 shrs, Bally's - 20%, Konami - 5%

150K Machines @ $10k/Machine

Not an/unit

System - architecture, bonus; tracking

Want outside US Competitor

Downloadable Server based technolgy - trend in industry

Comp Accts dev. - Consolidation of industry

Sophisticated Sales - Need 9 Block, Mostly C+B Players

Open to personell change

Want Strong Mgmt + sales

a Direct Salespeople, Some distributors

Independence from Japan

**YAHOO! MAIL**

Print - Close Window

*Exhibit 5*

**Subject:** List of Arbitrators

**Date:** Fri, 16 Jun 2006 10:29:45 -0700

**From:** "Howard Cole" <hcole@lionelsawyer.com>

**To:** lcramondetta@yahoo.com

*702-383-8888*

**CC:** "Steve Sutherland" <sutherland0705@konamigaming.com>, youngblood0124@konamigaming.com, "Thomas Jingoli" <jingoli0616@konamigaming.com>

June 16, 2006

Mr. Ramondetta,

Pursuant to our telephone conversation yesterday, I have listed two of the arbitration agencies that you could contact in order to pursue any claims that you claim against Konami Gaming, Inc. As I indicated, the offer letter requires mandatory arbitration of any employment-related dispute that arose during your employment or termination of employment.

I believe that there is a fee for filing an arbitration claim with the AAA although I do not know the amount. I do not know whether there is a filing fee with the FMCS. If you were to pursue a claim with the AAA or FMCS, it would be the intention of KGI to request a panel of arbitrators from Nevada and/or California. Unless directed otherwise, the AAA tends to furnish the Mountain States panel of arbitrators from such places as Montana making the time/travel expenses rather exorbitant.

As an alternative, I have also furnished the names of well-respected neutral arbitrators from whom to select. All of them are members of the National Academy of Arbitrators and renowned for their objectivity and impartiality. In short, they are the best in the business....Should you choose one of those arbitrators, please let me know and we can jointly contact that arbitrator.

To reiterate the position of KGI, in the event that you pursue arbitration over the severance pay issue, it would be the intention of KGI to counterclaim for reimbursement of the sign-on bonus of $50,000 based upon material misrepresentations and/or omissions made by you during the applicant/hiring/compliance process.

**Arbitration Agencies**

American Arbitration Association

8020 West Saharam suite 235
*6795 No. Palm Ave, 2nd Floor*
Las Vegas, Nevada 89146
*Fresno, 93704  Dwight James*
(702) 252-4071
*415-961-3101*
*Attn: Intake Dept/employment*
*877-528-0880*

Federal Mediation and Conciliation Service *553-5800-Ock*
*Schindler  706*
*Beth Gentry  714-321-1660-LA*
110 City Parkway
*Mostly labor cases*

Las Vegas, NV

aoo! Mail - lcramondetta@yahoo.com
Page 2 of 3
Case 3:08-cv-01002-EDL    Document 81-2    Filed 07/29/2008    Page 13 of 41

(702) 363-5857

## Arbitrators - Members of National Academy of Arbitrators

Sara Adler, Esq.

Arbitrator and Mediator

1034 Selby Avenue

Los Angeles, California 90024-3106

Phone: (310) 474-5170

Thomas Angelo          #\200/day/

Labor Arbitrator

Post Office Box 1937

Mill Valley, CA 94941

(415) 381-5014

(415) 381-1701

Gerald R. McKay, Esq.

Attorney at Law/Arbitrator

P.O. Box 406

Burlingame, CA 94011-0406

(650) 588-6655

Louis M. Zigman, Esq.          #350/hr
                               Knaus Howard
473 South Holt Avenue          Employer pays fees in CA
                               CA Case - At Mederos
Los Angeles, CA 90048          Ask for- Bios w/ Fees
                               Speak w/ Attorney/- Bar refer
(310) 556-3748

This e-mail message is a confidential communication from the law
firm of Lionel Sawyer & Collins and is intended only for the named
recipient(s) above and may contain information that is a trade
secret, proprietary, privileged or attorney work product. If you have



LEWIS
AND
ROCA
— LLP —
LAWYERS

Howard E. Cole
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

Direct Dial: (702) 949-8315
Direct Fax: (702) 949-8379
HCole@LRLaw.com
Admitted in: Nevada and California

Our File Number: 44973-00004

July 24, 2007

### Via Facsimile and U.S. Mail

Michele Jackson
Intake Department
American Arbitration Association
6795 North Palm Avenue, 2nd Floor
Fresno, CA 93704

> **Re:** *Lucien Ramondetta v. Konami Gaming, Inc.*
> *AAA Case No.: 74 460 00962 07*

Dear Ms. Jackson:

This Firm represents Konami Gaming, Inc. ("KGI") with regard to the above-referenced matter and KGI has requested that I respond on its behalf. This letter will also serve to acknowledge receipt of your correspondence, dated July 17, 2007, sent via facsimile.

A copy of the Demand For Arbitration under the American Arbitration Association ("AAA") Employment Arbitration Rules (*For Use Only In California*) was previously received via facsimile from Mr. Ramondetta on or about July 10, 2007.

*Although the reasons will be detailed with specificity herein, Konami Gaming, Inc. ("KGI") does **not** consent to the AAA acting as the administering agency pursuant to the terms and applicable law detailed in the Demand For Arbitration.* <u>KGI cannot consent to the AAA serving as the administering agency for several compelling reasons including, without limitation, the underlying dispute is governed by Nevada law because the employment at issue was based in Nevada. California law referenced in the Demand For Arbitration does not apply to the instant dispute, and the proper venue for any arbitration is exclusively in Clark County, Nevada.</u> In accordance with applicable federal and Nevada case precedent, mandatory arbitration arises from the Offer Letter agreed upon and executed by the parties. A redacted copy of Mr. Ramondetta's Offer Letter is attached hereto for your review and consideration.

Please note the last paragraph on Page 1 of the Offer Letter. The offer of employment was not only contingent upon Mr. Ramondetta's relocation from California to Nevada; the financial details of the relocation were expressly detailed. Please also note the prospective duties of employment detailed on Page 2 of the Offer Letter, including: "...Immediate roles and responsibilities will include Konami Game Sales, Product Management, and Sales Administration. Upon successful demonstration to executive management that the game sales

Received Time Jul.24.  2:42PM

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

July 24, 2007
Page 2

group is performing per plan, your role will expand to taking on responsibility of the Konami Systems Sales group..." Given that the sales and marketing staff, product development group, and Systems Sales group, and his direct supervisor Mr. Sutherland were all located at the headquarters of KGI in Las Vegas, Nevada, it is both illogical and absurd for Mr. Ramondetta to apparently claim that California law governs this dispute as specified in the Demand for Arbitration. For him to do so, KGI maintains a good faith belief that Mr. Ramondetta must have made false statements and/or withheld material information in filing the Demand For Arbitration *For Use Only In California*. It must be emphasized that KGI did not maintain or operate any offices in California at the time of his tenure of employment.

Mr. Ramondetta commenced employment with KGI on or about April 10, 2006. For the first couple of weeks of employment, Mr. Ramondetta traveled to gaming trade shows in Canada, Mississippi and participated in sales activities in states outside of Nevada and California. Thereafter, the services furnished by Mr. Ramondetta were entirely in Las Vegas, Nevada or at other trade shows and other sales related activities outside of California.

In or about early June, 2006, while again in travel status, Mr. Ramondetta had a telephone conversation with a senior executive of KGI stating that he and his wife had decided against a permanent relocation to Nevada at that time. Frustrated by his continued delays and then refusal to relocate to Las Vegas, KGI reminded him of the express condition of employment that required him to be at the headquarters of KGI on a full-time, five day a week basis. Mr. Ramondetta had been commuting from California on Sunday nights or early Monday mornings to work at KGI in Las Vegas from Monday through Friday, inclusive, then flying back to California after close of the workday on Fridays. Although the company had given him the opportunity to commute on a *short-term* basis from California pursuant to Mr. Ramondetta's assertions that he was arranging for sale of his home, KGI would not countenance further delays of months or years for Mr. Ramondetta to commit to and complete the relocation.

Mr. Ramondetta thereafter attempted to *renegotiate* the terms of his employment to increase the amount of his reimbursement for travel from California to work in Nevada from Monday through Friday while reducing the "relocation" reimbursement. Considering this a subterfuge in his continued attempts to further delay a full-time relocation to Nevada, KGI did not agree to any such renegotiation, instead insisting that the terms of the offer letter dealing with relocation and attendant expenses continued in force and effect.

Given his refusal to permanently relocate together with other valid and compelling reasons justifying the discharge from employment including without limitation an informational report expressing concern by a gaming compliance investigator from the province of Ontario, Canada, KGI severed its employment relationship with Mr. Ramondetta. Given the highly regulated gaming industry in which KGI must comply with stringent compliance regulations, the

.can Arbitration 7/30/2007 4:29:42 PM   PAGE   5/011   Fax Server
. Case 3:08-cv-01002-EDL   Document 81-2   Filed 07/29/2008   Page 16 of 41
ʍis and Roca LLP   7/24/2007 2:38 PM   PAGE   4/009   Fax Server



information imparted to KGI was of sufficient concern to constitute a material factor in the discharge of Mr. Ramondetta.

Should Mr. Ramondetta decide to pursue the arbitration asserting his specious claims for business expenses, severance pay and "termination," the proper jurisdiction for him to file is in the State of Nevada; the situs of his KGI employment, not the State of California. In or about July, 2006, Mr. Ramondetta filed a claim for unemployment benefits with the Employment Development Department ("EDD") of the State of California. At that time, KGI responded to the EDD that Mr. Ramondetta had never been an employee of KGI in the State of California. KGI was not informed about the disposition of that matter, except to state that at the time KGI did not have any state identification numbers or EDD accounts given that it was not an employer in the State of California during the relevant times of his tenure of employment. In addition, Mr. Ramondetta has recently filed a Claim with the Labor Commissioner of the State of California alleging nonpayment of business expenses totaling $5,000.00. KGI has analogously responded to the Labor Commissioner referencing the fact that the employment at issue occurred in Nevada.

It must be emphasized that the portion of the current dispute regarding "expenses" arises solely in the context of lodging and food expenses in Las Vegas, Nevada. Mr. Ramondetta had committed to relocate to Las Vegas, Nevada as a condition subsequent to his acceptance of employment by KGI. KGI advised Mr. Ramondetta that those expenses for lodging, food, et al. in Las Vegas would *not* be subject to reimbursement. KGI scrupulously reviewed all of Mr. Ramondetta's expense reports at the time of his discharge from employment. All legitimate business and travel expenses were tendered to Mr. Ramondetta at that time. It remains the position of KGI that Mr. Ramondetta was treated the same as every other Las Vegas employee; that is, the lodging, food and drink expenses of local employees is not a function of their business life but of their personal life. Mr. Ramondetta was not reimbursed for his living expenses in Las Vegas just as other Las Vegas employees were not reimbursed for theirs. The simple fact is that Mr. Ramondetta was treated as if he lived in Las Vegas as he had promised as a condition of initial employment. The $50,000 sign-on bonus (a bonus that Mr. Ramondetta has been permitted to keep despite only three months of employment tenure) together with the significant relocation incentive contained in his offer letter furnishes clear evidence that a Las Vegas domicile was the intent of the parties...an intent that Mr. Ramondetta failed and later refused to satisfy.

The Demand For Arbitration completed by Mr. Ramondetta is "For Use Only In California" according to its express designation. To reiterate, Mr. Ramondetta was never an employee of KGI in California. The position statement transmitted to the Employment Development Department of the State of California on July 31, 2006 in response to the Claimant's application for unemployment benefits stated, in pertinent part:

.can Arbitration 7/30/2007 4:29:42 PM PAGE 8/011 Fax Server
Case 3:08-cv-01002-EDL    Document 81-2    Filed 07/29/2008    Page 17 of 41

.wis and Roca LLP    7/24/2007 2:38 PM  PAGE   6/009   Fax Server



LEWIS
AND
ROCA
—LLP—
LAWYERS

July 24, 2007
Page 5

Mr. Ramondetta has historically pursued a course of venue shopping with his filing for unemployment benefits in California, his Claim filed with the Labor Commissioner in California, and now the Demand For Arbitration under California law "For Use Only In California." KGI will continue to resist Mr. Ramondetta's unswerving efforts to engage in such forum shopping and reiterates its willingness to participate in the arbitration process in the State of Nevada.

Please contact the undersigned if you have any questions regarding the foregoing.

Respectfully,

Howard E. Cole/lks

Howard E. Cole

HEC/lks
Enclosure

77821.1



Howard E. Cole
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

Direct Dial: (702) 949-8315
Direct Fax: (702) 949-8379
HCole@LRLaw.com
Admitted in: Nevada and California

Our File Number: 44973-00004

August 16, 2007

## VIA FIRST CLASS MAIL

Lou Ramondetta
2335 Stewart Avenue
Walnut Creek, CA 94596

> **Re:** ***KGI/Demand for Arbitration***
> ***AAA Case 74 460 00962 07***

Dear Mr. Ramondetta:

This will serve to supplement my earlier response, dated August 14, 2007.

In your correspondence, dated August 10, 2007, you stated, "On August 8[th] I received a call from Ms. Michelle Jackson from the American Arbitration Association ("AAA") explaining that she had no choice but to drop my request for arbitration with Konami since you would not support AAA as the arbitrator."

Since receipt of your letter, additional information has come to light. I received a copy of the letter, dated August 15, 2007, from Ms. Jackson explaining the filing deficiencies in the above-referenced Demand for Arbitration. The AAA notified you on July 30th that filing deficiencies existed in your Demand that needed to be rectified, including furnishing all requisite information as well as the appropriate filing fee. Based upon the August 15th letter, it would appear that you failed and/or refused to rectify said deficiencies leading to closure of the matter by the AAA. In this context, any alleged conversation between you and Ms. Jackson on August 8th must be deemed inherently suspect.

Since the date of your discharge, KGI has steadfastly maintained its position that it would fully cooperate with any Demand for Arbitration properly filed in and governed by the laws of the State of Nevada. Misrepresentations as to the underlying reasons for cessation of administration by the AAA will not lead to a change in that position. Rather than strengthen perceived leverage, such conduct only serves to further diminish your credibility.

79036.1



Reference to your "final demand" notwithstanding, your time and effort would again be much better spent on properly satisfying the filing and fee requirements with the AAA, FMCS, or court-annexed arbitration in Las Vegas, Nevada. Should you do so, KGI would fully cooperate with such processes and procedures.

Respectfully,

Howard E. Cole
Counsel for Konami Gaming, Inc.

HEC/lks

79036.1



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Western Case Management Center*
John M. Bishop
Vice President
Jeffrey Garcia
Assistant Vice President

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 877-528-0880 facsimile: 559-490-1919
internet: http://www.adr.org/

August 15, 2007

Exhibit 7A

**VIA FACSIMILE & U.S. MAIL**

Lou Ramondetta
2335 Stewart Ave.
Walnut Creek, CA 94596

Howard E. Cole, Esq.
Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169

Re: 74 460 00962 07
    Lou Ramondetta
    VS
    Konami

Dear Parties:

On July 30, 2007, you were notified that the filing requirements for the above matter have not been met.
Please be advised the Association does not retain incomplete filings. Therefore, we are returning to
Claimant the original filing and its attachments .

In the future should you decide to file this matter, please resubmit by providing all the requisite
information along with the appropriate filing fee.

If you have any questions regarding the Association's filing requirements, please visit our website at:
www.adr.org or feel free to contact me.

Sincerely,

/s/
Michele Jackson
Intake Department
559 490 1864
Jacksonm@adr.org

*Supervisor Information: Patrick L. Tatum, 559 490 1900, Tatump@adr.org*

Encl.

**_obi Youngblood**

| | |
|---|---|
| **From:** | Bobbi Youngblood [youngblood0124@konamigaming.com] |
| **Sent:** | Monday, May 01, 2006 11:44 AM |
| **To:** | 'Lou Ramondetta' |
| **Cc:** | 'sutherland0705@konamigaming.com'; 'sakamoto1121@konamigaming.com' |
| **Subject:** | RE: Important from HR Konami |

Hi, Lou:

Payroll is being processed today and it is imperative, per our company labor attorney, that per our offer letter and your agreement, you are to reside and work out of Las Vegas. To avoid all types of ramifications and scrutiny from California, including worker's comp, unemployment and other taxes and application of California labor laws, I must process you in our system as a Nevada resident.  I have called Camden Summit which has a two bedroom unit available immediately and will require a 3-month lease (this will allow you time to secure a more permanent residence), approximately $1000 per month.

Please call me at your earliest convenience to finalize the information.  Additionally, it will require you coming to Las Vegas to sign documents and other necessary forms.  Even if you have to miss the MS Gaming Show, it is more important that you make a trip to LV as soon as possible.

Please confirm everything through me or Steve by email or phone call and we will expedite what is needed.

Bobbi
702-683-7457
-----Original Message-----
From: Lou Ramondetta [mailto:lcramondetta@yahoo.com]
Sent: Saturday, April 29, 2006 4:53 PM
To: youngblood0124@konamigaming.com
Subject: Re: Hi from Konami HR


Thanks for checking.  I'll only be in week after next
for a day or two before going to CND for meetings.
Tom was just showing me areas, he has no information
on any of the apartments.  The one that was nice was
next to his development and close to the District.
Think it was Bella Vista.  I'll have to check more
extensively when I'm in.

--- Bobbi Youngblood <youngblood0124@konamigaming.com>
wrote:

> Hi, Lou:
> Hope you got the apartment information from Tom J;
> there is one available apartment at Camden Summit
> for $1168 per month
> (2B/2B) for 6 month lease.
> Please advise...their phone number again is
> 702-897-5033.
>
> Have a nice weekend,
>
> Bobbi Youngblood
>
> Director, Human Resources
> Konami Gaming, Inc.
> 585 Trade Center Drive
> Las Vegas, NV  89119
> phone number:  702.616.1400
> confidential fax:  702.616.1442
> www.konamigaming.com

1

**bbi Youngblood**

| From: | Bobbi Youngblood [youngblood0124@konamigaming.com] |
|---|---|
| Sent: | Thursday, May 04, 2006 5:09 PM |
| To: | 'Lou Ramondetta' |
| Cc: | 'sutherland0705@konamigaming.com'; 'sakamoto1121@konamigaming.com'; 'fielder0329 @konamigaming.com' |
| Subject: | RE: Expense report |

Hi, Lou:
I hope the Mississippi show was fruitful and you met a lot of our customers.

We are processing your first expense report and should have it ready by next week for reimbursement of approved items, including your hotel stay in LV and rental car your first week of employment with KGI.

Please note that your offer letter includes relocation expenses and assistance, but not temporary arrangements, or transportation associated with the pending move (as submitted by you on the current expense report). As such, please note that further submissions of hotel, rental car, food, and other items will not be authorized or approved for reimbursement. (This does not apply to itemized receipts you submit directly related to traveling or doing local business for Konami).

Please call or email if you have any questions. Hope to see you next week when you secure LV housing. I need your local address and W2 information so we can comply to paying you as a Nevada resident by May 15th.

Thank you,
Bobbi

*[handwritten notes in top left margin: NT, VA, MT, LA, AD-, Ontario]*

*[handwritten notes at top: Carole Zmuda, 702-616-1405, Zmuda C317@ licensing query.com, Exhibit 9]*

In order to complete your gaming applications, below is a list of documents that are required.

Birth Certificate
Passport
Social Security Card
Driver's licenses(s)

Marriage certificates
Divorce papers

VISA or application papers

High School and College Degree, Transcripts if available

Marriage (current or former):    *Carlene*
    Spouse maiden name
    Social security number
    Date of birth
    Place of birth
    Residence address
    Phone number

*[handwritten: Not Family, Not licensed.]*
Need at least 8 references that include:
    Full Name
    Home Address/Phone –fax number
    Work Name/Address/Phone-fax  number
    Job Title
    Years known
    Date of birth

Family member  names   *brothers or kids?*
    Relationship
    Address/Phone
    Driver's License Number, where and when licensed
    Date of birth
    Place of birth
    Date of death
    Spouse's name and all the above information for them also
    Parents of each person listed
    Occupation of each member, even if deceased
    Last placed they lived if deceased

*[handwritten: Mother, sister, spouses, wifes, brother, sister, spouse, Grand parents]*

Education
> Name of school (Grammar, High and College)
> Address of school
> Dates attended
> Graduated
> Type of degree

Lawsuits
> All documentation regarding suit and outcome

- Employment  (back 25 years or to age 18) (no blank periods of time, all time must be accounted)
> Name of employed
> Address
> Phone/Fax number
> Supervisor
> — Co-workers (3) ea.
> Job Title
> Job Description
> Period of time worked
> Reason for leaving

Residences (back 25 years or to age 18) (no blank periods of time, all must be accounted)
> Address
> City/State/Zip
> Periods of time at  each residence
> One reference per address listed

Bank Account
> Name
> Address
> Phone number
> Account #
> Date Opened
> Interest Rate
> Balances
> Names on all accounts

Stock certificates
> Issuer Name
> Number of shares
> Purchase date
> Purchase price
> Current value
> Name in which held

Mortgages (and copies of documents)
>      Address of property
>      Size
>      Purchase price
>      Purchase date
>      Current value
>      Original amount of loan
>      Balance remaining on loan
>      Term  of loan
>      Monthly payment
>      Interest Rate

Automobiles
>      Make
>      Year/Color
>      Date purchased
>      Purchase Price
>      Monthly payments
>      Interest Rate
>      Current value
>      License number
>      Balance remaining on loan

Net Worth Statement broken down by Assets and Liabilities.

Tax returns for past five (5) years

Investment account and bank account statements for past 12 months.

Credit card statements for past 12 months.

Trust documents

Safe deposit information – bank name/address, name in which held, box #

Exhibit 10

**ALCOHOL AND GAMING COMMISSION OF ONTARIO**
*__INVESTIGATIONS BRANCH - APPLICANT INTERVIEW__*

*DATE:* _____     *FILE #* _____

*LOCATION:* _____

*START TIME :* _____

*PERSON INTERVIEWED: MR./MRS./MS*

_____

*DATE OF BIRTH* _____     *S.I.N.* _____

*ADDRESS :* _____

_____

      *Region/County* _____ *Prov./State* _____

      *POSTAL CODE:* _____

*PHONE NUMBER: (* _____ *) -* _____ *-* _____

*O.G.C.C. REGISTRATION NUMBER* _____ *Exp:* _____

Wells Fargo    CHECKLIST

☑ PHOTOCOPY12 MONTHS BANKING
☑ PHOTOCOPY OF LAST CREDIT CARD STATEMENTS  - Visa
☐ PHOTOCOPY OF PASSPORT
☐ PROOF OF CITIZENSHIP OR LANDED IMMIGRANT STATUS
☐ PHOTOCOPY BIRTH CERTIFICATE
☐ PHOTOCOPY OF DRIVER'S LICENCE
☐ PHOTOCOPY OF WORK VISA
☐ PHOTOCOPY OF OTHER GAMING LICENCES
☐ PHOTOCOPY 5 YEARS PERSONAL INCOME TAX
☐ PHOTOCOPY OF PROOF OF R.R.S.P., GIC OR STOCK
INFORMATION

3

14/11/01

**STATE OF CALIFORNIA**                                          Arnold Schwarzenegger, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT
1515 Clay Street, Suite 801
Oakland, CA 94612-1499
510-622-3273
FAX 510-622-3257



April 19, 2007


Lou Ramondetta
2335 Stewart Avenue
Walnut Creek, CA 94596                          They heard the
                                                     Expense Claim

Re:    State Case #07-60767 ML
       Claim vs. Konami Gaming

Dear Mr. Ramondetta:

I have reviewed your claim for expense reimbursement and severance pay in the amount
of $67,500.00. Based on your correspondence of April 2, 2007, addressed to Deputy
Laboy, California does have jurisdiction over the matter since you worked out of your
home in Walnut Creek. However, it does not appear that a hearing pursuant to Labor
Code §98(a) is the appropriate forum for resolving your dispute.

Your offer letter refers to a benefit of "three months severance including a three-month
non-compete agreement," but you did not attach a copy of any non-compete or other
separation agreement. If you entered into a severance agreement and your employer did
not comply with the terms of that agreement, your claim would be based on the terms of
the agreement, which we would generally have no jurisdiction to enforce.

The provisions of Labor Code §98 contemplate an informal process designed to expedite
the collection of unpaid wages. The administrative mechanism of the Labor
Commissioner's process is not designed to handle claims involving intricate principles of
contract law and contract interpretation or claims which rely on extensive use of
cumbersome and time consuming discovery procedures. It is our experience that such
claims are generally appealed to court and using our process only serves to delay
resolution of the claim.

There is no requirement that the Division of Labor Standards Enforcement accept all
claims filed with the Division. It is within the discretion of the Labor Commissioner to
determine what action to take and what investigations to conduct. See Painting &
Drywall Work Preservation Fund Inc. vs. Aubry, 206 Ca. App. 3d 682, 253 Cal. Rptr. 776
(1988).

Our agency is currently operating under severe budget and staffing constraints. Based on resource allocation and the factors addressed above, we have determined that the Division of Labor Standards Enforcement shall take no further enforcement action on your claim. You may wish to consult with an attorney regarding pursuing arbitration or filing a private civil action against your employer.

Consequently, I am advising you that pursuant to California Labor Code Section 98(a), your case has been closed. This determination is without prejudice to any rights or remedies you may be entitled to in another forum.

Sincerely,

Ellen E. Shaffer
Senior Deputy Labor Commissioner
Oakland District Office

cc: Ysmael Raymundo, Regional Manager    415 - 703 - 4810
                                          916 - 263 - 1811



*Exhibit 12*

585 Trade Center Drive
Las Vegas, Nevada  89119
702.616.1400

March 16, 2006

Lou Ramondetta
2335 Stewart Avenue
Walnut Creek, CA  94596

Dear Lou:

Konami Gaming, Inc. is pleased to offer you the position of Vice President, Sales and
Marketing at an annual rate of $220,000, payable in biweekly installments; a sign on
bonus of $30,000 (minus applicable taxes) payable within 30 days after your date of hire;
and an additional bonus based on game unit sales in the North American market to
include game units and participation units, as specified below:

*$200,000 LR*
*$50,000 LR immediately*

| Quantity | Bonus Amount | Accumulated Amount |
|----------|--------------|--------------------|
| 4,500 units | $25,000 | $25,000 |
| 5,000 units | $50,000 | $75,000 |
| 5,500 units | $75,000 | $150,000 |
| 6,000 units | $100,000 | $250,000 |
| 6,001 – 10,000 units | $37.50/unit | per calculation |
| 10,001 & units | $50.00/unit | per calculation |

*plus applicable annual performance and Cost of Living adjustment LR*

Second year annual salary will be no less than $250,000, or as agreed to by CEO Satoshi
Sakamoto.  This is a full-time exempt position reporting to Steve Sutherland, Executive
Vice President and COO of Konami Gaming, Inc.  Your start date will be on or about
April 3, 2006. *Loth LR*

Relocation costs will be based on mutually agreed upon standards to include:
- current home closing costs, such as sales commission, legal and recording fees
  (excluding outstanding taxes, liens, etc)
- closing costs on the purchase of new residence in Las Vegas, Nevada such as title
  fees, application, etc (excluding 'points')
- cost of packing and moving household goods from California to Nevada and the
  transportation of two vehicles (excluding car collections; RV, etc)
- cost associated with moving one family, including mileage, airfare, hotel, meals

Ramondetta Offer                    Page 1 of 3

- general fund of $10,000 to include painting, carpet cleaning, miscellaneous preparatory expenses associated with new residence
- total amount (based on submission of verified receipts) to be grossed up and agreed upon by your start date at Konami Gaming, Inc.
- should employee voluntarily terminate employment within the first 12-months of the start date with Konami Gaming, Inc., the employee is responsible for the repayment of all relocation costs to Konami.

The scope of this letter is to outline our offer of employment and is not to be perceived as an employment contract. Konami Gaming, Inc. (KGI) is an "At Will" employer meaning that either you or KGI can terminate the employment relationship at any time, with or without notice, and with or without reason. Immediate roles and responsibilities will include Konami Game Sales, Product Management, and Sales Administration. Upon successful demonstration to executive management that the game sales group is performing per plan, your role will expand to taking on responsibility of the Konami Systems Sales group. In the interim period, you will be working with Steve Sutherland on the strategic positioning and organization of the systems division, ensuring cohesive and tactical sales efforts in the marketplace between both departments are achieved. It should be noted KGI considers an essential job function of your position to include travel. By signing the acceptance below, you are warranting that you will be able to conform to the reasonable expectations of KGI and fulfill the job functions. As a condition of employment, you may be required to sign Confidentiality and Intellectual Property Agreement(s) covering, without limitation, use, disclosure and/or ownership of confidential, proprietary, and/or trade secret information of KGI and its affiliates during and following the tenure of employment.

BENEFITS
- You are eligible to participate in the KGI Health, Dental, Vision, and other benefit plans on the first of the month following the date of hire
- Term Life insurance equal to two (2) times your annual salary
- Four weeks paid vacation
- Our current 401K benefit includes a company match of 50% up to 15% contributed for this calendar year
- Three months severance including a three-month non-compete agreement.

Other:        The Company maintains memberships at Southern Highlands Golf Course and the Foundation Room specifically for the purposes of customer entertainment. In your role at KGI, you will have access to these facilities per the guidelines established for employees provided such access.

Because we operate in a heavily regulated industry, the position offered to you is subject to a criminal background check. This offer is contingent upon Compliance approval, a pre-employment drug test, and final approval from our Japanese parent company. Should you fail to receive Compliance approval, or test positive for the presence of an illegal or controlled substance, or not be approved by our parent company, this offer will be withdrawn. All necessary paperwork and drug test forms need to be completed at your

Ramondetta Offer                          Page 2 of 3

earliest convenience. Additionally, as a key employee of Konami Gaming, Inc. you will be subject to further criminal background checks by multiple gaming jurisdictions throughout your tenure of employment.

By accepting this offer of employment, you agree to settle any and all claims, disputes or controversies arising out of or relating to your application or candidacy for employment, employment and/or cessation of employment with KGI, *exclusively* by final and binding *arbitration* before a neutral arbitrator. By way of example only, such claims include claims under federal, state, and local statutory or common law, such as the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, as amended, including the amendments of the Civil Rights Act of 1991, the American With Disabilities Act, the law of contract and the law of tort.

Please indicate your acceptance of the terms of this offer by signing on the line provided. Your signature confirms that you do not have any restrictive covenant with your employer that would prevent you from accepting employment with KGI. Additionally, as professionals operating within this competitive industry, you have our commitment that we will not ask for, nor should you divulge, any proprietary information, including customer lists. All confidential material relative to your previous employer must and shall remain confidential.

Sincerely,

Satoshi Sakamoto, Chief Executive Officer
Konami Gaming, Inc.

Accepted by:

Lou Ramondetta                (Date)





7/28/2008

# Group Companies(America) - KONAMI

# KONAMI

HOME > About KONAMI > Group Companies > America

## Group Companies

- Oceania
- Asia
- Europe
- America
- Japan

**America**

**Konami Corporation of America**



Address          2381 Rosecrans Ave, Suite 200, El Segundo, CA 90245-4922 U.S.A.

Business Activity    U.S.-based holding company.

**Konami Digital Entertainment, Inc.**

Address          2381 Rosecrans Ave, Suite 200, El Segundo, CA 90245-4922 U.S.A.

Business Activity    Planning, production, and distribution of online games, computer & video games, amusement machines, toys, card games, contents for mobile phone, music/video,software, books, and magazines.

Website          www.konami-digital-entertainment.com

http://www.konami.co.jp/en/corporate/subsidiaries/america.html

Group Companies(America) - KONAMI

**Konami Gaming, Inc.**



| | |
|---|---|
| Address | 585 Trade Center Drive, Las Vegas, NV 89119 U.S.A. |
| Business Activity | Production, manufacturing and distribution of gaming machines |
| Website | www.konamigaming.com |

Page Top

1  LOU RAMONDETTA, *in propria persona*
   2335 Stewart Avenue
2  Walnut Creek, CA  94596
   Telephone:  (925) 989-2525
3  Facsimile:   (925) 945-1655

4
   Lewis and Roca LLP
5  3993 Howard Hughes Pkwy., Ste. 600
   Las Vegas, NV 89169
6  (702) 949-8200
   (702) 949-8398 (fax)
7
   July 29, 2008
8

9

10

11

12

13
                    UNITED STATES DISTRICT COURT
14
                   NORTHERN DISTRICT OF CALIFORNIA
15

16

17  LOU RAMONDETTA,                          )    CASE NO.: C08-01002 EDL
                                             )
18           Plaintiff,                      )    **(PROPOSED) ORDER DENYING**
                                             )    **DEFENANTS MOTION TO COMPEL**
19       v.                                  )    **ARBITRATION AND DETERMINE**
                                             )    **NEVADA AS APPLICABLE LAW**
20  KONAMI, *et al.*, Konami, Steve Sutherland, )
    Satoshi Sakamoto and Tom Jingoli         )    Date: July 19, 2008
21                                           )    Time: 9:30 pm
                                             )    Courtroom: #?, 15th floor
22           Defendants.                          Before:  Honorable Elizabeth LaPorte

23

24

25

26

27

28

    PLAINTIFF'S PROPOSED ORDER

    CASE NO. C0801002 EDL

1

2

## **PLAINTIFF'S (PROPOSED) ORDER**

3

4 Wherefore Plaintiff's (Ramondetta) filed on July 29, 2008 Opposition to Defendant's (Konami) Motion to Compel Arbitration and Dismiss; Motion to Determine Applicable Law before Hon. Judge LaPorte.

5

6 Having reviewed and considered the parties respective pleadings, papers and declarations, and having heard oral arguments, the Court makes the following findings of fact and conclusion of law:

7

8
   1           The offer contract contains an unconscionable arbitration provision and that clause of the contract should be removed.

9
   2           The Court procedure requires Plaintiff and Defendant to initiate the ADR process through this Court.

10

11
   3           Application of California Law applies in this case

12 Whereas, the Court, having considered the discussion and papers submitted in support of and in opposition to the Motion, as well as admissible evidence and counsel's arguments offered in connection therewith, finds good cause and IT IS HEREBY ORDERED THAT:

13

14 Defendants' Motions is DENIED and the litigants will initiate an ADR process prior to pending any more proceedings in this Court which this Court will hear said case pursuant to FRCP 12(b)(2), (b)(3), 28 USC 1391, 1404(a).

15

16       IT IS SO ORDERED.

17

18

19 Dated: _____                          By: _

20 _____                       The Honorable Judge LaPorte

21

22 Cc Served to:

23 Lewis and Roca LLP
   3993 Howard Hughes Parkway, Ste. 600
24 Las Vegas, NV 89169
   (702) 949-8200
25

26 (702) 949-8398 (fax)

27

28

PLAINTIFF'S PROPOSED ORDER                    -1-

CASE NO. C08-01002 EDL



1 | LOU RAMONDETTA, *in propria persona*
2335 Stewart Avenue
2 | Walnut Creek, CA 94596
Telephone: (925) 989-2525
3 | Facsimile: (925) 945-1655

4 | July 3, 2008

5

6 | UNITED STATES DISTRICT COURT

7 | NORTHERN DISTRICT OF CALIFORNIA

8

9 | LOU RAMONDETTA,                                      )        CASE NO.: C08-01002 EDL
                                                        )
10 |                 Plaintiff,                          )        **CERTIFICATE OF SERVICE**
                                                        )
11 |          v.                                         )        Date: July 29, 2008
                                                        )
12 | KONAMI, *et al.*, Konami, Steve Sutherland,         )
     Satoshi Sakamoto and Tom Jingoli                    )
13 |                                                     )
                                                        )
14 |                 Defendants.

15

16

17 | I hereby certify that on July 29, 2008, I served the forgoing by depositing a copy of mailing, first class mail, postage prepaid to the following:

18 | **Suzanne Martin**
     **Lewis and Roca LLP**
19 | 3993 Howard Hughes Parkway, Ste. 600
     **Las Vegas, NV 89119**
20 | (702) 949-8200

21

22 | And by personal delivery to the following:

23 | United States District Court
     450 Golden Gate Ave
24 | San Francisco, CA 94102
     Attn: Hon Judge White
25 | Jennifer Ottolini

26 |                                          By:        Lou Ramondetta
                                                        "pro se"
27

28

PLAINTIFF'S COMPLAINT

CASE NO. C0801002 JSW



1  LOU RAMONDETTA, *in propria persona*
   2335 Stewart Avenue
2  Walnut Creek, CA  94596
   Telephone:  (925) 989-2525
3  Facsimile:   (925) 945-1655

4
   Lewis and Roca LLP
5  3993 Howard Hughes Pkwy., Ste. 600
   Las Vegas, NV 89169
6  (702) 949-8200
   (702) 949-8398 (fax)
7

8  July 29, 2008

9

10

11

12
                    UNITED STATES DISTRICT COURT
13
                 NORTHERN DISTRICT OF CALIFORNIA
14

15
   LOU RAMONDETTA,                    )   CASE NO.:  C08-01002 EDL
16                                     )
           Plaintiff,                  )   **DECLARATIONS OF LOU**
17                                     )   **RAMONDETTA OPPOSING**
           v.                          )   **DEFENDANT'S MOTION TO DISMISS**
18                                     )   **PURSUANT TO FED. RULE CIV.**
   KONAMI,                             )   **PROC. 12(B)(2), (B)(3), USC 1391,**
19                                     )   **1404(A)**
                                       )
20         Defendants.                 )   Date: August 19, 2008
                                       )   Time: 9:30 am
21  ─────────────────────────────────     Courtroom:  #, 15th floor
                                          Before:  Honorable Judge LaPorte
22

23

24

25

26

27

28

   PLAINTIFF'S DECLARATIONS  7/29/08

   CASE NO. C0801002 EDL

# PLAINTIFF'S DECLARATIONS

1. I, Lou Ramondetta declare:

2. I have personal knowledge of the facts set forth in this declaration, and I could competently testify to them.

3. I had much of my recruitment, hiring process, interviews and agreement negotiated and signed in California.

4. I currently reside in Walnut Creek, CA with my family and did so while employed with Konami.

5. On or about January 2006, I was contacted by Eve Nam, Senior Associate, at Korn/Ferry International recruiters, based at 2600 Michelson Drive in Irvine, CA for the Vice President of Sales and Marketing role for Konami. I had a number of extensive interviews and negotiations with Nam and her boss Elliot Gordon, Senior Client Partner, who is also based in the Irvine office.

6. On February 17th, I flew to Las Vegas for a 1:30 PM interview with Steve Sutherland and Satoshi Sakamoto (SS). The discussion encompassed a number of information gathering vs. negotiation topics including the very poor historical performance of Konami, it's competitors, needed upgrading of the team, reasons for termination of a number of prior individuals in the role etc. There was only a brief mention about the regulatory nature of the industry and considering relocation.

7. I has no recollection of a formal "second round of interviews" occurring with Thomas Jingoli, Director Legal Compliance, or Bobbi Youngblood, Director, Human Resources prior to the initial February 27th offer being extended.

8. On February 27, 2006, the first offer from Konami titled "JOB OFFER – KONAMI GAMING, INC" was faxed to me in California already pre-signed by Sutherland. I had a subsequent phone call(s) with Sutherland and Nam regarding changes but never had any mention of an arbitration clause being added to a revised offer letter. On March 3, 2006 another offer letter was faxed, this time it was signed by Satoshi Sakamoto (SS) with a number of changes added that I had not discussed or agreed to. My comments on this offer letter included underlining part of the arbitration clause and a note questioning why I "give up my legal rights". I discussed these changes separately with Sutherland and Nam via phone. Sutherland said Konami would not remove or change the arbitration provision since it was a non negotiable company policy for all contracts. As a condition of employment, I was required to sign the arbitration provision as is requiring only me to submit to arbitration The final offer letter was faxed from Konami on March 16th. I discussed some hand written changes by phone. I counter-signed the final agreement, consummating and executing it in California. I faxed the offer contract back on March 24th with the discussed and agreed to changes.

9. The offer letter and arbitration provision were vague and ambiguous saying nothing about relocation being required, the timing of a potential relocation, what state law would be

PLAINTIFF'S DECLARATIONS                                   -1-

CASE NO. C08-01002 JSW

applicable, what arbitration company or individual would be used or how arbitration would be initiated.

10. I commuted from California to North America for the two months during my employment to learn my new role, travel all around North America to meet customers, evaluate my team and attend trade shows. Only a small percentage of my time was actually spend at the Las Vegas office. Despite the business and travel challenges of a Konami's turn-around situation, I spent substantial time to evaluate and view housing options including travels with various estate agents looking at high rise condos and homes in i.e. Anthem, Green Valley, Henderson etc. and I even visited some schools.

11. I was not paid any salary income or expense payments until I was forced to fly to Las Vegas, NV to sign documents falsely claiming among other things, that I was a permanent Nevada resident.

12. After less than a month of employment, Konami had decided not to pay my travel expenses to Nevada and I still hadn't received my first salary or expense reimbursement checks. I felt this was oppressive to force my immediate relocation to Nevada. I made it very clear all along to Konami that I would not consider relocation immediately since my children were still in school.

13. While traveling all over North America and learning a new job, I had to find and provide volumes of data and filled out multiple gaming documents for submission to state and province gaming authorities including having to provide in some cases 5 to 25 years or more of W2's, bank accounts and statements with dates opened and closed, mortgage documents with purchased dates, values and balances, 5 years of tax returns, birth certificates, passports, Social Security cards, marriage certificates and marriage history, high school and college degrees and transcripts, wife's personal and professional information, 25 years of past residences, references with their detailed personal information, family members with their detailed personal information and that of their spouses, education history, lawsuit history, 25 years or since being 18 of employment history, stock certificates with purchase dates, automobiles, net worth, credit card statements, trust documents, safe deposit information, etc, etc,.

14. I manually filled out the New Jersey and Ontario submission forms for licensing. I believe an "incident" prior to my 18th birthday was definitely disclosed on at least one of those forms or supplements. I believe the charges for my "incident" were completely dropped and my record was completely expunged of it. I was told by authorities subsequent to and at the time that it was completely legal and acceptable for him to answer "NO" when asked if I had ever been arrested or charged with a crime.

15. I was instructed to provide all my personal and financial information regularly to Carol Zmundo at the Compliance Department. It is largely the Compliance Department's responsibility to properly file, store, track, transfer and submit etc. all the information from the manually filled out submissions and documents regularly provided into a formal type written submission for each state or province.

PLAINTIFF'S DECLARATIONS                    -2-

CASE NO. C08-01002 JSW

1    16. I sat with Thomas Jingoli to review the wording of my submissions to make sure Jingoli
2         was comfortable with what was written including my voluntary disclosure of the incident
          before he was 18.

3    17. I was not aware or made aware that I was missing any documents including credit card
4         statements or bank statements in preparation for the Ontario interview. This was not
          intentional and all those accounts are available for review.

5    18. I was from outside the gaming industry, prior to my first meeting with any regulatory
6         gaming organization and I was given virtually no preparation from Konami or Jingoli.
          Both Sutherland and Thomas Jingoli, Director Legal Compliance where out of town for
7         my meeting. It is standard practice for someone from Konami like Jingoli, to spend a
8         substantial amount of time preparing an employee prior to an interview with gaming
          detectives. It is also standard practice for Jingoli to be available during the meeting in case
9         questions arose.

10   19. I called and spoke with Wilf Muller, the Detective Sergeant from my Ontario interview
          and also tried to call Rob Knudsen, Detective Inspector immediately after my termination
11        on June 15th. Muller said that although I were missing some items; assuming the
12        information I provided had no issues, I'd be easily recommended for Ontario registration.

13   20. At no time did Konami pay or offer to pay any fees to support the arbitration provision nor
          did they file papers to support the arbitration process they were requiring me to use. Most
14        of the so called neutral arbitrator names that were provided by Howard Cole had a
          relationship with Howard Cole's firm. It was evident to me that Konami's position was
15        not in anyway helping to initiate the arbitration provision I was trying to use to resolve my
          dispute
16

17   21. Konami unilaterally chose to terminate my employment before any potential relocation
          could happen and before any potential regulatory registrations were completed.
18
19   22. I was told in my initial interview by Sutherland and Sakamoto that Konami had a major
          revenue and customer base that they interact with regularly in California. Konami has a
          U.S. based holding company for all three divisions headquartered at 2381 Rosecrans
20        Ave., Ste 200, El Segundo, CA 90245. Konami also has another an office in California at
          1400 Bridge Pkwy, Redwood City, CA.
21
22   23. The California Department of Labor Standards Enforcement accepted jurisdiction over
          my expense case filed against Konami that I addressed separately with them setting
          precedence for California having Jurisdiction and being the right venue. On April 19th,
23        2007 in a letter from Ms. Ellen Shaffer, Sr., Deputy Labor Commissioner, she stated in
          part that California does have Jurisdiction over the matter.
24
     24. I declare under penalty of perjury that the foregoing is true and correct.
25

26

27

28

PLAINTIFF'S DECLARATIONS                    -3-

CASE NO. C08-01002 JSW

1

Executed on:  July 29, 2008

2

3

4

Lou Ramondetta

5

6

7

Served to:

8

Lewis and Roca LLP

9  3993 Howard Hughes Pkwy., Ste. 600
   Las Vegas, NV 89169

10  (702) 949-8200
   (702) 949-8398 (fax)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S DECLARATIONS                    -4-

CASE NO. C08-01002 JSW